## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAIRFAX COUNTY, VIRGINIA, et al.,  :

           Plaintiffs,  :  Civil Case No. 08-0433 (JR)

           v.  :

BANK OF AMERICA N.A.,  :

           Defendant.  :

## MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION
## FOR THE APPOINTMENT OF INTERIM CO-LEAD CLASS COUNSEL

Pursuant to Federal Rule of Civil Procedure 23(g)(2)(A), Plaintiffs respectfully ask that the Court appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") and Boies, Schiller & Flexner LLP ("BSF") Interim Co-Lead Counsel for the proposed class.[1]  Plaintiffs are authorized to state that Defendant takes no position with respect to this motion.

## I.     INTRODUCTION

The Court should appoint CMHT and BSF Interim Co-Lead Counsel for the proposed class because: (a) appointing lead counsel would facilitate the parties' ongoing, mediator-directed settlement discussions and (b) CMHT and BSF are qualified to represent the proposed class, given their substantial work to date investigating and identifying the claims in this action, and the experience, knowledge, skill, and resources that enable them to litigate this matter effectively and efficiently.  *See* Fed. R. Civ. P. 23(g)(1)(C) (listing factors courts must consider

---

[1]     This brief is filed in support of Plaintiffs' Motion for Appointment of Interim Co-Lead Class Counsel filed on March 12, 2008 (Docket Entry No. 5).

in appointing class counsel). For these reasons, which are discussed in more detail below, CMHT and BSF should be appointed Interim Co-Lead Counsel for the proposed class.

## II.     PROCEDURAL BACKGROUND

Plaintiffs began investigating anticompetitive conduct in the municipal derivatives industry approximately a year and a half ago. They also have been engaged in confidential settlement discussions with Bank of America, overseen by nationally recognized mediator and former California state court judge Daniel Weinstein of JAMS, for approximately the past seven months.

Based on their independent investigation and discussions with Bank of America, Plaintiffs filed the complaint in this action on March 12, 2008, alleging a pervasive bid-rigging and price-fixing conspiracy for municipal derivatives and naming Bank of America as the sole defendant. Plaintiffs also filed a parallel complaint on the same day against Bank of America's co-conspirators, which is also before the Court. *See Fairfax County, Virginia, et al. v. Wachovia Bank, N.A.*, Civil Action No. 08-cv-0432 (JR) (D.D.C.) (filed May 12, 2008).

Bank of America is differently situated than its co-conspirators, because: (a) it has been accepted into the Department of Justice's amnesty program; (b) it has committed to cooperating with Plaintiffs; (c) its alleged wrongdoing occurred during a shorter period than did that of its co-conspirators; and (d) the parties are engaged in mediation with the goal of achieving a class-wide settlement. Recognizing Bank of America's differing situation, and to avoid delaying the parties' ongoing settlement efforts, Plaintiffs sued Bank of America separately. The two complaints pending before this Court were the first civil complaints filed relating to this alleged antitrust conspiracy in the municipal derivatives industry.

Since filing this action, Plaintiffs have continued to meet with Bank of America to discuss settlement. The parties also have retained experienced antitrust economists to assist settlement by analyzing Bank of America's transactional data to inform negotiations over potential damages.

Several other complaints alleging the same anticompetitive conduct in the same industry against largely the same co-conspirators have since been filed in two other jurisdictions.[2] Not coincidentally, those complaints are based in large part – if not completely – on the Plaintiffs' complaint in this action. No other complaint, however, has been filed solely against Bank of America.

## III.    ARGUMENT

The Federal Rules of Civil Procedure recognize the importance of the early appointment of counsel to act on behalf of a proposed class. Rule 23(g)(2)(A) expressly grants the court the power to appoint interim co-lead counsel before determining whether to certify the action as a class action. *See* Fed. R. Civ. P. 23(g)(2)(A). Furthermore, the Advisory Committee notes for this Rule cite as a factor to consider in appointing class counsel the need to handle pressing pretrial activities prior to certification. *See* Adv. Committee Notes to Fed. R. Civ. P. 23(g)(2)(A).

Early appointment of class counsel is particularly appropriate in this case to facilitate the significant progress that Plaintiffs are making – and already have made over the past seven months – in the ongoing mediator-directed settlement talks.

---

[2]    Hinds County, Mississippi filed a substantially similar complaint against most of the defendants, including Bank of America, that Plaintiffs named in their two complaints in the Southern District of New York on March 13, 2008. *See Hinds County, Mississippi v. Wachovia Bank, N.A., et al.*, 08-cv-2516 (LTS) (S.D.N.Y.) (filed Mar. 13, 2008). Haywood County, Tennessee subsequently filed a complaint against several defendants, including Bank of America, in the Southern District of New York on March 24, 2008. *See Haywood County, Tennessee v. Bank of America, N.A., et al.*, 08-cv-3002 (LTS) (S.D.N.Y.) (filed Mar. 24, 2008). The City of Oakland, California most recently filed a complaint against virtually all of the co-conspirators, including Bank of America, in the Northern District of California on April 23, 2008. *See City of Oakland, California v. AIG Financial Products Corp., et al.*, 08-cv-2116 (JSW) (N.D. Cal.) (filed Apr. 23, 2008).

In addition, Rule 23(g)(1)(C) sets forth several factors that courts should consider in appointing class counsel:

- the work counsel has done in identifying or investigating potential claims in the action;

- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;

- counsel's knowledge of the applicable law; and

- the resources counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(C). These factors also strongly support appointing CMHT and BSF as Interim Co-Lead Counsel for the proposed class.

>    **A.    Prompt appointment of CMHT and BSF as Interim Co-Lead Counsel will facilitate the ongoing mediation between Plaintiffs and Bank of America.**

CMHT and BSF should be appointed Interim Co-Lead Counsel for the proposed class to facilitate the ongoing mediation process, a pressing pre-trial activity that counsel needs to handle, and indeed already is handling. *See* Adv. Committee Notes to Fed. R. Civ. P. 23(g)(2)(A). Granting these firms interim co-lead counsel status will facilitate negotiations by providing all parties with the requisite assurance that CMHT and BSF continue, with the Court's knowledge and authorization, to act on behalf of the proposed class. The certainty created by the requested appointment will further the parties' efforts to craft a fair, reasonable, and mutually acceptable resolution of the case.

>    **B.    CMHT and BSF are qualified to represent the proposed class pursuant to the factors listed in Rule 23(g)(1)(C).**

In addition, both firms readily satisfy the Rule 23(g)(1)(C) factors that courts consider in appointing class counsel.

1.    ***The firms have done a substantial amount of work in investigating and identifying the claims in this action.***

*First*, as discussed above, the firms have done a substantial amount of work in investigating and identifying the claims in this action. They began investigating anticompetitive conduct in the municipal derivatives industry approximately a year and a half ago. They also began confidential settlement discussions with Bank of America, overseen by the Honorable Daniel Weinstein, about seven months ago. Based on this work, Plaintiffs filed this action against Bank of America and the parallel action against its co-conspirators. These were the first civil suits filed in the country alleging this bid-rigging and price-fixing conspiracy in the municipal derivatives industry, and sparked the copycat suits. Indeed, a comparison of Plaintiffs' complaints with the subsequently filed complaints reveals just how much the other counsel relied on CMHT's and BSF's work in drafting their own complaints.[3]

In addition, CMHT and BSF have continued to put substantial resources into this action after they filed the complaint. They have had numerous post-filing meetings and discussions with Bank of America concerning the alleged anticompetitive conduct. Both sides have retained well-regarded economists to analyze potential damages models. Accordingly, this factor strongly favors appointing these firms Interim Co-Lead Counsel.

2.    ***The firms have the requisite experience, knowledge, and resources.***

*Second*, the firms possess the requisite experience, knowledge, and resources to skillfully and efficiently handle this litigation on behalf of the proposed class. Indeed, they are among the most experienced and reputable attorneys in the country in the prosecution of complex antitrust class actions. They repeatedly have served as lead counsel in such cases and will be able to draw upon their experience and resources to represent Plaintiffs and the proposed class in this

---

[3]    *See* copies of follow-on complaints attached hereto as Exhibit A.

litigation. In fact, CMHT and BSF are among the limited number of trial attorneys who successfully have brought defendants to trial in antitrust class actions in recent years and won major jury verdicts, including in this District in *In re Vitamins Antitrust Litigation*, before the Hon. Thomas F. Hogan. CMHT and BSF also have worked together to secure settlements praised by courts in written opinions not merely as fair and reasonable, but as records in the antitrust field. Brief summaries of their resumes (which are attached as Exhibits B and C) and accomplishments follow.

CMHT is a highly respected leader of the plaintiffs' antitrust bar. The firm has a unique knowledge of antitrust class actions and unparalleled experience in prosecuting such cases. With over 70 attorneys, it is one of the largest firms in the nation dedicated primarily to the prosecution of class actions. It also has one of the largest plaintiffs' antitrust class action practices in the bar, with approximately 30 attorneys dedicated to the practice. In 2007, CMHT became the first plaintiffs' class action firm to open an office outside of the United States, when it opened in London, in recognition of the need to combat international cartels through a multi-jurisdictional approach. The firm's attorneys bring to their practice experiences rare in the plaintiffs' bar, including clerkships on the Supreme Court and leading Circuit and District Courts.

CMHT, together with BSF, acted as trial counsel in one of only a handful of recorded class action antitrust cases in the past decade prosecuted through a jury trial, *In re Vitamins Antitrust Litigation*. In that case, which concerned price-fixing and market allocation claims in an international cartel, trial counsel Michael Hausfeld of CMHT and William Isaacson of BSF won a jury verdict after a three week trial in this District against four non-settling defendants of $49.5 million (10% more than was requested from the jury), which was then trebled to $148.5 million.

The CMHT team working on this litigation is headed by Michael Hausfeld, one of the most respected members of the plaintiffs' class action and antitrust bar. Mr. Hausfeld has a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing. Chief Judge Edward Korman (E.D.N.Y.) has noted that Mr. Hausfeld is one of the two "leading class action lawyers in the United States." He has been profiled in, and recognized by, many articles and surveys. He was named one of thirty master negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiatiors*, by Michael Benoliel, Ed.D. *The Wall Street Journal* profiled him and his practice, he has been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America," and *The New York Times* referred to him as one of the nation's "most prominent antitrust lawyers."

BSF is one of the most experienced law firms in the field of class actions and complex antitrust litigation in the United States, and has a demonstrated ability to prepare and try complex cases to verdict. It has over 230 attorneys in nine offices throughout the country. BSF principally specializes in the trial of highly complex litigation, and its partners have litigated some of the most significant antitrust cases in recent times, both in terms of the legal issues at stake and the recoveries obtained for consumers and businesses.

In addition to the firm's work in *In re Vitamins Antitrust Litigation*, Mr. Isaacson, as lead counsel, won a jury verdict in the Northern District of Ohio in 2006 in *In re Scrap Metal Antitrust Litigation*. That multi-week trial of price-fixing and market allocation claims resulted in an $11.5 million verdict and a $23 million award after trebling and judgment reduction from other settlements.

Mr. Isaacson, a partner at BSF since its inception in 1997, leads the BSF team in this litigation. He is a former law clerk for Chief Judge Harrison L. Winter of the United States Court of Appeals for the Fourth Circuit. In addition to his role as trial counsel for class plaintiffs in *In re Vitamins Antitrust Litigation* and *In re Scrap Metal Antitrust Litigation*, Mr. Isaacson recently was appointed interim co-lead counsel for the proposed class in *In re Graphics Processing Units Antitrust Litigation*. He also has acted as lead counsel in *In re First Databank Antitrust Litigation*, 205 F.R.D. 408 (D.D.C. 2002) (approving $24 million settlement), among other class actions. He also filed the first class actions uncovering cartels in the vitamin C industry in China and among magnesite producers in China.

In addition to the exemplar jury verdicts discussed above, CMHT and BSF have secured numerous significant settlements in antitrust class actions. For example, in *In re Vitamins Antitrust Litigation*, the firms secured a $1.1 billion settlement on behalf of the class. As the court noted:

> The Settlement is unprecedented for many reasons: the percentage rate on which the Agreement is predicated is in the highest tier of settlements for price-fixing class actions; the total dollar value to the class is the largest settlement of a price-fixing class action[.]

*In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000). And in *In re Auction Houses Antitrust Litigation*, BSF obtained a $512 million settlement:

> Indeed, there could be no greater testament to the process than some of the comments made at the settlement hearing by two of the interim lead counsel who were ousted as a result of the Court's decision to hold an auction to select lead counsel. Mr. Furth, on behalf of all of the interim lead counsel, said that he 'never in [his] fondest dreams . . . believed that these defendants would pay $512 million' and that this settlement 'is the most outstanding result I have ever heard of in the history of the antitrust laws.

*In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648 (LAK), 2001 WL 170792, at *6 (S.D.N.Y. Feb. 22, 2001).

As the firms' resumes demonstrate, they possess unparalleled experience in handling antitrust class actions and other complex litigation, command superior knowledge of antitrust and class certification law, and will commit whatever resources are necessary to represent the proposed class. Accordingly, application of the Rule 23(g)(1)(C) factors strongly favors appointment of CMHT and BSF as interim co-lead counsel.

## IV.     CONCLUSION

The posture of the mediation process between the parties justifies the appointment of CMHT and BSF as Interim Co-Lead Counsel for the proposed class. The fact that these firms clearly are qualified, willing, and able to vigorously represent the proposed class further supports these firms' appointment. Accordingly, Plaintiffs respectfully request that the Court appoint CMHT and BSF to be Interim Co-Lead Counsel for the proposed class.

Dated: May 9, 2008

By: _Michael D. Hausfeld / by CC_

Michael D. Hausfeld (DC Bar No. 153742)
Richard A. Koffman (DC Bar No. 461145)
Megan E. Jones (DC Bar No. 467255)
Christopher J. Cormier (DC Bar No. 496384)
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

William A. Isaacson (DC Bar No. 414788)
Tanya Chutkan (DC Bar No. 420478)
Jonathan Shaw (DC Bar No. 446249)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131

Jonathan W. Cuneo (DC Bar No. 939389)
Daniel M. Cohen (DC Bar No. 470056)
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
Telephone:  (202) 789-3960
Facsimile:  (202) 789-1813

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS
PLLC
1200 New Hampshire Avenue, NW
Suite 570
Washington, DC 20036
Telephone:  (202) 659-8000
Facsimile:  (202) 659-8822

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street
28th Floor
Philadelphia, PA 19103
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872

Samuel D. Heins
Vincent J. Esades
Dylan J. McFarland
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
One Embarcadero Plaza
San Francisco, CA 94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643

Robert G. Eisler
COHEN, MILSTEIN, HAUSFELD & TOLL
P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

Carol V. Gilden
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone:  (312) 357-0370
Facsimile:  (312) 357-0369

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone:  (716) 664-2967
Facsimile:  (716) 664-2983

10

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone:     (415) 421-3400
Facsimile:     (415) 421-2234

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone:  (215) 564-5182
Facsimile:  (215) 569-0958

Precious Martin Senior
PRECIOUS MARTIN SENIOR &
ASSOCIATES PLLC
821 North Congress St.
P.O. Box  373
Jackson, MS 39205-0373
Telephone:  (601) 944-1447
Facsimile:  (601) 944-1448

Arnold Levin
Laurence S. Berman
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone:  (215) 592-1500
Facsimile:  (215) 592-4663

Brian K. Herrington
BRENT COON & ASSOCIATES
6360 I-55 North
Suite 340
Jackson, MS 39211
Telephone:  (601) 957-6177
Facsimile:  (601) 957-6507

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401
Telephone:  (843) 723-9804
Facsimile:  (843) 723-7446

Steven A. Kanner
FREED KANNER LONDON &
 MILLEN LLC
2201 Waukegan Rd.,
Suite 130
Bannockburn, IL 60015
Telephone:  (224) 224-632-4500
Facsimile:  (224) 632-4521

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS  39211
Telephone:  (601) 977-5253
Facsimile:  (601) 977-5236

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

Paul F. Bennett
Steven O. Sidener
C. Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA  94105
Telephone:  (415) 777-2230
Facsimile:  (415) 777-5189

*Attorneys for One or More Individual Plaintiffs*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| HINDS COUNTY, MISSISSIPPI on behalf of itself and all other similarly situated State and municipal entities, | **08 CV** |
| Plaintiff, | Civil Action No. |
| v. | |
| WACHOVIA BANK N.A..; AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.; BEAR, STEARNS & CO., INC.; FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.; FINANCIAL SECURITY ASSURANCE, INC.; FINANCIAL GUARANTY INSURANCE COMPANY; GE FUNDING CAPITAL MARKET SERVICES, INC.; TRINITY FUNDING CO., LLC; GENWORTH FINANCIAL INC.; NATIXIS S.A. F/K/A IXIS CORPORATE AND INVESTMENT BANK; JP MORGAN CHASE & CO.; LEHMAN BROTHERS INC.; MERRILL LYNCH & CO, INC.; MORGAN STANLEY; NATIONAL WESTMINSTER BANK PLC; PIPER JAFFRAY & CO.; SOCIÉTÉ GÉNÉRALE SA; UBS AG; XL ASSET FUNDING COMPANY LLC; XL LIFE INSURANCE & ANNUITY, INC.; NATIXIS FUNDING CORP. F/K/A CDC FUNDING CORP.; INVESTMENT MANAGEMENT ADVISORY GROUP, INC.; BANK OF AMERICA N.A; CDR FINANCIAL PRODUCTS; FELD WINTERS FINANCIAL LLC; WINTERS & CO. ADVISORS, LLC; FIRST SOUTHWEST COMPANY; GEORGE K. BAUM & CO.; KINSELL NEWCOMB & DE DIOS INC.; PACKERKISS SECURITIES, INC.; SHOCKLEY FINANCIAL CORP.; SOUND CAPITAL MANAGEMENT, INC.; CAIN BROTHERS & CO., LLC; and MORGAN KEEGAN & CO., INC. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |



1

## NATURE OF CASE

1.      This case involves a conspiracy among Defendants to fix, raise, maintain or

stabilize the price of, and to rig bids and allocate customers and markets for, Municipal

Derivatives (as defined below) sold in the United States and its territories.

2.      The United States Department of Justice's Antitrust Division, the Internal

Revenue Service, and the Securities and Exchange Commission are investigating industry-wide

collusive practices in the two-hundred year old municipal bond industry.  A grand jury

investigation currently is being conducted by the Antitrust Division in the United States District

Court for the Southern District of New York.  Approximately thirty large commercial and

investment banks, insurance companies, and brokers have been subpoenaed, and the offices of

three brokers have been raided by the Federal Bureau of Investigation.  Numerous employees

and former employees of various Defendants recently received letters notifying them that they

are regarded as targets of the grand jury investigation concerning antitrust and other violations

regarding contracts related to municipal bonds.

3.      According to published reports, Defendant Bank of America has been

conditionally accepted into the Antitrust Division's amnesty program, in connection with which

there was disclosure of information regarding the conspiracy described below and the promise to

provide full and complete cooperation to the Antitrust Division and the Class.  The inevitable

and practical result of this illegal conduct affected the market prices of municipal derivatives.

4.      Plaintiff brings this action to seek civil redress for injuries suffered as a result of

the conspiracy on behalf of itself and all state, local and municipal government entities and their

agencies, that purchased Municipal Derivatives in the United States and its territories directly

from one or more of the Provider Defendants (as defined below) and/or through one or more

Broker Defendants (as defined below) in the period from January 1, 1992 through December 31,

2006 (the "Class Period"). At all relevant times, Defendants issued and/or sold Municipal

Derivatives. During the Class Period, Defendants agreed, combined, and conspired with each

other to fix prices, and to rig bids and allocate customers and markets, of Municipal Derivatives

sold in the United States and its territories. As a result of that unlawful conduct, Plaintiff and the

Class (as defined in this Complaint) paid artificially inflated effective prices for these contracts,

including the ancillary fees and other costs and expenses related thereto, and therefore have

suffered injury to their business and property.

## JURISDICTION AND VENUE

5.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys'

fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by

reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16

of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class

Period the Defendants resided, transacted business, were found, or had agents in this District, and

because a substantial portion of the affected interstate trade and commerce described herein is

and has been carried out in that District.

## PLAINTIFF

8.    Plaintiff Hinds County, Mississippi purchased one or more Municipal Derivatives from at least one Provider Defendant and/or through at least one Broker Defendant during the Class Period.

## DEFENDANTS

9.    The entities listed below are collectively referenced herein as "Provider Defendants."

10.    Provider Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, AIG Financial issued and sold Municipal Derivatives to members of the Class.

11.    Provider Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.

12.    Provider Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class.

13.    Provider Defendant Financial Security Assurance Holdings, Ltd. ("FSAHL") is a New York corporation with its principal place of business in New York, New York. During the Class Period, FSAHL issued and sold Municipal Derivatives to members of the Class.

14.    Provider Defendant Financial Security Assurance, Inc. ("FSAI") is a New York corporation with its principal place of business in New York, New York. During the Class

Period, FSAI issued and sold Municipal Derivatives to members of the Class. FSAI and FSAHL are referred to collectively herein as "FSA."

15.    Provider Defendant Financial Guaranty Insurance Company ("FGIC") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, FGIC issued and sold Municipal Derivatives to members of the Class.

16.    Provider Defendant Trinity Funding Co. LLC ("GE Trinity"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a New York limited liability corporation with its principal place of business in New York, New York. During the Class Period, Trinity issued and sold Municipal Derivatives to members of the Class.

17.    Provider Defendant GE Funding Capital Market Services, Inc. ("GE Funding"), a member of the GE Funding Capital Market Services Group (GE Funding CMS), is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

18.    Provider Defendant Genworth Financial Inc. ("Genworth Financial") is a Delaware corporation with its principal place of business in Richmond, Virginia. During the Class Period, Genworth Financial issued and sold Municipal Derivatives to members of the Class.

19.    Provider Defendant Natixis S.A. f/k/a IXIS Corporate and Investment Bank ("IXIS") is a French corporation with its principal place of business in Paris, France. During the Class Period, IXIS issued and sold Municipal Derivatives to members of the Class.

20.    Provider Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

21.    Provider Defendant Lehman Brothers Inc. ("Lehman Brothers" is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman Brothers is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

22.    Provider Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

23.    Provider Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

24.    Provider Defendant National Westminster Bank plc ("NatWest") is a public limited company with its principal place of business in London, England. During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a subsidiary of Royal Bank of Scotland.

25.    Provider Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

26.    Provider Defendant Société Générale SA ("Société Générale") is a French corporation with its principal place of business in Paris, France. During the Class Period, Société Générale issued and sold Municipal Derivatives to members of the Class.

6

27.    Provider Defendant AIG SunAmerica Life Assurance Co. ("SunAmerica") is an Arizona corporation with its principal place of business in Los Angeles, California. During the Class Period, SunAmerica issued and sold Municipal Derivatives to members of the Class.

28.    Provider Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

29.    Provider Defendant Wachovia Bank N.A. ("Wachovia") is a national chartered banking association with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

30.    Provider Defendant Security Capital Assurance Inc. ("Security Capital Assurance") is a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the Class Period, Security Capital Assurance issued and sold Municipal Derivatives to members of the Class.

31.    Provider Defendant XL Asset Funding Company LLC ("XL Asset Funding") is a limited liability company with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Asset Funding issued and sold Municipal Derivatives to members of the Class.

32.    Provider Defendant XL Life Insurance & Annuity, Inc. ("XL Life Insurance") is a subsidiary of XL Life & Annuity Holding Co. with its principal place of business in Schaumburg, Illinois. During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class. XL Asset Funding and XL Life Insurance are referred to collectively herein as "XL."

## BROKER DEFENDANTS

33.    The entities listed below are collectively referred to herein as "Broker

Defendants."

34.    Broker Defendant Natixis Funding Corp. f/k/a CDC Funding Corp. ("CDC") is a

New York corporation with its principal place of business in New York, New York. During the

Class Period, CDC acted as a broker for members of the Class in purchasing Municipal

Derivatives from the Provider Defendants. CDC also functioned on some deals as a Provider,

and to the extent it did so, is also referenced herein as one of the Provider Defendants.

35.    Broker Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. During

the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal

Derivatives from the Provider Defendants.

36.    Broker Defendant CDR Financial Products ("CDR") is a California corporation

with its principal place of business in Beverly Hills, California. During the Class Period, CDR

acted as a broker for members of the Class in purchasing Municipal Derivatives from the

Provider Defendants.

37.    Broker Defendant Feld Winters Financial LLC ("Feld Winters") is a California

limited liability company with its principal place of business in Sherman Oaks, California.

During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing

Municipal Derivatives from the Provider Defendants.

38.    Broker Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

39.    Broker Defendant First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas. During the Class Period, First Southwest acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

40.    Broker Defendant George K. Baum & Co. ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri. During the Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

41.    Broker Defendant Kinsell Newcomb & De Dios Inc. ("Kinsell") is a California corporation with its principal place of business in Carlsbad, California. During the Class Period, Kinsell acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

42.    Broker Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation, with its principal place of business in Delray Beach, Florida. During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from the Provider Defendants.

48.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## DEFINITIONS AND BACKGROUND

### Municipal Bonds

49.     Municipal bonds are issued by states, cities, and counties, or their agencies (collectively "issuers") to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants.  The issuer typically uses proceeds from a bond sale to pay for capital projects or for other purposes for which it cannot or does not desire to pay immediately with available funds.

50.     Because of the tax-exempt status of most municipal bonds, investors usually accept lower interest payments than on other types of borrowing.  This makes the issuance of bonds an attractive source of financing to many government entities, as the borrowing rate available in the open market is frequently lower than what is available through other channels.

51.     Municipal bonds bear interest at either a fixed or variable rate of interest.  The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span at least several years.

52.    In order for municipal bonds to maintain their tax-exempt status, Internal Revenue Service regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

53.    Municipal bond proceeds typically are put into three types of funds to serve their purpose within the anticipated life of the project. The largest fund is known as the project fund or construction fund and, as its name implies, is used to pay for the construction or public works project at hand. The two smaller funds are administrative in nature, and ensure that the project fund is adequately funded and that the investors recoup their investment. The debt service fund, or "sinking fund," contains the money used to make principal and interest payments on the bond. The payments out of this fund usually are due semi-annually, although the principal portion of the payment may only be due annually. The debt service reserve fund ensures that if unforeseen contingencies occur, debt obligations can still be paid.

54.    Because municipal bonds typically are used to fund multi-year projects, most of a given bond's proceeds cannot or need not be spent in one lump sum. Rather, the proceeds are spent at regularly set intervals, and are invested to earn interest until they are put to use for their stated purpose.

55.    The municipal bond industry is extremely large. Approximately $385 billion worth of municipal bonds was issued in 2006 according to the Securities Industry and Financial Markets Association. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

## Municipal Derivatives

56.    The investment vehicles in which issuers invest their bond proceeds until they are ripe for use are known as Municipal Derivatives.  Municipal Derivatives is an umbrella term that refers to a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings while they are waiting to be spent for their given purposes.

57.    Municipal Derivatives are provided by highly rated insurance companies and large commercial and investment banks, and they typically are sold to government entities. Municipal derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

58.    When government entities desire to purchase municipal derivatives, they frequently will engage a broker to obtain the best possible price for such derivatives either by arranging an auction among multiple issuers of municipal derivatives or otherwise.

59.    Municipal Derivatives are grouped generally into two categories, pertaining either to (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations. The former category of Municipal Derivatives is known broadly as Guaranteed Investment Contracts, while the latter category of Municipal Derivatives includes instruments such as Swaps, Options, Collars, and Floors.

60.    A Guaranteed Investment Contract, commonly known as a GIC, is an investment agreement, secured by a contract with a financial institution (i.e., provider), which guarantees a fixed rate of return and a fixed date of maturity.  GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a company agrees to guarantee a fixed or variable rate of interest or a future

payment that is based on an index or similar criteria that is payable at a predetermined date on monies that are deposited with the company.[1] The types of investment agreements that the Internal Revenue Service generally references as GICs are: (a) Forward Purchase or Forward Delivery Agreements; (b) Repurchase Agreements or Collateralized GICs; (c) Unsecured or Uncollateralized GICs; and (d) Advance Refunding Escrows.

61.    A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers (i.e. municipalities and other entities authorized to issue bonds) can request bids based on rate of return or on upfront payments, although the latter is the norm. This is an agreement wherein the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. Forward contracts are generally entered into in the over-the-counter markets. A forward may be used for any number of purposes. For example, a forward may provide for the delivery of specific types of securities on specified future dates at fixed yields for the purpose of optimizing the investment of a debt service reserve fund. A forward also may provide for an issuer to issue and an underwriter to purchase an issue of bonds on a specified date in the future for the purpose of effecting a refunding of an outstanding issue that cannot be advance refunded.

62.    A Repurchase Agreement or Collateralized GIC is an agreement consisting of two simultaneous transactions whereby the issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an

---

[1] Interest rates for Municipal Derivatives typically are calculated pursuant to LIBOR or BMA rates. LIBOR refers to the London Interbank Offered Rate, the standard rate for quoting interbank lendings of Eurodollar deposits, while BMA refers to the Bond Market Association Index.

agreed-upon rate of return. This is known as a collateralized GIC because the issuer possesses securities as collateral for the GIC until the maturity date.

63.    An Unsecured or Uncollateralized GIC does not involve associated securities and functions like a savings account. It is used most often for construction or project funds. In the bidding process, the issuer sets forth a proposed draw down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period. These agreements typically have terms addressing flexibility issues regarding, for example, requirements to pay or not pay penalties for not meeting deadlines, such as construction benchmarks.

64.    An Advance Refunding Escrow is when the proceeds of the refunding issue (a bond issued to refund an outstanding bond) are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

65.    A Swap is a type of investment agreement frequently used with respect to interest rate obligations. It is the sale of a security and the simultaneous purchase of another security for purposes of enhancing the investor's holdings. A swap may be used to achieve desired tax results, to gain income or principal, or to alter various features of a bond portfolio, including call protection, diversification or consolidation, and marketability of holdings. There are several types of swaps: (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (i.e., LIBOR or BMA).

66.    An Option is one of two types: a Put Option or a Call Option. A Put Option is a provision in a bond contract where the investor has the right, on specified dates after required

notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price (usually par value). A Call Option is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof (plus, in certain cases, an additional amount representing a redemption premium) as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date (often referred to as the "call").

67.    A Collar is an agreement entered into by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. It is used typically on variable rate debt, the maximum and minimum interest rates that establish a range within which the rate of interest to be paid on the debt must remain, regardless of whether the method for determining the variable rate would otherwise provide for a rate of interest above the maximum interest rate or below the minimum interest rate.

68.    A Floor (also known as an interest rate floor), typically used as part of an interest rate collar for variable rate debt, is an agreement whereby the issuer agrees to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor and the actual lower rate on the debt. It is used typically on variable rate debt, the minimum interest rate that can be paid on the debt, regardless of whether the method for determining the variable rate would otherwise provide for a lower rate of interest.

69.    The municipal bond industry is very large. A substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives.

70.    The Municipal Derivatives industry is relatively concentrated. On information and belief, there are no more than 20 major providers of Municipal Derivatives in the United States. With respect to GICs in particular, an article from The Bond Buyer, the preeminent trade publication for the municipal bond industry, placed the number of "major dealers" throughout the United States at 10 to 12. On the other hand, the same publication places the number of issuers in the tens of thousands.

71.    In a competitive marketplace, providers would be expected to compete against each other for issuers' business on the basis of the highest rate of return for Municipal Derivatives that they could earn for issuers, subject to Internal Revenue Service rules that prevent issuers from generally engaging in arbitrage.

### IRS Rules and Regulations

72.    Internal Revenue Service rules and their corresponding regulations prevent issuers from earning arbitrage (i.e., profit) off of their tax-exempt bond proceeds, subject to certain exceptions. *See* Internal Revenue Code § 148(a) (stating that tax-exempt bonds can become "arbitrage bonds" and become taxable if any portion of the proceeds are used directly or indirectly to acquire investments that have yields greater than the yield on the underlying bond); *see also* Internal Revenue Code §§ 148(c), (d) and (e) (enumerating exceptions to this principle). Specifically, the yield from the municipal derivative cannot exceed the bond's yield by 0.001%, or it will be deemed arbitrage. In addition, providers cannot divert arbitrage earnings, meaning that they cannot "burn" an otherwise arbitrage yield by charging the issuer a higher fee and reducing the yield by the amount of the fee in order to comply with the rules.

17

73.     The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates. The rules and regulations, therefore, require all profits made on tax exempt bond investments to be rebated to the IRS, absent an exception.

74.     Another group of IRS regulations sets forth the procedure for establishing the fair market value of GICs. *See* Treasury Reg. § 1.148-5(d)(6). These regulations govern the bidding process for GICs, and there is a rebuttable presumption that a fair price is obtained for GICs procured in compliance with these regulations. Key regulations include the following:

(a)     The bid specifications must be in writing;

(b)     The bid specifications must be timely forwarded to potential providers;

(c)     The bid specifications must contain all material terms (*i.e.*, the term directly or indirectly affects yield);

(d)     The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

(e)     The bid specifications must be commercially reasonable;

(f)     There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

(g)     The bid specifications must contain a reasonably expected draw down schedule;

18

(h)    All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

(i)    The issuer must receive at least three bids from solicited providers.

75.    The winning bid is the bid with the highest yielding bona fide offer net of broker fees. Broker fees usually are listed in the bid specifications. The winning provider must certify that administrative costs (such as bond counsel fees and broker fees) are paid to third parties on behalf of the issuer. In addition, the issuers must keep records of all bids for a minimum of three years after the last outstanding bond from the bid has been paid.

76.    The intent and purpose behind the Internal Revenue Service's safe harbor regulations is to provide a fair, competitive, and transparent process for issuers to obtain the best possible price for tax-exempt Municipal Derivatives. But due to the concerted effort of Defendants during the Class Period to conspire to fix prices and rig bids and customers and markets – as opposed to competing – this laudable goal was not realized.

## FACTUAL ALLEGATIONS

77.    The Department of Justice's Antitrust Division, the Internal Revenue Service, and the Securities and Exchange Commission are all conducting investigations into industry-wide collusive practices in the Municipal Derivatives Industry. The investigations of the IRS and the Antitrust Division are discussed in more detail below.

### Internal Revenue Service Investigation

78.    The IRS was the first agency to launch an investigation. Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in

19

taxes by engaging in abusive arbitrage devices. The IRS was concerned that some GIC providers were overcharging issuers for GICs and other investment products. This would artificially lower, or "burn," investment yields below the bond yield. The spread between the investment and bond yields was then passed to the provider, rather than rebated to the IRS as required by the federal tax laws.

79.    Several settlements have resulted from the IRS's investigation into abusive arbitrage devices. On February 7, 2007, Defendant Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities. In addition, Broker Defendant George K. Baum & Co. settled allegations with the IRS that it illegally diverted profits on municipal bond deals. That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001. According to relevant documents, Bank of America provided the GIC, on at least one of the Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc. Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant, hidden payment to Baum.

80.    In addition to the regulations concerning arbitrage, the IRS regulations governing GIC bidding – as well as the federal antitrust laws – also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing and bid-rigging and kickbacks. Indeed, in January 2005, the IRS's office of tax exempt bonds said that it found pervasive evidence of bid-rigging for GICs.

## Antitrust Division Investigation

81.    In light of these revelations, the Antitrust Division of the Department of Justice commenced its own investigation in the bid-rigging in the Municipal Derivatives markets.  For the better part of two years, the Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives.

82.    On November 15, 2006, the Federal Bureau of Investigation raided the offices of and seized documents from three Broker Defendants:  CDR, IMAGE, and Sound Capital Management.

83.    Following the FBI raids, the Broker and Provider Defendants were served with subpoenas.  The subpoenas sought detailed information from the companies dating back to 1992, including organizational charts, lists of directors and officers, employees' birth dates and home addresses, calendars and appointment books, travel and expense records, telephone records, and all records relevant to the awarding of bids.

84.    On December 11, 2006, prosecutors based out of the Antitrust Division's New York field office that were tasked with investigating the alleged bid-rigging brought their case to a federal grand jury sitting in the Southern District of New York.

### The U.S. Department of Justice Grants Conditional Amnesty to Bank of America

85.    On February 9, 2007, Bank of America, the second largest U.S. bank, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program.  The DOJ's

investigation has since been expanded to include other types of Municipal Derivatives in addition to GICs.

86.    On February 9, 2007, Bank of America issued a press release and stated the following:

> Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry.  This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.
>
> The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.
>
> . . .
>
> In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS relating to the company's role in providing guaranteed investment contracts and other agreement in connection with certain "blind pool" bond transactions.

87.    On February 12, 2007, Bond Buyer reported that "[s]ources said that key derivatives officials at the bank were on 'administrative leave,' including Dean Pinard, who had managed the bank's derivatives department in Charlotte, N.C., and had recently moved to New York City.  One colleague said Pinard, who could not be reached, "was on administrative leave with no date for returning."  The Bond Buyer also reported that "When the criminal investigation was announced in November, attorneys representing several firms approached the [Justice Department] and were told amnesty was no longer available.".

88.    On February 28, 2008, Bank of America, in its SEC Form 10k at page 123, stated the following:

> Municipal Derivatives Matters
>
> The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA, from the early 1990s to date. The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA [Defendant Bank of America] received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.
>
> On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants.

### Numerous Press Accounts and Company Filings Detail the Extent of the Government's Investigations

89.    On January 6, 2005, The Bond Buyer reported the following:

> The heightened concerns about GIC transactions come as regulators have obtained evidence showing that bid rigging is much more prevalent in the municipal market than believed.

"It looks like bid rigging is wider and more pervasive than we thought," said Charles Anderson, field operations manager for the IRS' tax-exempt bond office . . .

"I think the investigation is broadening at this point," said Mark Scott, director of the tax-exempt bond office, who also declined to provide any specific details.

. . .

With as many as 20 IRS investigations of GIC bid rigging ongoing in the municipal market, the agency has increasingly found over the past year that some firms are providing so-called courtesy bids, or unrealistic bids, for GICs.

. . .

"When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided," Scott said.

These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," Scott said. "We have seen transactions where the winning bid is the only bid high enough to make the deal work."

. . .

"That's basically what we've been doing . . . is following those, what I like to refer to as 'tentacles of abuse,'" [the IRS's Scott] said. "It's hard to say how widespread the problem is, but there is a significant problem out there at this point."

. . .

The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

90.    On November 16, 2006, the Bloomberg news agency ("Bloomberg") reported the

following:

U.S. law enforcement agents seized documents from three brokers and subpoenaed companies including bond insurers and **General**

24

**Electric Co.** in a criminal investigation of whether banks and financial firms conspired to rig bids for investment deals done with local governments.

The probe by the U.S. Justice Department centers on guaranteed investment contracts, which municipalities buy to hold bond money until funds are needed to pay for projects. The contracts are what banks and brokers used to invest at least $7 billion of proceeds from bonds issued by local governments across the U.S.; that money was never spent to benefit the public, according to an Oct. 4 Bloomberg news report.

"'There's a lack of transparency in the whole market,' said Dan Veres, executive vice president of Grant Street Group, a Pittsburgh-based firm that conducts guaranteed investment contract auctions on its Web site. "'It is ripe for abuse, the whole process."

Federal Bureau of Investigation agents searched **CDR Financial Products** of Beverly Hills, California, said Laura Eimiller, a spokeswoman for the FBI in Los Angeles, without providing further details.

**CDR** had a secret agreement with the provider of a guaranteed investment contract for bonds issued in 1999 by an authority in Gulf Breeze , Florida, Bloomberg News reported on Oct. 4. The deal allowed **CDR** to increase its fees if none of $220 million in bond proceeds was used for its intended purpose – affordable housing.

In an e-mailed statement, **CDR** confirmed it was asked to provide documents to the Justice Department. The firm, which says it has handled almost $160 billion of transactions including guaranteed investment contracts as a financial adviser and a broker, said it is cooperating fully with investigators.

. . .

**Financial Security Assurance Holdings Ltd.,** a unit of Brussels-based financial services company **Dexia SA,** yesterday said it was subpoenaed by the Justice Department.

**FGIC Corp.,** a New York-based bond insurer, also received a Justice Department subpoena, Brian Moore, a spokesman for the company, said today. Moore said **FGIC,** a former unit of Fairfield, Connecticut-based **General Electric,** had exited the

guaranteed investment contract business in 2003 when **GE** sold the company. The outstanding contracts remained with **GE**.

...

**GE** also received a subpoena as part of the U.S. probe, said GE spokesman Russell Wilkerson.

**Security Capital Assurance Ltd.**, a Bermuda-based bond insurance unit of **XL Capital Ltd.**, today said a unit received a grand jury subpoena from the antitrust division of the U.S. Attorney's Office for the Southern District of New York. **XL Capital** also said a unit received a subpoena from the U.S. Securities and Exchange Commission related to a probe of guaranteed investment contract brokers, without specifying the subsidiary.

Federal investigators took documents yesterday from **Investment Management Advisory Group Inc.**, a broker of guaranteed investments contracts and a municipal derivatives adviser based in Pottstown, Pennsylvania, said Gene Grabowski, a spokesman for the firm, known as **IMAGE**.

"**IMAGE** received a subpoena from the antitrust division of the U.S. Department of Justice and the company is cooperating fully with the authorities,' the firm said in a written statement last night. "It is our understanding that subpoenas have been issued to numerous other firms and that the investigation is industry wide . . . "

Today, a third guaranteed investment contract broker, Eden Prarie, Minnesota-based **Sound Capital Management Inc.**, said federal investigators seized documents from the firm and also served a subpoena for more documents.

...

The actions by the Justice Department show that an investigation into how banks compete for the right to reinvest money raised in the $2 trillion tax-exempt bond market has expanded beyond the IRS. The IRS has been looking into whether brokers awarded the work to favored banks, potentially boosting the cost of the investment agreements and depriving the federal government of tax revenue.

The Justice Department is conducting an "investigation of anticompetitive practices in the municipal bond industry," said spokeswoman Kathleen Bloomquist.

The IRS's office of tax-exempt bonds said in January 2005 that it found pervasive bid-rigging for guaranteed investment contracts.

. . .

**CDR's** handling of investment bids for the city of Atlanta has already come under scrutiny. The IRS last year told officials from Atlanta that the city may have overpaid for a $453 million guaranteed investment contract from **Bank of America Corp.** in an auction run by **CDR**. The contract was for money raised by a 1999 water and sewer bond.

A **Bank of America** employee who bid for the Atlanta bond work, Doug Campbell, was fired after disclosing that he paid $57,393 to **CDR** for transactions in which it played no role.

The employee said in internal e-mails that the payments were made to bolster his relationship with **CDR**. Campbell also wrote that he made similar payments to another broker of guaranteed investment contracts, Los Angeles-based **Winters & Co.,** and **PaineWebber Inc.**, now a unit of Zurich-based **UBS AG** and a rival bidder for investment contracts.

. . .

Charles Anderson, manager of field operations for the IRS's tax-exempt bond division, told bond lawyers in May that the agency is investigating cases where providers of guaranteed investment contracts paid kickbacks to the brokers who evaluated their bids for the agreements . . .

The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. According to documents obtained from the authority, the IRS said it was concerned about quarterly payments made by Paris-based **Societe Generale**, France's third-biggest bank, to **CDR**, which structured the transaction and evaluated bids for the investment agreement.

New York-based **Financial Security Assurance** was one of the four that bid for that contract, the records show.

On Nov. 10, **George Baum & Co.**, a Kansas City, Missouri-based investment bank settled allegations that bidding was rigged in the selection of a guaranteed investment contract provider for a $150 million loan pool underwritten by **Baum** in 1999 and issued by the Illinois Development Finance Authority.

. . .

The IRS settlement with **Baum** covered more than $2 billion of such deals between 1997 and 2001. **Baum**, which agreed to pay the IRS an undisclosed amount, didn't admit or deny wrongdoing.

91.    On November 17, 2006, The Bond Buyer reported the following:

[N]ine firms – including GIC brokers, insurance companies, and broker dealers – confirmed they had received subpoenas from the U.S. Department of Justice's antitrust division.

The Securities and Exchange Commission's separate, parallel civil investigation of bid-rigging also came to light yesterday as **Financial Security Assurance Holdings, Ltd.** and **First Southwest Securities** announced they had received subpoenas from the SEC. In the criminal probe, a third GIC broker, **Sound Capital Management**, disclosed yesterday that the Federal Bureau of Investigation had raided its Eden Prarie, Minn., offices.

Industry sources say 20 to 25 firms were served with subpoenas Wednesday. Nine have announced them or confirmed they were received: **IXIS Corporate & Investment Bank, CDR Financial Products, Investment Management Advisory Group Inc., Financial Guaranty Insurance Co., Kinsell Newcomb & De Dios Inc., XL Capital Assurance, Inc., First Southwest Securities, FSA,** and **Sound Capital.**

The **Sound Capital** raid came as the FBI also raided the offices of **CDR** and **IMAGE** Wednesday.

Knowledgeable sources said three other firms have been served with subpoenas from the Justice Dept., but those either would not comment or could not be reached: **Société Générale, George K. Baum & Co.,** and **Feld Winters Financial LLC.**

. . . .

Sources say that several government officials are aware of recorded phone conversations suggesting firms colluded with each other. These recordings have been crucial evidence in the investigations, they say.

88.    On December 7, 2006, Bloomberg reported the following:

The first-ever antitrust probe of the municipal bond market is roiling an industry that states and cities depend on to finance everything from garbage trucks to schools.

U.S. Justice Department prosecutors subpoenaed more than a dozen banks and insurers three weeks ago, seizing documents from three brokers in a search for evidence of bid rigging. Lawyers say it's the biggest criminal investigation of the almost 200-year-old market, where municipalities have more than $2 trillion of debt outstanding.

. . .

**JPMorgan Chase & Co.,** the third largest bank in the U.S., **American International Group Inc.,** the world's largest insurance company, and **Financial Security Assurance Holdings Ltd.,** a unit of Brussels-based financial services company **Dexia SA,** are among the companies that received subpoenas.

. . .

The Justice Department asked for information from as far back as 1992, including files on guaranteed investment contracts and other financial products, such as derivatives. A derivative is a financial contract whose value is derived from tradable securities or linked to events such as interest-rate changes.

. . .

"The way that these folks have operated, largely by telephone and largely out of public view, are not as transparent as they might be," said Patrick Born, chief financial officer of Minneapolis and the head of the debt committee of the Chicago-based Government Finance Officers Association. "And it's certainly possible that when you don't have transparency you can have abuses."

[Charlie] Anderson [manager of field operations for the IRS's tax-exempt bond division] says regulators "think we have evidence of bid rigging." Local governments are required to pay as taxes any

profits they get by borrowing at low tax-exempt rates and investing in higher-yielding securities.

The IRS probe shows that investment contracts were sold at below market rates, Anderson said. That means lower returns for municipalities and less tax revenue for the IRS, he said.

"People were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal," said the IRS's Anderson.

89.    On February 9, 2007, the Bloomberg news agency reported the following:

> **Bank of America** provided the guaranteed investment contract on at least one of the **Baum** transactions targeted by the IRS, a $100 million issue sold by **Rural Enterprises of Oklahoma, Inc.**, bond documents show. **Rural Enterprises of Oklahoma, Inc.** disclosed in July 2003 that a "significant," hidden payment was made by **Baum** to the provider of the investment agreement.

90.    On May 18, 2007, the Bloomberg news agency reported the following:

> **Bear Stearns Cos., UBS AG, Piper Jaffray Cos., Wachovia Corp.** and four other banks said they were subpoenaed as part of a U.S. investigation of Wall Street's sales of investments and derivatives to local governments.
>
> The disclosures were contained in quarterly filings that bond underwritings made with the California treasurer . . . **Cain Brothers, George K. Baum & Co., Morgan Keegan & Co.** and **JPMorgan Chase & Co.** also said they were contacted by U.S. regulators.
>
> "These subpoenas were issued as part of a broad, industry-wide investigation," New York-based **Bear Stearns** wrote in a filing with the California treasurer's office.
>
> . . .
>
> The disclosures also offer evidence that the U.S. investigation involves more than the bidding practices for investment contracts. Five of those subpoenaed reference derivatives, a fast-growing and

lucrative business for banks seeking to help governments lock in future interest rates and guard against swings in borrowing costs.

**UBS** and **Bear Stearns** both said that investigators sought information on derivatives sold to municipal borrowers as well as information related to guaranteed investment contracts, which local governments frequently buy with the proceeds of bond sales.

**Morgan Keegan & Co.**, another subpoenaed firm, also notes that the SEC sought information on a bond and derivative transaction the Memphis, Tennessee-based firm handled. **Wachovia**, based in Charlotte, North Carolina, said the two regulators are looking at "competitive bid practices in the municipal derivatives market."

**UBS**, the second-largest underwriter on municipal bonds in the U.S. after Citigroup Inc., said it was subpoenaed in November by both the antitrust unit of the Justice Department and the SEC.

"The two subpoenas concern **UBS's** conduct relating to derivative transactions entered into with municipal bond issuers, and to the investment of proceeds of municipal bond issuances," **UBS** said in its filing."

91.   On February 28, 2008, the Reuters news agency reported the following:

**Wachovia Corp** (WB.N: Quote, Profile, Research) on Thursday said two employees in its main banking unit are targets of a U.S. Department of Justice probe into competitive bidding in the municipal derivative markets.

In its annual report filed with the U.S. Securities and Exchange Commission, the company said the department notified the **Wachovia** Bank employees in November that they were targets, and that the employees are on administrative leave.
**Wachovia** said the Department of Justice and the SEC both believe that certain **Wachovia** employees engaged in improper conduct on some competitively bid transactions.

92.   On February 29, 2008, Bond Buyer reported the following:

Two employees of **Wachovia Bank NA** in Charlotte, N.C. have been notified by the U.S. Justice Department that they are targets of a grand jury investigation regarding antitrust and other violations involving contracts related to municipal bonds, according to regulatory information obtained by The Bond Buyer.

The two employees – Jay Saunders and Martin McConnell – worked in the derivatives marketing department at the bank, but were put on administrative leave after receiving written notifications that they were targets on the grand jury investigation.

Saunders was listed as director of marketing in the derivatives department in The Bond Buyer's Municipal Marketplace "Red Book" last fall. McConnell was listed as having been managing director of marketing during the spring of last year.

93.    On March 3, 2008, Bloomberg reported the following:

The criminal investigation of U.S. municipal bond firms is spreading as current or former bankers at **Bear Stearns Cos., UBS AG, JP Morgan Chase & Co.** and **Deutsche Bank AG** disclosed they are targets of the probe.

Peter Ghavami, the former co-head of municipal derivatives at Zurich-based **UBS**, Europe's biggest bank by assets, is part of the Justice Department's investigation, employment records with the Financial Industry Regulatory Authority show. Charlotte, North Carolina-based **Wachovia Corp.** and **Piper Jaffray Cos.** In Minneapolis disclosed last week that their employees were targeted.

. . . .

Ghavami, a former co-lead of the municipal derivatives group at **UBS** who later became head of one of the bank's commodities divisions, was among the banker who received letters saying they are targets of the investigation, Finra records show. Ghavami quit **UBS** in November and started at New York-based Lehmann Brothers Holdings Inc. as head of capital markets for Russia in January.

**Bear Stearns'** Stephen Salvadore and former **JPMorgan** banker James Hertz said they are targets, according to Finra records. Goldman Sachs Group Inc.'s Shomi Raz, who worked at **JPMorgan** until 2003, disclosed to Finra that he is being investigated, without saying whether he is a target.

. . .

32

Hertz was fired by **JPMorgan** in December, according to records with Finra.

"Mr. Hertz has been advised that he is a target of a grand jury investigation regarding municipal securities business," his record states.

. . .

**Bear Stearns'** Salvadore received a letter notifying him that he is a target of an investigation "concerning antitrust and other violations involving contracts related to municipal bonds," his record states.

Patrick Marsh, the head of municipal structuring at Frankfurt-based **Deutsche Bank**, Germany's biggest bank, disclosed in November he was a target of the probe. Samuel Gruer, who works for Marsh at **Deutsche Bank**, also received a "target letter" from the Department of Justice in November, according to regulatory filings.

A person familiar with the probe said prosecutors were focusing on alleged conduct by Marsh and Gruer at their former employers. Marsh, who joined **Deutsche Bank** in April 2005, formerly worked at **Bear Stearns**. Gruer was employed by **JPMorgan** until June 2006.

94.    On March 3, 2008, Bond Buyer reported the following:

**NELNET Inc.**, an education planning and financing company, disclosed Friday that **Shockley Financial Corp.**, an indirect wholly owned subsidiary, and two associates who provided investment advisory services for municipal and corporate bonds, on Feb. 8 were subpoened by a grand jury in New York City for documents and information relating to the criminal investigation.
. . .

Market participants said Friday that the individuals and firms known to have been subpoened or to have received target letters in the investigation may just be the tip of the iceberg. Most firms are not publicy disclosing the Justice Department actions until their 10-K financial filings are due. Securities firms appear to be including disclosures of the target letters in the regulatory filings for their employees, even before their 10-K filings are due, but

banks and investment advisory firms are not subject to the same disclosure requirements.

. . .

"Usually by the time an individual gets a target letter, the investigation is pretty far down the road and it's an indication that indictments are going to be issued in the relative near terms," said John K. Markey, a partner a Mintz Levin Cohn Ferris Glovsky & Popeo PC in Boston, and former federal and state prosecutor.

Markey said that in a target letter, "The Department of Justice is informing an individual or his attorney that it already has substantial evidence of the commission of a federal crime. It usually is a sign that the individual is going to be indicted and it may prompt an attempt at a plea bargain or cooperation deal with the government."

. . .

Mary A. Packer, president of **PackerKiss Securities Inc.**, in San Rafael, Calif., disclosed in her regulatory filing that she was notified by the Justice Department on Dec. 11 that she is a target of the grand jury muni investigation . . .

**Piper Jaffray & Co.**, disclosed in the regulatory filing for James H. Towne, former managing director of the firm's municipal derivatives group, that he received a notice from the Justice Department's antitrust division Dec. 15 relating to "potential antitrust and other violations involving contracts related to municipal bonds.

95.     On March 5, 2008, the Wall Street Journal reported the following:

Federal authorities are preparing to charge more than two dozen people and a handful of financial firms amid an investigation of municipal contract awards, according to company disclosures and people familiar with the matter.

. . .

In the past few weeks, at least four companies—including banks **UBS AG, Bank of America Corp.**, bond issuer **Financial Security Assurance Holdings Ltd.** and product developer **CDR Financial Products Inc.** – disclosed that they received so-called

34

Wells notices from the SEC. A Wells notice indicates that the agency is considering filing civil charges and gives the recipient an opportunity to say why charges shouldn't be filed. FSA said it was facing civil charges.

Several individuals also were sent Wells notices, a person familiar with the investigation said, and more notices to firms and people might be sent.

The Justice Department's antitrust division has sent target letters to almost 30 individuals, according to people familiar with the matter. A target letter indicates the department will seek indictment or file criminal charges . . .

Authorities are investigating whether investment firms colluded to rig the bidding for the right to invest the municipal money, people familiar with the matter said.

Among the areas of interest is whether parties submitted phony bids to let one bank win a contract in exchange for another bank getting a contract later. In addition, authorities are looking into whether the financial firms paid kickbacks to other firms to win business. Federal tax laws and rules require such contracts to have at least three bids to make them competitive.

As a result of the alleged wrongdoing, municipalities may have paid higher fees than they might have under competitive bidding.

. . .

The municipal market has long been opaque and ripe for abuse.

. . .

Municipalities often use an agent to run a bidding process to find the bank that will pay the highest interest rate.

. . .

About 30 companies or their subsidiaries have received subpoenas, people familiar the inquiry say."

35

### History of Fraud in the Municipal Derivatives Market

96.    The wrongful conduct alleged herein is not the first time that Wall Street firms have run afoul of laws designed to prevent unfair profiteering on the proceeds of a bond issuance.  Commencing in January 1998, the United States Securities and Exchange Commission sanctioned 21 firms who were involved in fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn.  According to the SEC, this so-called "yield-burning" scandal led to settlements of $172 million as a result of misconduct on 3600 separate municipal bond issues.  Piper Jaffray & Co., one of the Provider Defendants here, was involved in the earlier municipal bonds scandal.

## WRONGDOING ALLEGED

97.    Plaintiff incorporates by reference each of the foregoing paragraphs of their complaint and summarize their allegations of wrongdoing as follows:

98.    The Broker Defendants, who were purportedly acting as the agents of issuers (i.e. municipalities), knowingly facilitated sham auctions for Municipal Derivatives to make it appear that an auction had been conducted in compliance with I.R.S. rules and regulations.

99.    In these sham auctions, several bidders, including at times one or more Provider Defendants, would submit bids at prices they knew were not competitive so that another Provider, including at times a Provider Defendant, could win the business by slightly underbidding the sham bids.

100.    The providers who knowingly and intentionally engaged in these rigged auctions, including the Provider Defendants, understood that they would take turns providing the winning bid.  At times, the providers, including one or more Provider Defendants, directly discussed with

36

each other the terms of their bids. On other occasions, communications between the providers, including one or more Provider Defendants, were made indirectly through the Broker Defendants, who would guide the providers, including one or more Provider Defendants, by suggesting the terms of their respective bids. The provider designated to win a particular auction frequently bid after it had been given the terms of the bids provided by the other bidders.

101.    At times, providers, including one or more Provider Defendants, engaged in back-end swaps to compensate other providers, including one or more Provider Defendants, who submitted the sham bids. On other occasions, the winning provider, including at times one or more Provider Defendants, would secretly compensate other providers, including at times one or more Provider Defendants, for declining to submit a bid.

102.    The brokers, including one or more Broker Defendants were handsomely compensated for their role as the issuer's agent in these Municipal Derivatives auctions and they agreed to facilitate the bid-rigging by the Provider Defendants to induce the providers to recommend that issuers in later auctions use them as brokers. The Broker Defendants also received secret payments from the providers, including one or more Provider Defendants, to facilitate the bid-rigging alleged herein.

103.    One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that Defendant Bank of America provided to the City of Atlanta in 2002, in which Defendant CDR acted as the broker and handled the bidding. In a June 28, 2002 e-mail contained in court records, Douglas Campbell told Phil Murphy that $182,393 was paid to Defendants CDR, Piper Jaffray, PaineWebber, and Winters. The payments were described as a bid to build Defendant Bank of America's relationship with these companies.

104.    Yet more evidence of bid-rigging and price-fixing exists. The IRS has focused on over 20 lease-to-own deals between CDR and Defendant Societe Generale, as well as CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. According to letters the IRS sent to issuers in the Fall of 2006, the IRS has evidence of quarterly payments Societe Generale made to CDR for "unspecified services" relating to these lease-to-own deals. The letters also asserted that the IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues. The IRS now is examining whether the awarding of GIC bids was prearranged to allow Societe Generale to inflate various fees and divert illegal arbitrage as part of a larger plan involving numerous other bond issuances.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action on its own behalf and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local and municipal government entities, independent
> government agencies and private entities that purchased by
> competitive bidding or auction Municipal Derivatives directly
> from a Provider Defendant or Bank of America, or through a
> Broker Defendant, at any time from January 1, 1992 through the
> present in the United States and its territories or for delivery in the
> United States and its territories.

106.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of Defendants and their unnamed co-conspirators. But due to the nature of the trade and commerce involved, Plaintiff believes that the Class described above comprises thousands of members.

107.   The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

108.   There are questions of law and fact common to the Class, including:

    a.   Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices, and rig bids and allocate customers and markets of Municipal Derivatives;

    b.   The identity of the participants of the alleged conspiracy:

    c.   The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

    d.   Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

    e.   Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

    f.   The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

    g.   Whether Defendants fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Class; and

    h.   The appropriate class-wide measure of damages.

109.   Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased Municipal Derivatives, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

110.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

111.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

112.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

114.    Defendants' activities, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

115.    During the Class Period, Defendants issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation other than the states in which Defendants reside.

116.   The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## EFFECTS

117.   Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a.   Prices charged by Defendants to Plaintiff and the members of the Class for Municipal Derivatives were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

b.   Customers and markets of Municipal Derivatives were allocated among Defendants;

c.   Plaintiff and the other members of the Class had to pay more for Municipal Derivatives than they would have paid in a competitive marketplace, unaffected by Defendants' collusive and unlawful activities;

d.   Price competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

e.   As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

## FRAUDULENT CONCEALMENT

118.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

119.    Plaintiff and the Class members did not discover, nor could they have discovered through reasonable diligence, that Defendants were violating the antitrust laws until shortly before this litigation was commenced because Defendants used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Defendants did not tell Plaintiff or other class members that they were rigging bids. To the contrary, Plaintiff and the other class members were falsely assured that the Broker Defendants were acting as their agents and were soliciting bids for Municipal Derivatives that were fair and competitively priced and that complied with specific IRS rules and regulations that required Broker Defendants to obtain at least three commercially reasonable bids. Accordingly, Plaintiff and the other class members could not have discovered the violations alleged herein until shortly before the filing of this Complaint because Defendants conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

120.    Defendants engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

    a.    By meeting secretly to discuss prices, customers and markets of Municipal
           Derivatives sold in the U.S. and elsewhere;

    b.    By agreeing among themselves at meetings and in communications not to
           discuss publicly, or otherwise reveal, the nature and substance of the acts
           and communications in furtherance of their illegal scheme; and

    c.    By intentionally creating the false appearance of competition by engaging
           in sham auctions in which the results were pre-determined.

121.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That judgment be entered for Plaintiff and the members of the Class against Defendants for treble damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    That Plaintiff and the members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: March 12, 2008                         By: _____

    Precious Martin Senior                              Roland Riopelle, Esq. (RR-2950)
    PRECIOUS MARTIN SENIOR &                   SERCARZ & RIOPELLE, LLP
    ASSOCIATES PLLC                                 Carnegie Hall Tower
    821 North Congress St.                            152 W. 57th Street
    P.O. Box 373                                         New York, New York 10019
    Jackson, MI 39205-0373                         Tel: (212) 586-4900
    Telephone: (601) 944-1447                      Fax: (212) 586-1234
    Facsimile: (601) 944-1448

                                    Attorneys for Plaintiff

                                    *Hinds County, Mississippi*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAYWOOD COUNTY, TENNESSEE, On behalf
of itself and all others similarly situated,

               Plaintiff,

         v.

BANK OF AMERICA, N.A., CDR FINANCIAL
PRODUCTS, FELD WINTERS FINANCIAL LLC,
JP MORGAN CHASE & CO., MORGAN
KEEGAN & CO., INC., PIPER JAFFRAY & CO.,
UBS AG, WINTERS & CO. ADVISORS LLC and
WACHOVIA BANK N.A.,

               Defendants.

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiff Haywood County, Tennessee, individually and on behalf of itself and all others

similarly situated, brings this action against the Defendants named in this Complaint for treble

damages and injunctive relief under the antitrust laws of the United States. Plaintiff alleges the

following upon information and belief based upon the investigation of counsel, except as to those

paragraphs applicable to the named Plaintiff which are alleged upon knowledge, as follows:

### NATURE OF THE CASE

1.    This antitrust class action is brought to recover treble damages and injunctive relief

for violations of Section 1 of the Sherman Act, 15 U.S.C. §1. This action is brought on behalf of

Plaintiff and a class of all state, local and municipal government entities, independent government

agencies and private entities that purchased by competitive bidding or auction Municipal

Derivatives directly from a Defendant, or through a broker, at any time from January 1, 1992

through the present in the United States and its territories or for delivery in the United States and

its territories.

2.    The United States Department of Justice's ("DOJ") Antitrust Division, the Internal Revenue Service ("IRS"), and the Securities and Exchange Commission ("SEC") have been investigating collusive practices in the municipal bond industry and a grand jury investigation currently is being conducted by the DOJ, Antitrust Division in the United States District Court for the Southern District of New York. Defendant Bank of America has received conditional amnesty and has agreed to provide the Government with information regarding the conspiracy alleged herein. As part of its agreement with the Government, Bank of America will provide full and complete cooperation in accordance with the terms of the DOJ amnesty program.

3.    Plaintiff alleges that Defendants entered into a contract, combination or conspiracy to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds. Defendants have engaged in communications to restrain competition by rigging bids, secretly compensating losing bidders, making courtesy bids, deliberately losing bids, and entering into agreements not to make competitive bids.

4.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have sustained injury to their business and property by: (i) receiving lower interest rates on contracts than they would have in a competitive market; and (ii) paying ancillary fees and other costs and expenses.

## JURISDICTION AND VENUE

5.    This action is instituted under Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of

the violations alleged herein.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is proper in this District pursuant to Sections §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period the Defendants resided, transacted business, were found, or had agents in this District. Moreover, a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFF

8.     Plaintiff Haywood County, Tennessee purchased one or more Municipal Derivatives from at least one Defendant during the Class Period.

## DEFENDANTS

9.     Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business located at 100 N. Tryon Street, Charlotte, NC 28255. During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.

10.     Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, NY, 10017. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

11.     Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business located at 50 N. Front Street, Memphis, TN 38103. During the Class Period, Morgan Keegan acted as a broker for

members of the Class in purchasing Municipal Derivatives.

12.    Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business located at 9777 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90212. During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives.

13.    Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business located at Bahnhofstrasse 45, CH-8090 Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

14.    Defendant Piper Jaffray & Co, ("Piper Jaffray") is a Delaware corporation with its principal place of business located at 800 Nicollet Mall, Suite 800, Minneapolis, Minnesota 55402-7020. During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

15.    Defendant Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business located at 15260 Ventura Boulevard, Suite 2220, Sherman Oaks, CA 91403. During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives.

16.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business located at 11845 W. Olympic Boulevard, Suite 540, Los Angeles, CA 90064. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives.

4

17.    Defendant Wachovia ("Wachovia") is a North Carolina corporation with its principal place of business located at 301 S. College Street, Suite 4000, One Wachovia Center, Charlotte, NC. 28288-0013.  During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

## UNNAMED CO-CONSPIRATORS

18.    Various other persons, firms, corporations and John Does 1-100, not named herein as a Defendant or named conspirator, have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy.

19.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## FACTS

### A.    Municipal Bonds

20.    Municipal bonds are issued by states, cities, and counties, or their agencies, as well as by private entities, also known as issuers, to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants.  Municipal bonds bear interest at either a fixed or variable rate of interest. The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span several years.

21.    In light of the tax-exempt status of municipal bonds', investors typically accept lower

interest payments. Bonds are an attractive source of financing to many government and private entities because the borrowing rate available in the tax free municipal bond market is frequently lower than what is available through other channels. In order for municipal bonds to maintain their tax-exempt status, IRS regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

22.     Municipal bond proceeds are typically placed into three types of funds: (i) a project fund or construction fund which is used to pay for the construction or public works project at hand; (ii) a "sinking fund" which contains the money used to make principal and interest payments on the bond; or (iii) a debt service reserve fund which ensures that if unforeseen contingencies occur, debt obligations can still be paid.

23.     The municipal bond industry is extremely large. In 2006, approximately $385 billion worth of municipal bonds were issued. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

**B.    Municipal Derivatives**

24.     A "Municipal Derivative" is one of a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings in their possession.

25.     Municipal Derivatives, typically sold to government entities, are provided by highly rated insurance companies and large commercial and investment banks. Municipal derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

26.     When purchasing a municipal derivative government entities typically engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives.

6

27.    Municipal Derivatives are grouped generally into two categories, pertaining either to: (i) the investment of bond proceeds, or (ii) the bond's underlying interest rate obligations. The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts ("GICs") (forward purchase, supply, or delivery agreements and repurchase agreements) and escrow agreements. The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

28.    A GIC is an agreement secured by a contract with a financial institution which guarantees a fixed rate of return and a fixed date of maturity. GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria. It is payable at a predetermined date on monies that are deposited with the company. The types of investment agreements that the IRS generally references as GICs are: (i) Forward Purchase or Forward Delivery Agreements; (ii) Repurchase Agreements or Collateralized GICs; and (iii) Unsecured or Uncollateralized GICs.

29.    A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers request bids based on rate of return or on upfront payments. In other words, the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. These contracts are generally entered into in the over-the-counter markets.

30.    A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions. The issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return.

31.    An Unsecured or Uncollateralized GIC does not involve associated securities. Instead, they function like a savings account. They are frequently for construction or project funds. In the bidding process, the issuer sets forth a proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period.

32.    An Advance Refunding Escrow pertains to an arrangement by which the proceeds of the refunding issue are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

33.    A Swap is a type of agreement frequently used with respect to interest rate obligations. It is the sale of an instrument and the simultaneous purchase of another instrument for purposes of enhancing the investor's holdings. There are at least three types of swaps: (i) floating-for-fixed interest swap; (ii) fixed-for-floating interest swap; and (iii) floating-for-floating (basis-rate) swap, where the two are based on different indices such as LIBOR or BMA.

34.    An Option is much like an option on a securities transaction as it involves one of two types: (i) a Put Option; or (ii) a Call Option. A Put Option is a provision in a bond contract where the investor has the right, on specified dates after required notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price. A Call Option is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date.

35.    A "Swaption" is the combination of a Swap and an Option.

36.    A Floor is an agreement by the issuer to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference

8

between the interest rate floor and the actual lower rate on the debt. In other words, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minimum rate.

37.    A Collar is an agreement by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. The Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt.

38.    The Municipal Derivatives industry is very large and a substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives. The Municipal Derivatives industry is comprised of approximately 20 major providers of Municipal Derivatives in the United States. With respect to GICs, there are 10 to 12 major dealers in the United States. Issuers, on the other hand, number in the tens of thousands.

### C.    IRS Rules And Regulations

39.    IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage off of their tax-exempt bond proceeds, subject to certain exceptions. *See* Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) an (e) (enumerating exceptions to this principle). If the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation.

40.    The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates. The rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

41.    IRS regulations also ensure a competitive marketplace for GICs by creating a fair

bidding process. *See* Treasury Reg. § 1.148-5(d)(6).  The central regulations include the following:

    a.    The bid specifications must be in writing;

    b.    The bid specifications must be timely forwarded to potential providers;

    c.    The bid specifications must contain all material terms (i.e., the term directly or indirectly affects yield);

    d.    The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

    e.    The bid specifications must be commercially reasonable;

    f.    There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

    g.    The bid specifications must contain a reasonably expected draw down schedule;

    h.    All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

    i.    The issuer must receive at least three bids from solicited providers.

42.    These rules were designed to provide a fair, competitive, and transparent process for

issuers to obtain the best possible price for tax-exempt municipal derivatives.

## D.    Defendants' Anticompetitive Conduct

43.    During the Class Period, Defendants entered into a continuing contract, combination

or conspiracy to unreasonably restrain trade and commerce in the United States in violation of

Section 1 of the Sherman Act. 15 U.S.C. §1.

44.    Defendants have combined and conspired to allocate customers and fix or stabilize the

prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging.

45.    Defendants knowingly and intentionally engaged in these rigged auctions.    In furtherance of their contract, combination or conspiracy, Defendants directly discussed with each other the terms prior to submitting their bids.

46.    Defendants also communicated indirectly through one or more means by suggesting the terms of their respective bids.

47.    Defendants engaged in complementary trades to compensate other Defendants who either did not submit bids or who engaged in sham bids.    On occasion, a winning bidder would compensate one or more bidders for agreeing not to submit a competitive bid.

48.    Defendants have knowingly participated in an unlawful contract, combination or conspiracy not to compete and to rig bids in order to win the favor of other Defendants and share in the profits of the conspiracy.    This conduct was in breach of their fiduciary and other duties as agents for Plaintiff and members of the class during the bidding process.

49.    The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As *The Bond Buyer* reported on November 21, 2006:

> "The industry tends to be quite intertwined and interconnected," said Willis Ritter, a partner at Ungaretti & Harris here. "Virtually all the major houses are involved in selling [GICs], so if you think you've found something about one, you suspect you're going to find it about all of them."

50.    The existence of the unlawful contract, combination or conspiracy occurred through

11

communications among marketing personnel employed in the municipal bond/derivative market.

These individuals have participated in direct communications with competitors with respect to the

following, *inter alia:*

    a.    the rigging of bids, including the collusive suppression of interest rates paid
        to issuers on Municipal Derivatives;

    b.    conduct that would be used to limit competition;

    c.    sharing of profits from a winning bid with a losing bidder and other secret
        compensation of losing bidders;

    d.    bids that would be won by specific Defendants; and

    e.    an exchange of a deliberately losing bid for a future winning bid.

    51.    The existence of the unlawful contract, combination or conspiracy occurred through

communications among marketing personnel employed in the municipal bond/derivative certain

individuals. These individuals have participated in direct communications with competitors with

respect to limit competition, rig bids and create the false impression of a competitive environment by:

    a.    submitting courtesy bids to create the appearance of competition where there
        was none;

    b.    submitting bids known to be unrealistically low and deliberately losing
        bids;

    c.    submitting bids where only one bid was sufficiently high to make the deal
        work;

    d.    agreeing to share profits from a winning bid with a losing bidder t o u g h
        transactions between one another;

    e.    engaging conduct in violation of IRS regulations relating to the bidding
        process; secret last look agreements; and

    f.    entering into agreements not to bid.

    52.    Defendants shared their wrongful profits from the illegal agreement, understanding

and conspiracy, by paying kickbacks to broker. For example, CDR had a secret agreement with the

provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida. The deal allowed

CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose -

affordable housing.

53.    Brokers knowingly participated in the unlawful contract, combination or conspiracy by agreeing: (i) not to compete; (ii) to rig bids in order to limit competition; and (iii) to create the appearance of competition where there was none. Brokers participated in and facilitated the unlawful contract, combination or conspiracy by arranging the allocation of winning bids among the Defendants. Brokers engaged in conspiratorial communications concerning:

    a.    winning bids that would be allocated to Defendants;

    b.    confirming understandings that bids would be won by Defendants;

    c.    confirming understandings that bids would be lost by Defendants;

    d.    the fact that bids were being rigged; and

    e.    bid levels that would be necessary by Defendants to win or lose a bid.

54.    Individuals who have engaged in the unlawful contract, combination or conspiracy include, *inter alia*:

    a.    Douglas Campbell, a former co-conspirator Bank of America sales team manager who also formerly worked at Piper Jaffray;

    b.    Dean Pinard, former manager of co-conspirator Bank of America's derivatives department;

    c.    James Hertz, former vice-president in JP Morgan's tax-exempt capital markets group;

    d.    Stephen Salvadore, Managing Director of municipal capital markets and derivatives at Bear Stearns;

    e.    Jay Saunders, who worked in the derivatives marketing department at Wachovia;

    f.    Martin McConnell, who worked in the derivatives marketing department at Wachovia;

    g.    Peter Ghavai, former Managing Director and co-manager in UBS's municipal derivatives group;

    h.    Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Bear Stearns;

    i.    Shlomi Raz, a banker who formerly worked at JP Morgan; and

    j.    Samuel Gruer, former vice-president in JP Morgan's tax-exempt capital markets group.

    k.    James Towne, former Managing Director of Defendant Piper Jaffray's municipal derivatives group;

    l.    David Lail, who worked in Baum's derivatives department; and

    m.    Mary Packer, president of PackerKiss.

55.    The conspiracy has been facilitated through intercompetitor contacts at trade associations such as the International Swaps & Derivatives Association ("ISDA") whose members include Bank of America, JP Morgan, Bear Stearns, Societe Generale, UBS, and Wachovia. Another such organization is the American Bankers Association, which includes Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia.

56.    One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that Bank of America provided to the City of Atlanta in 2002, in which CDR acted as the broker and handled the bidding. In a June 28, 2002 e-mail, Douglas Campbell told Phil Murphy that $182,393 was paid to CDR, Piper Jaffray, PaineWebber, and Winters. The payments were described as a bid to build Bank of America's relationship with these companies.

57.    Other examples of bid-rigging and kickbacks exist. The IRS is examining over 20 lease-to-own deals between CDR and Societe Generale, as well as CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. There is evidence of quarterly payments Societe Generale made to CDR for "unspecified services" relating to these lease-to-own deals. The IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues.

58.    The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. The IRS said it was concerned about quarterly payments made by Societe Generale to CDR, which structured the transaction and evaluated bids for the investment agreement. Records suggest that Defendant FSA was one of the four that bid for that contract.

14

59.    In November of 2006, as part of a settlement with the IRS, it was disclosed that Baum illegally diverted profits on municipal bond deals.  That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001.  The agency found evidence of big rigging in these deals.  Baum had rigged the deals to allow CDR, who was the winner on many of the deals, to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to Baum.  In one case, CDR paid a large fee directly to David Lail of Baum.

60.    Bank of America also provided the GIC, on at least one of the Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc.  Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant hidden payment to Baum.

61.    The objective of the unlawful contract, combination or conspiracy was to artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by Defendants.

**E.    The Internal Revenue Service Investigation**

62.    The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry.  Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices.

63.    In 2005, Charles Anderson, field operations manager for the IRS's tax-exempt bond office, publicly stated that "[i]t looks like bid rigging is wider and more pervasive than we thought."  Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."  These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair

15

market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went on to note, "[t]hat's basically what we've been doing ....is following those, what I like to refer to as 'tentacles of abuse.'"

64.    As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."

65.    The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

66.    On February 7, 2007, Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities.

67.    In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

### F.    The Antitrust Division Investigation

68.    The Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital.

16

69.     Following the FBI raids, the industry players were served with subpoenas which sought detailed information from the companies dating back to 1992. According to news reports and company filings, the following entities have received governmental subpoenas: GE Funding; GE Trinity; CDR; FSA; FGIC; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Societe Generale; Baum; Feld Winters; JP Morgan; American International Group Inc.; Bear Stearns; UBS; Piper Jaffray; Wachovia; Cain Brothers; Morgan Keegan; Shockley; Genworth Financial; and SunAmerica.

70.     On December 11, 2006, prosecutors based out of the DOJ, Antitrust Division's New York field office were tasked with investigating the alleged bid-rigging and brought their case to a federal grand jury sitting in the Southern District of New York.

### G.     The DOJ Grants Conditional Amnesty to Bank Of America

71.     On February 9, 2007, Bank of America, the second largest bank in the United States, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program.

72.     On February 9, 2007, Bank of America issued a press release and stated the following:

> Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.
>
> The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.
>
> * * *
>
> In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS

17

relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions.

73.    It was reported that key derivatives officials at the bank were on "administrative leave," including Dean Pinard.

74.    On February 28, 2008, Bank of America, in its SEC Form 10-K stated the following:

Municipal Derivatives Matters

The Antitrust Division of the U.S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA [co-conspirator Bank of America], from the early 1990s to date. The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants.

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action on behalf of itself and as a class action under the provisions

of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

following Class:

> All state, local and municipal government entities, independent
> government agencies and private entities that purchased by competitive
> bidding or auction Municipal Derivatives directly from a Defendant, or
> through a broker, at any time from January 1, 1992 through the present
> in the United States and its territories or for delivery in the United States
> and its territories.

76.    Plaintiff does not know the exact number of class members because such information

is in the exclusive control of the Defendants and the unnamed co-conspirators.  Due to the nature of

the trade and commerce involved, Plaintiff believes that there are thousands of Class members, the

exact number and their identities being known by the Defendants and unnamed co-conspirators.

77.    The Class is so numerous and geographically dispersed that joinder of all members is

impracticable.

78.    There are questions of law and fact common to the Class, including:

a.    Whether Defendants and their co-conspirators engaged in a contract,
combination or conspiracy among themselves to fix, raise, maintain or stabilize
prices, and to rig bids or allocate customers and markets of Municipal
Derivatives;

b.    The identity of the participants of the alleged conspiracy;

c.    The duration of the alleged conspiracy and the acts carried out by
Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15
U.S.C. § 1;

e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this
Complaint, caused injury to the business or property of the Plaintiff and the
other members of the Class;

19

     f.     The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

     g.     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the other members of the Class; and

     h.     The appropriate class-wide measure of damages.

79.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a purchaser of Municipal Derivatives, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

80.     Plaintiff is represented by counsel who is competent and experienced in the prosecution of antitrust and class action litigation.

81.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

82.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

84.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

85.     During the Class Period, Defendants and their co-conspirators issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation.

## FRAUDULENT CONCEALMENT

86.     At all times relevant during the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

87.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Neither Defendants nor their co-conspirators told Plaintiff or other class members that they were rigging bids. To the contrary, Plaintiff and members of the Class were falsely assured that bids for Municipal Derivatives were fair and competitively priced in compliance with specific IRS rules and regulations that required brokers to obtain at least three commercially reasonable bids. Thus, Plaintiff and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

88.     Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

21

a.    By meeting secretly to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;

b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;

d.    Through covert sharing of profits or other secret compensation paid to losing bidders;

e.    By secretly communicating about bids that would be won or lost by the Defendants;

f.    By paying kickbacks to brokers;

g.    By submitting cover or courtesy bids, or unrealistically low or other artificial bids, and/or deliberately losing bids, to create the appearance of competition where there was none; and

h.    By covert agreements not to bid;

i.    By giving false and pretextual reasons for the pricing of Municipal Derivatives sold during the Class Period, including by falsely describing such pricing as being the result of competitive factors rather than collusion.

j.    Through other schemes and devices which will be learned during discovery.

89.    As a result of Defendants and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

## COUNT I

### (Violation of Sherman Act 15 U.S.C. §1)

90.    Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1-89 herein.

91.    Beginning at least as early as January 1, 1992, and continuing until the present, the exact dates being unknown to the Plaintiff, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy in restraint of trade to artificially fix, raise, maintain, or stabilize prices for Municipal Derivatives in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22

92.     During the Class Period, Plaintiff and members of the Class purchased Municipal Derivatives directly from a Defendant or through an agent.

93.     The contract, combination or conspiracy alleged herein has had the following effects, among others:

    a.     Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;

    b.     Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels throughout the United States;

    c.     Customers and markets of Municipal Derivatives were allocated among Defendants and their co-conspirators;

    d.     Plaintiffs and the other members of the Class received lower interest rates on Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities; and

    e.     Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States.

94.     As a direct and proximate result of the unlawful contract, combination or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their business and property in amounts to be determined.

95.     Plaintiff and members of the class seek injunctive relief, and treble damages and such other relief that the court deems necessary by reason of the violations alleged herein.

## COUNT II

## (Restitution/Disgorgement/Unjust Enrichment)

96.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

97.     Defendants benefited from their unlawful acts through the receipt of overpayments by Plaintiff and other Class members.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiff and members of the Class and

retained by Defendants.

98.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefits to Defendants of, or as the result of such overpayments from which Plaintiff and other Class members may make claims on a pro-rata basis for restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been *a per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That judgment be entered for Plaintiff and members of the Class against Defendants for treble damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees and expenses;

D.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 24, 2008
      New York, New York

                                POMERANTZ HAUDEK BLOCK
                                GROSSMAN & GROSS LLP

                                By: _____
                                  Michael M. Buchman (MB-1172)
                                J. Douglas Richards (JDR-6038)
                                100 Park Avenue, 26th Floor
                                New York, New York 10017
                                Telephone: (212) 661-1100
                                Facsimile: (212) 661-8665

                                Michael J. Banks
                                Banks Law Firm
                                108 S. Washington Avenue
                                Brownsville, Tennessee 38012
                                Telephone: (731 772-5300
                                Facsimile: (731) 772-5302

                                *Attorneys for Plaintiff*

1   John A. Russo, City Attorney (SBN 063203)
    *jrusso@oaklandcityattorney.org*
2   Barbara Parker, Chief Asst. City Attorney (SBN 069722)
    *bparker@oaklandcityattorney.org*
3   Mark Morodomi, Supervising Deputy City Attorney (SBN 120914)
    *mmorodomi@oaklandcityattorney.org*
4   Kathleen Salem-Boyd, Deputy City Attorney (SBN 100179)
    *ksalemboyd@oaklandcityattorney.org*
5   CITY OF OAKLAND, CALIFORNIA
    One Frank H. Ogawa Plaza, 6th Floor
6   Oakland, California 94612
    Telephone:     (510) 238-3034
7   Facsimile:      (510) 238-6500

8   Richard M. Heimann (SBN 63607)
    *rheimann@lchb.com*
9   Joseph R. Saveri (SBN 130064)
    *jsaveri@lchb.com*
10  Eric B. Fastiff (SBN 182260)
    *efastiff@lchb.com*
11  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
12  San Francisco, California 94111
    Telephone:     (415) 956-1000
13  Facsimile:      (415) 956-1008

14  James A. Quadra (SBN 131084)
    *quadra@meqlaw.com*
15  Sylvia Sokol (SBN 200126)
    *sokol@meqlaw.com*
16  MOSCONE, EMBLIDGE & QUADRA, LLP
    220 Montgomery Street
17  Mills Tower, Suite 2100
    San Francisco, California 94104
18  Telephone:     (415) 362-3599
    Facsimile:      (415) 362-2006
19
    *Attorneys for Individual and Representative Plaintiff*
20  *City of Oakland, California*

21              UNITED STATES DISTRICT COURT

22              NORTHERN DISTRICT OF CALIFORNIA

23  CITY OF OAKLAND, CALIFORNIA, a Municipal          Case No.
    Corporation, on behalf of itself and all others
24  similarly situated,                                **COMPLAINT FOR VIOLATIONS
                                                       OF THE SHERMAN ACT, THE
25                  Plaintiff,                          CARTWRIGHT ACT, AND THE
                                                       UNFAIR COMPETITION LAW**
26          v.
                                                       **CLASS ACTION**
27  AIG FINANCIAL PRODUCTS CORP.; AIG
    SUNAMERICA LIFE ASSURANCE CO.; BANK               **JURY TRIAL DEMANDED**
28  *(caption continued on next page)*

756814.3                                              CLASS ACTION COMPLAINT

1   OF AMERICA CORPORATION; BANK OF
    AMERICA, N.A.; BEAR STEARNS
2   COMPANIES, INC.; CAIN BROTHERS &
    COMPANY, LLC; CDR FINANCIAL
3   PRODUCTS, INC.; FELD WINTERS
    FINANCIAL, LLC; FINANCIAL GUARANTY
4   INSURANCE CO.; FINANCIAL SECURITY
    ASSURANCE HOLDINGS, LTD.; FIRST
5   SOUTHWEST COMPANY; GE FUNDING
    CAPITAL MARKET SERVICES, INC.;
6   GENWORTH FINANCIAL, INC.; GEORGE K.
    BAUM & COMPANY; INVESTMENT
7   MANAGEMENT ADVISORY GROUP, INC.;
    JPMORGAN CHASE & CO.; JPMORGAN
8   CHASE BANK, N.A.; KINSELL NEWCOMB &
    DE DIOS, INC.; LEHMAN BROTHERS INC.;
9   MERRILL LYNCH & CO. INC.; MORGAN
    KEEGAN & CO., INC.; MORGAN STANLEY;
10  NATIONAL WESTMINSTER BANK plc;
    NATIXIS, S.A.; PACKERKISS SECURITIES,
11  INC.; PIPER JAFFRAY & CO.; SECURITY
    CAPITAL ASSURANCE, INC.; SHOCKLEY
12  FINANCIAL CORP.; SOCIÉTÉ GÉNÉRALE;
    SOUND CAPITAL MANAGEMENT, INC.;
13  TRINITY FUNDING COMPANY, LLC; UBS AG;
    UBS SECURITIES LLC; UBS FINANCIAL
14  SERVICES INC.; WACHOVIA BANK, N.A.;
    WACHOVIA CORPORATION; WINTERS & CO.
15  ADVISORS, LLC; XL ASSET FUNDING
    COMPANY 1 LLC; XL CAPITAL, LTD.; and XL
16  LIFE INSURANCE & ANNUITY COMPANY,

17              Defendants.

18

19          Plaintiff City of Oakland, California (hereafter "Oakland" or "Plaintiff"),

20  individually and on behalf of a class of all those similarly situated, brings this action for treble

21  damages under the antitrust laws of the United States against Defendants, demands a trial by jury,

22  and alleges the following on information and belief except as to the contents of paragraphs 1 and

23  16 which are based on personal knowledge:

24                          **NATURE OF THE CASE**

25          1.      The City of Oakland, California has issued hundreds of millions of dollars

26  of tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs") to

27  allow Oakland to have funds available while earning a higher rate of return than they would if

28  Oakland simply invested the proceeds in a savings account. For example, Oakland issued tax-

1    free municipal bonds to, *inter alia*, rebuild the Oakland Coliseum, modernize its sewer system,

2    and provide for general obligations.

3         2.    Oakland alleges a nationwide conspiracy among Defendants to rig bids, to

4    allocate customers and markets, and to fix, raise, maintain, or stabilize the returns received by

5    Oakland and the members of the Class for Municipal Derivatives (as defined below), including

6    but not limited to GICs, sold in the United States.

7         3.    Oakland brings this action on behalf of itself and all entities that contracted

8    for Municipal Derivatives in the United States and its territories directly from Municipal

9    Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as defined in this

10   Complaint during the period from January 1, 1992 through December 31, 2007. As a result of

11   Defendants' unlawful conduct, Oakland and the Class, as defined in this Complaint, have paid

12   higher supracompetitive prices for these products, and therefore suffered injury to their business

13   and property.

## JURISDICTION AND VENUE

14

15        4.    Oakland brings this action pursuant to Section 4 of the Clayton Act,

16   15 U.S.C. §§ 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for

17   Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act,

18   California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition

19   Law, Business and Professions Code § 17200, *et seq.*

20        5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and

21   1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

22        6.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and

23   22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the

24   Defendants resided, transacted business, was found, or had agents in this district, and because a

25   substantial part of the events giving rise to Oakland's claims occurred, and a substantial portion

26   of the affected interstate trade and commerce described below was carried out in this district.

27

28

**INTRA-DISTRICT ASSIGNMENT**

7.    Pursuant to Local Rules 3-5(b) and 3-2(c), this action should be assigned to the San Francisco/Oakland Division based on Oakland's location in the County of Alameda.

**DEFINITIONS**

8.    Bid: As used herein, the term "Bid" means the Rate of Return offered by prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or the competitive processes by which other Municipal Derivatives are purchased by Government Entities.

9.    Competitive Bidding Process: As used herein, the term "Competitive Bidding Process" means the process mandated by Treasury Regulation §148.5, *et seq.*, and detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to purchase a Guaranteed Investment Contract, as that term is defined herein.

10.    Government Entity: As used herein, the term "Government Entity" means any state, local or municipal body or any subdivision thereof. Excluded from the definition of Government Entity is any federal government body.

11.    Municipal Derivative: As used herein, the term "Municipal Derivative" means a variety of financial instruments that Government Entities use to invest the proceeds of bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the interest-rate risk associated with the issuance of tax-exempt debt. As used herein, the term Municipal Derivative encompasses all of the following types of transactions:

a.    Guaranteed Investment Contract ("GIC"): "Guaranteed Investment Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange for a series of payments at a guaranteed Rate of Return over the life of the contract. A GIC is a Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs

1   (typically used for capital projects and subject to provisions allowing investment principal to be

2   drawn down pursuant to a set schedule).  A GIC is similar to a bond, in that "principal" – the

3   proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate

4   of Return determined by the terms of the contract.

5        b.   Advance Refunding Escrow:  An "advance refunding escrow" is an

6   arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding

7   bond) are deposited into an escrow account for investment in an amount sufficient to pay the

8   principal of, and interest on, the underlying issue to be refunded on the original interest payment

9   and maturity dates.

10        c.   Swap:  A "swap" is a type of agreement frequently used to

11   minimize the interest rate risk Government Entities face when issuing large amounts of tax-

12   exempt debt obligations.  A swap involves two Counterparties – the Government Entity and a

13   Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous

14   purchase of another instrument for purposes of enhancing the Counterparties' respective holdings.

15   Government Entities use swaps to achieve desired tax results, or to alter or protect various

16   features of an existing municipal bond portfolio.  There are several types of swaps: (a) floating-

17   for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

18   rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

19   Government Entities, even those with sophisticated and experienced municipal finance

20   departments, retain a Municipal Derivatives Broker (including many of those named as

21   Defendants herein) as "swap advisors" to aid in the swap transaction.

22        d.   Option:  An "option" is one of two types of agreements used to

23   shift a Government Entity's tax-exempt securities holdings typically acquired in association with

24   issuance of municipal bonds.

25          i.   A Put Option is a provision in a bond contract where the

26   investor has the right, on specified dates after required notification, to surrender the securities to

27   the issuer or the issuer's agent at the predetermined price (usually par value).

28

756814.3                                    - 4 -                        CLASS ACTION COMPLAINT

1     ii.  A <u>Call Option</u> is a transaction where the issuer repays to the

2 holder of an outstanding security the principal amount thereof (plus, in certain cases, an

3 additional amount representing a redemption premium) as a result of the issuer exercising a right

4 under the bond contract to repay the security prior to its scheduled maturity date (often referred to

5 as the "call").

6     e.  <u>Swaption:</u>  A "Swaption" is the combination of a Swap and an

7 Option.

8     f.  <u>Interest Rate Floors and Collars</u>:  Interest rate "floors" and "collars"

9 are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the

10 Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing

11 to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less

12 than a particular interest rate within range of interest rates (a "collar").

13    12.  <u>Municipal Derivatives Broker</u>: As used herein, the term "Derivatives

14 Broker" means an entity retained by a Government Entity to oversee the processes, including the

15 Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased.

16 Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal

17 Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding

18 undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly

19 competitive means.  Derivatives Brokers enjoy mutually symbiotic and incestuous relationships

20 with large investment banks and insurance companies, and act as "finders" of municipal securities

21 business for the securities dealers or investment banks that often pay kickbacks to the Municipal

22 Derivatives Brokers in the form of finders' fees and monthly retainers.

23    13.  <u>Municipal Derivatives Counterparty</u>:  As used herein, the term "Municipal

24 Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a

25 Government Entity contracts for a transaction involving the purchase of one or more of the

26 Municipal Derivatives described herein.

27

28

1    14.    Municipal Derivatives Seller: As used herein, the term "Derivatives Seller"

2    means an entity offering to enter into a Municipal Derivative transaction with a Government

3    Entity pursuant to the Competitive Bidding Process or other competitive process.

4    15.    Rate of Return: As used herein, the term "Rate of Return" means the fixed

5    amount, typically expressed as a percentage of the underlying bond proceeds amount or as a

6    specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received

7    by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction

8    with a Municipal Derivatives Counterparty. The Rate of Return is an element of the Competitive

9    Bidding Process where competition is intended to occur for the benefit of bond issues. It was a

10    focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

11                                    **PARTIES**

12                                    **Plaintiff**

13    16.    Plaintiff, the City of Oakland, California, is a municipal corporation and a

14    Government Entity. Oakland purchased Municipal Derivatives, including from one or more

15    Derivatives Seller Defendants pursuant to a Competitive Bidding Process overseen by one or

16    more of the Derivative Broker Defendants during the Class Period. Oakland purchased millions

17    of dollars' worth of Municipal Derivatives from one or more of the Derivatives Seller Defendants

18    and retained one or more of the Derivatives Broker Defendants to oversee, supervise and manage

19    the processes, including the Competitive Bidding Process, undertaken to purchase the Municipal

20    Derivatives. As a result of the unlawful conspiracy alleged herein, Oakland was injured in its

21    business or property. Oakland has contracted for its GICs with a variety of brokers and

22    underwriters, including Bank of America, FSA Management (a subsidiary of Financial Security

23    Assurance Holdings, Ltd.) and IXIS Corporate & Investment Banking, on which the Department

24    of Justice has served subpoenas as part of its investigation into Municipal Derivative bid-rigging.

25                        **Municipal Derivatives Seller Defendants**

26    17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware

27    corporation maintaining its principal place of business in Wilton, Connecticut. It is a wholly

28

1   owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and

2   sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

3               a.      AIG Financial is part of the Capital Markets arm of its parent

4   company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

5               b.      In November, 2006, AIG Financial received a subpoena from the

6   Antitrust Division of the United States Department of Justice in connection with its grand jury

7   investigation into anticompetitive conduct in the Municipal Derivatives business.

8           18.     Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is

9   an Arizona corporation maintaining its principal place of business in Los Angeles, California.

10  During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to Oakland

11  and/or members of the Class in the United States.

12              a.      In November, 2006, AIG SunAmerica received a subpoena from

13  the Securities and Exchange Commission in connection with the SEC's investigation into

14  anticompetitive practices in the Municipal Derivatives industry.

15          19.     Defendant Bank of America Corporation ("BOA") is a Delaware

16  corporation with its principal place of business in Charlotte, North Carolina.  During the time

17  period covered by this complaint, Bank of America was headquartered in San Francisco,

18  California and conducted substantial business operations in this judicial district.  During the Class

19  Period, BOA issued and sold Municipal Derivatives to Oakland and/or members of the Class in

20  the United States, either directly or through its wholly-owned subsidiary Defendant Bank of

21  America, N.A ("BANA").

22          20.     Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary

23  of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte,

24  North Carolina.  During the Class Period, BANA issued and sold Municipal Derivatives to

25  Oakland and/or members of the Class in the United States.

26              a.      In November, 2006, BOA received subpoenas from the Antitrust

27  Division of the United States Department of Justice and the Securities and Exchange Commission

28

1    in connection with those agencies' investigations into anticompetitive conduct in the Municipal

2    Derivatives business.

3                b.        In February, 2007, BOA entered into a Corporate Conditional

4    Leniency agreement with the DOJ in connection with the antitrust investigation into

5    anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged

6    in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives industry.

7    Such leniency agreements, which insulate the corporate applicant from criminal antitrust

8    prosecution as long as it cooperates, are only entered into after the cooperating company has

9    proactively offered the DOJ evidence of *per se* violations of the antitrust laws.  Such leniency

10   agreements only cover criminal antitrust violations, and do not insulate companies from criminal,

11   civil or administrative actions in other areas.

12               c.        On February 4, 2008, Defendant BOA's subsidiary BANA received

13   a so-called Wells notice from the SEC, advising the company that the SEC staff has

14   recommended that the SEC bring a civil or administrative action against BANA in connection

15   with its investigation of anticompetitive practices in the Municipal Derivatives industry.

16               d.        BOA and BANA are also targets of investigation by the Internal

17   Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal

18   Derivatives industry.  In February, 2007, concurrently with its entrance into the DOJ's Corporate

19   Leniency agreement covering criminal antitrust violations,  BOA entered into an agreement with

20   the IRS related to BOA's role in providing GICs and other agreements in connection with certain

21   "blind pool" municipal bond transactions.

22               e.        BOA has also been implicated in a bid-rigging and kickback

23   scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved

24   Derivative Broker Defendants CDR and Feld Winters as well as Derivative Seller Defendants

25   UBS and Piper Jaffray.

26               21.       Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware

27   corporation with its principal place of business in New York, New York.  During the Class

28

1   Period, Bear Stearns issued and sold Municipal Derivatives to Oakland and/or members of the

2   Class in the United States.

3               a.      The SEC has previously investigated Bearn Stearns' municipal

4   bond department and its municipal bond underwriting practices.

5               b.      Stephen Salvadore, currently the Senior Managing Director and

6   Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has

7   disclosed that he is a target of the grand jury convened in the Southern District of New York by

8   the Antitrust Division of the Department of Justice investigating antitrust and other violations

9   related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

10  kind received by Salvadore are an indication that the DOJ has substantial evidence of the

11  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

12  plea agreement or cooperation deal.

13              c.      In addition, at least one former Bear Stearns employee is a target of

14  both the SEC and the grand jury convened in the Southern District of New York by the Antitrust

15  Division of the Department of Justice investigating antitrust and other violations related to

16  anticompetitive conduct in the Municipal Derivatives business.

17              d.      Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and

18  whose last position at the company was Managing Director and Chief of Municipal Structuring,

19  has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or

20  administrative action against him in connection with securities violations related to bidding

21  procedures in the Municipal Derivatives industry during his tenure at Bear Stearns. Marsh also

22  disclosed that he is a target of the grand jury convened in the Southern District of New York by

23  the Antitrust Division of the Department of Justice investigating antitrust and other violations

24  related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

25  kind received by Marsh are an indication that the DOJ has substantial evidence of the commission

26  of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

27  agreement or cooperation deal. Marsh was also subpoenaed by the SEC in connection with its

28

1    investigation into wrongdoing associated with municipal bond derivatives transactions in

2    Jefferson County, Alabama.

3              22.      Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

4    corporation maintaining its principal place of business in New York, New York. During the

5    Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

6    to Oakland and/or members of the Class in the United States.

7                    a.      FGIC has received a subpoena from the Securities and Exchange

8    Commission in connection with the SEC's investigation into anticompetitive practices in the

9    Municipal Derivatives industry.

10              23.      Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

11    is a New York corporation maintaining its principal place of business in New York, New York.

12    During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Oakland and/or

13    members of the Class in the United States, either directly or through its wholly-owned subsidiary

14    FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited liability company

15    headquartered in New York City.

16                    a.      In November, 2006 FSA Holdings received subpoenas from the

17    Antitrust Division of the United States Department of Justice and the Securities and Exchange

18    Commission in connection with those agencies' investigations into anticompetitive conduct in the

19    Municipal Derivatives business.

20                    b.      On February 4, 2008, FSA Holdings received a so-called Wells

21    notice from the Philadelphia regional office of the SEC, informing the company that the SEC

22    staff had recommended civil or administrative action against FSA Holdings in connection with its

23    investigation into anticompetitive practices in the Municipal Derivatives industry. The Wells

24    notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

25    Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

26              24.      Defendant First Southwest Company ("First Southwest") is a Delaware

27    corporation with its principal place of business in Dallas, Texas. During the Class Period, First

28

1    Southwest issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

2    United States.

3            a.    First Southwest has received a subpoena from the Securities and

4    Exchange Commission in connection with the SEC's investigation into anticompetitive practices

5    in the Municipal Derivatives industry.

6        25.    Defendant Genworth Financial, Inc. ("Genworth") is a New York

7    corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

8    and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

9            a.    Genworth has received subpoenas from the Antitrust Division of

10    the United States Department of Justice and the Securities and Exchange Commission in

11    connection with those agencies' investigations into anticompetitive conduct in the Municipal

12    Derivatives business.

13        26.    Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

14    Delaware corporation maintaining its principal place of business in New York, New York.  GE

15    Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

16    During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

17    Class.

18        27.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware

19    corporation maintaining its principal place of business in New York, New York.  During the

20    Class Period, JPMorgan issued and sold Municipal Derivatives to Oakland and/or members of the

21    Class in the United States.

22            a.    In November, 2006, JPMorgan received subpoenas from the

23    Antitrust Division of the United States Department of Justice and the Securities and Exchange

24    Commission in connection with those agencies' investigations into anticompetitive conduct in the

25    Municipal Derivatives business.

26            b.    At least three former JPMorgan employees are targets of the Justice

27    Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives

28    industry.

1        c.    Samuel Gruer, who worked at JPMorgan from 1994 through 2006

2   and whose last position was Vice-President in the Derivatives Marketing unit of the company's

3   Tax-Exempt Capital Markets Group, has recently disclosed that he is a target of the grand jury

4   convened in the Southern District of New York by the Antitrust Division of the Department of

5   Justice investigating antitrust and other violations related to anticompetitive conduct in the

6   Municipal Derivatives business.  Target letters of the kind received by Gruer are an indication

7   that the DOJ has substantial evidence of the commission of a federal crime and typically a sign

8   that the recipient will soon be indicted absent a plea agreement or cooperation deal.

9        d.    Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also

10  recently disclosed that he is a target of the grand jury convened in the Southern District of New

11  York by the Antitrust Division of the Department of Justice investigating antitrust and other

12  violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters

13  of the kind received by Raz are an indication that the DOJ has substantial evidence of the

14  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

15  plea agreement or cooperation deal.

16       e.    James Hertz, who worked at JPMorgan from 1994 until he was

17  fired from the firm in January, 2008, has also recently disclosed that JPMorgan informed him that

18  he was under investigation by the DOJ for what Hertz described as "conduct on the municipal

19  derivatives marketing desk," an indication that the investigation involves JPMorgan's entire

20  municipal derivatives business, which necessarily includes Municipal Derivatives.  Target letters

21  of the kind received by Hertz are an indication that the DOJ has substantial evidence of the

22  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

23  plea agreement or cooperation deal.

24       28.   Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

25  banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase.  During

26  the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Oakland and/or

27  members of the Class in the United States.

28

29.    Defendant Kinsell Newcomb & DeDios Inc. ("KND") is a California corporation with its principal place of business in Solano Beach, California. During the Class Period, KND issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

a.    KND has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

30.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

31.    Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

32.    Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

33.    Defendant National Westminster Bank plc ("NatWest") is a public limited corporation maintaining its principal place of business in London, England. During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a subsidiary of Royal Bank of Scotland.

34.    Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate & Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place of business in Paris, France. During the Class Period, Natixis issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

a.    In November, 2006, Natixis' predecessor IXIS Corporate & Investment Bank received a subpoena from the Antitrust Division of the United States

1    Department of Justice in connection with its grand jury investigation into anticompetitive conduct

2    in the Municipal Derivatives business.

3            35.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation

4    with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper

5    Jaffray issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

6    United States.

7                    a.    Piper Jaffray has received subpoenas from the Antitrust Division of

8    the United States Department of Justice and the Securities and Exchange Commission in

9    connection with those agencies' investigations into anticompetitive conduct in the Municipal

10   Derivatives business.

11                   b.    James Towne, employed as Managing Director of Piper Jaffray's

12   municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed

13   him that he is under investigation by the Antitrust Division of the Department of Justice for

14   potential antitrust and other violations relating to the Municipal Derivatives industry.

15           36.    Defendant Security Capital Assurance, Inc. ("Security Capital") is a

16   foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the

17   Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

18   and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Oakland

19   and/or members of the Class in the United States.

20           37.    Defendant Société Générale ("SocGen") is a French corporation

21   headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives

22   to Oakland and/or members of the Class in the United States, either directly or through its wholly-

23   owned subsidiaries Société Générale Americas, Inc., a Delaware corporation headquartered in

24   New York, New York and/or SG Americas Securities, LLC, a Delaware limited liability

25   corporation also headquartered in New York, New York.

26                   a.    SocGen has received a subpoena from the Securities and Exchange

27   Commission in connection with the SEC's investigation into anticompetitive practices in the

28   Municipal Derivatives industry.

756814.3                              - 14 -                    CLASS ACTION COMPLAINT

1          b.    SocGen's Municipal Derivatives business is being scrutinized by

2 the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

3 by CDR.

4       38.    Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

5 limited liability corporation maintaining its principal place of business in New York, New York.

6 GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

7 During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

8 Class.

9       39.    Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

10 in Basel, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to

11 Oakland and/or members of the Class in the United States, either directly or through its wholly-

12 owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

13          a.    In November, 2006, UBS received subpoenas from the Antitrust

14 Division of the United States Department of Justice and the Securities and Exchange Commission

15 in connection with those agencies' investigations into anticompetitive conduct in the Municipal

16 Derivatives business.

17          b.    On February 4, 2008, UBS received a so-called Wells notice from

18 the Philadelphia regional office of the SEC advising the company that the SEC staff had

19 recommended that the SEC bring a civil action against UBS in connection with the

20 anticompetitive practices associated with municipal bond derivatives.

21          c.    Peter Ghavami, until December 2007 the Managing Director and

22 Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently

23 disclosed that he is a target of the grand jury convened in the Southern District of New York by

24 the Antitrust Division of the Department of Justice investigating antitrust and other violations

25 related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

26 kind received by Ghavami are an indication that the DOJ has substantial evidence of the

27 commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

28 plea agreement or cooperation deal.

40.    Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. During the Class Period, UBS Securities issued and sold Municipal Derivatives to members of the Class.

41.    Defendant UBS Financial Services Inc. ("UBS Financial"), formerly known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. In 2000, UBS Financial was purchased by Defendant UBS AG. During the Class Period, UBS Financial issued and sold Municipal Derivatives to members of the Class.

42.    Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia N.A. issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

43.    Defendant Wachovia Corporation ("Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States either directly or through its wholly-owned subsidiary Defendant Wachovia Bank, N.A. ("Wachovia N.A.").

a.    In November, 2006, Wachovia received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

b.    Both the DOJ and the SEC have advised Wachovia that they believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid municipal derivatives transactions.

c.    Two Wachovia N.A. employees working in the company's Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

1  grand jury convened in the Southern District of New York by the Antitrust Division of the

2  Department of Justice investigating antitrust and other violations related to anticompetitive

3  conduct in the Municipal Derivatives business.  Target letters of the kind received by McConnell

4  and Saunders are an indication that the DOJ has substantial evidence of the commission of a

5  federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6  or cooperation deal.  Wachovia recently placed both Saunders – who worked for Defendant Bank

7  of America from 1998 through 2003 – and McConnell on administrative leave following their

8  disclosure that they were targets of the government's grand jury investigation.

9        44.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

10  liability corporation maintaining its principal place of business in Schaumberg, Illinois.  During

11  the Class Period, XLAF issued and sold Municipal Derivatives to Oakland and/or members of the

12  Class in the United States.

13            a.    XLAF received subpoenas from the Antitrust Division of the

14  United States Department of Justice and the Securities and Exchange Commission in connection

15  with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

16  business.

17        45.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance")

18  is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois.

19  During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Oakland

20  and/or members of the Class.

21        46.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation

22  maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, XL

23  Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding

24  1, LLC issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

25  United States.

26            **Municipal Derivatives Broker Defendants**

27        47.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited

28  liability corporation with its principal place of business in New York, New York.  During the

1   Class Period, Cain acted as a broker for Oakland and/or members of the Class in purchasing

2   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3              a.     Cain was subpoenaed by the SEC in connection with its

4   investigation of anticompetitive practices in the Municipal Derivatives industry.

5              48.    Defendant CDR Financial Products, Inc. ("CDR") is a Delaware

6   corporation maintaining its principal place of business at Beverly Hills, California.  During the

7   Class Period, CDR acted as a broker for Oakland and/or members of the Class in purchasing

8   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

9              a.     CDR's California offices were raided by the FBI in November,

10  2006, at the start of the government's investigation into anticompetitive conduct in the Municipal

11  Derivatives market.

12             b.     CDR has been the subject of a series of long-standing federal

13  governmental investigations involving its dealings with other participants in the municipal

14  derivatives market, including Defendant Bank of America.

15             49.    Defendant Feld Winters Financial, LLC ("Feld Winters"), is a California

16  limited liability corporation with its principal place of business in Sherman Oaks, California.

17  During the Class Period, Feld Winters acted as a broker for Oakland and/or members of the Class

18  in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

19  Defendants.

20             a.     Feld Winters was subpoenaed by the Justice Department in

21  connection with its investigation of anticompetitive conduct in the Municipal Derivatives

22  business.

23             50.    Defendant George K. Baum & Company ("Baum") is a Missouri

24  corporation with its principal place of business in Kansas City, Missouri.  During the Class

25  Period, Baum acted as a broker for Oakland and/or members of the Class in purchasing Municipal

26  Derivatives from one or more of the Municipal Derivatives Seller Defendants.

27             a.     Baum was subpoenaed by the SEC in connection with its

28  investigation of anticompetitive practices in the Municipal Derivatives industry.

1               b.      Baum has been the target of previous governmental investigations

2  related to its Municipal Derivatives business.

3               c.      On November 10, 2006, Baum settled allegations with the IRS that

4  it diverted profits from municipal bond deals. In one instance the IRS alleged that bidding was

5  rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

6  1999 and issued by the Illinois Development Finance Authority.

7          51.      Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

8  Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

9  During the Class Period, IMAGE acted as a broker for Oakland and/or members of the Class in

10  purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

11  Defendants.

12               a.      IMAGE's Pennsylvania offices were raided by the FBI in

13  November, 2006, at the start of the government's investigation into anticompetitive conduct in the

14  Municipal Derivatives market.

15          52.      Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

16  Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

17  Memphis, Tennessee. During the Class Period, Morgan Keegan acted as a broker for Plaintiff

18  and/or members of the Class in purchasing Municipal Derivatives from one or more of the

19  Municipal Derivatives Seller Defendants.

20               a.      Morgan Keegan has received a subpoena from the Securities and

21  Exchange Commission in connection with the SEC's investigation into anticompetitive practices

22  in the Municipal Derivatives industry.

23          53.      Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

24  corporation maintaining its principal place of business in Delray Beach, Florida. During the

25  Class Period, PackerKiss acted as a broker for Plaintiff and/or members of the Class in

26  purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

27  Defendants.

28

1        54.    Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet

2 Inc., is a corporation maintaining its principal place of business in Aurora, Colorado. During the

3 Class Period, Shockley acted as a broker for Plaintiff and/or members of the Class in purchasing

4 Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

5        55.    Defendant Sound Capital Management, Inc. ("Sound Capital") is a

6 Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota.

7 During the Class Period, Sound Capital acted as a broker for Oakland and/or members of the

8 Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

9 Defendants.

10        a.    Sound Capital's Minnesota offices were raided by the FBI in

11 November, 2006, at the start of the government's investigation into anticompetitive conduct in the

12 Municipal Derivatives market.

13        56.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California

14 limited liability company maintaining its principal place of business in Los Angeles, California.

15 During the Class Period, Winters acted as a broker for Plaintiff and/or members of the Class in

16 purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

17 Defendants.

18        **CO-CONSPIRATORS**

19        57.    Various other persons, firms and corporations, not named as Defendants

20 herein, have participated as co-conspirators with Defendants and have performed acts and made

21 statements in furtherance of the conspiracy.

22        58.    Whenever in this Complaint reference is made to any act, deed or

23 transaction of any corporation, the allegation means that the corporation engaged in the act, deed

24 or transaction by or through its officers, directors, agents, employees or representatives while they

25 were actively engaged in the management, direction, control or transaction of the corporation's

26 business or affairs.

27

28

**CLASS ACTION ALLEGATIONS**

59.    Oakland brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local or municipal Government Entities and private entities in the United States and its territories that purchased Municipal Derivatives directly from one or more of the Municipal Derivatives Seller Defendants and/or through one or more of the Derivatives Broker Defendants at any time from January 1, 1992 through December 31, 2007. Excluded from the Class are all federal governmental entities and instrumentalities of the federal government.

60.    Oakland does not know the exact number of Class members because such information is in the exclusive control of Defendants. But due to the nature of the trade and commerce involved, Oakland believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

61.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62.    There are questions of law and fact common to the Class, including:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective prices of Municipal Derivatives sold in the United States;

b.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the United States;

c.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for Municipal Derivatives sold in the United States;

d.    The identity of the participants of the alleged conspiracy;

e.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

756814.3

CLASS ACTION COMPLAINT

1              f.      Whether the alleged conspiracy violated Section 1 of the Sherman

2   Act, 15 U.S.C. § 1;

3              g.      Whether the conduct of Defendants and their co-conspirators, as

4   alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code §

5   16720, *et seq.*;

6              h.      Whether the conduct of Defendants and their co-conspirators, as

7   alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof.

8   Code § 17200, *et seq.*;

9              i.      Whether the conduct of Defendants and their co-conspirators, as

10   alleged in this Complaint, caused injury to the business or property of the Oakland and the other

11   members of the Class;

12              j.      The effect of the alleged conspiracy on the effective prices of

13   Municipal Derivatives sold in the United States during the Class Period;

14              k.      Whether the Defendants and their co-conspirators fraudulently

15   concealed the conspiracy's existence from the Oakland and the other members of the Class; and

16              l.      The appropriate class-wide measure of damages.

17       63.      Oakland is a member of the Class, Oakland's claims are typical of the

18   claims of the Class members, and Oakland will fairly and adequately protect the interests of the

19   Class. Oakland is a direct purchaser of Municipal Derivatives, and its interests are coincident

20   with, and not antagonistic to, those of the other members of the Class.

21       64.      Oakland is represented by counsel who are competent and experienced in

22   the prosecution of antitrust and class action litigation.

23       65.      The prosecution of separate actions by individual members of the Class

24   would create a risk of inconsistent or varying adjudications, establishing incompatible standards

25   of conduct for Defendants.

26       66.      The questions of law and fact common to the members of the Class

27   predominate over any questions affecting only individual members, including legal and factual

28   issues relating to liability and damages.

1       67.    A class action is superior to other available methods for the fair and

2   efficient adjudication of this controversy. The Class is readily definable and is one for which

3   records should exist. Prosecution as a class action will eliminate the possibility of repetitious

4   litigation. Treatment as a class action will permit a large number of similarly situated persons to

5   adjudicate their common claims in a single forum simultaneously, efficiently, and without the

6   duplication of effort and expense that numerous individual actions would engender. This class

7   action presents no difficulties in management that would preclude maintenance as a class action.

8                  **TRADE AND INTERSTATE COMMERCE**

9       68.    The activities of Defendants and their co-conspirators, as described in this

10  Complaint, were within the flow of and substantially affected interstate commerce.

11      69.    During the Class Period, Defendants and their co-conspirators issued and

12  sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of

13  interstate commerce to Government Entities located in states other than the states in which the

14  Municipal Derivatives Seller Defendants issued and/or brokered these products.

15      70.    The conspiracy in which the Defendants and their co-conspirators

16  participated had a direct, substantial, and reasonably foreseeable effect on United States

17  commerce.

18                          **FACTS**

19             **The Market for Municipal Derivatives**

20      71.    Municipalities and state and local government agencies issue over $2

21  trillion worth of municipal bonds annually.

22      72.    While the tax-free bonds are sold in contemplation of construction, public

23  housing or other public-works projects, municipalities have in the last decade opted to invest the

24  proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk

25  associated with the issuance of large amounts of tax-exempt debt.

26      73.    Municipal Derivatives have become an attractive investment vehicle for

27  municipalities looking to park bond proceeds until the money raised from the sale is actually

28  needed for capital projects, or to protect themselves from interest-rate risk associated with issuing

1    their tax-exempt bonds.  There are roughly $40 - $60 billion in Municipal Derivatives created in

2    the United States annually.

3              74.    The market for Municipal Derivatives has become more concentrated since

4    the late 1990's, with an increasingly smaller number of investment banks and bond insurers

5    occupying the market.

6              75.    The Municipal Derivatives industry has been variously described by

7    market participants as opaque, intertwined and interconnected, all characteristics which facilitate

8    the type of illegal collusion alleged herein.  The Municipal Derivatives market lacks transparency,

9    and regulatory and private efforts to impose transparency have not been successful.  On July 26,

10   2007, the Chairman of the Securities and Exchange Commission delivered a white paper to

11   Congress calling for improved oversight of the municipal securities market.

12                        **The Competitive Bidding Process**

13             76.    A wide variety of Municipal Derivatives are sold through competitive

14   bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers

15   acting as their fiduciaries.

16             77.    The Competitive Bidding Process involving GICs is illustrative of the way

17   many Government Entities purchase Municipal Derivatives, and indicative of the methods by

18   which the Defendants have succeeded in manipulating these financial instruments pursuant to

19   their bid-rigging and customer allocation conspiracy.

20             78.    Flush with proceeds from a muni bond sale, a Government Entity looks to

21   invest in a GIC.  The Government Entity will retain a GIC Broker to facilitate the acquisition of

22   the contract.  The Government Entities typically pay a fee to the GIC Broker for shopping for

23   GIC Bids.

24             79.    In the wake of the so-called "yield-burning" scandal of the 1980's and

25   1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged

26   fees that acted to artificially reduce the yields on their underlying bond issues – the IRS

27   promulgated regulations meant to ensure that Government Entities were purchasing Municipal

28   Derivatives at a fair market value price.

1          80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate

2   that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot

3   exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-

4   exempt bond investments is required to be rebated to the IRS, absent an exception.

5          81.    To satisfy these so-called arbitrage rules, any given GIC is structured to

6   limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond

7   whose issuance financed the investment in the GIC in the first place.  The Rate of Return any

8   particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively

9   capped.

10          82.    Treasury Regulations related to Municipal Derivatives are aimed at

11   ensuring that Government Entities get competitive bids on the interest rate a Municipal

12   Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury

13   Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain

14   procedures.  Essentially, there should be at least three reasonably competitive bids solicited from

15   Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid –

16   that is, no bidder can have a "last look" to review other bids before bidding on the contract.

17   Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an

18   entity with "an established industry reputation" as a competitive Municipal Derivatives Seller.

19   The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging

20   has occurred.

21          83.    The Municipal Derivatives Broker, acting as the fiduciary to the

22   Government Entity, oversees the solicitation and placement of the bids from Municipal

23   Derivatives Sellers.

24          84.    After hiring a Municipal Derivatives Broker to oversee the solicitation of

25   GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the

26   Competitive Bidding Process.

27

28

85.    The parties to a GIC are the Municipal Derivatives Seller, acting as the Counterparty and the Government Entity. The Municipal Derivatives Seller now acting as the Counterparty supplies the most salient term, namely the Rate of Return on the investment.

86.    The GIC entitles the Government Entity to receive the return of the Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to withdraw principal from the GIC as permitted.

87.    Generally, a Government Entity will acquire a GIC in order to invest funds on deposit in a debt service reserve fund or construction fund until it needs to use such funds to service debt or fund the payment of project expenses in accordance with the underlying bond documents.

88.    In exchange for the payment of a guaranteed Rate of Return to the Government Entity, and the full repayment of all principal on a date certain, the Municipal Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity. The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to whatever investment the Municipal Derivatives Counterparty chooses.

89.    The Competitive Bidding Process outlined in the Treasury Regulations mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids from Municipal Derivatives Sellers. Each bidder typically faxes its Bid into the Municipal Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and the time each Bid was received.

90.    Each GIC Bid includes a statement that the Bid was determined without regard to any other formal or informal agreement with another Municipal Derivatives Seller, and that the Bid was not submitted solely as a so-called "courtesy" Bid.

1        91.     The Municipal Derivatives Seller that offers the highest-yielding Rate of

2    Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding

3    Process.

4        92.     The vast majority of GICs purchased in the United States are purchased

5    pursuant to the competitive bidding process established by Treasury Regulation §1.148-5 *et seq.*,

6    which has been in effect since approximately 1993, and which are only some of the Treasury

7    Regulations governing the reinvestment of municipal bond proceeds.

8        93.     The entire GIC bidding and purchasing process, as well as those processes

9    relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even

10    when dealings involve sophisticated and experienced Government Entities.

11        94.     Even sophisticated Government Entities (who rely in large part on the

12    Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are

13    the target of the bid-rigging and customer allocation conspiracy alleged herein.

14                     **The Bid-Rigging Conspiracy**

15        95.     The potential for bid-rigging in any given GIC transaction exists in the

16    exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government

17    Entity looking to invest its bond proceeds. The Municipal Derivatives Seller Defendants, aided

18    by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a

19    travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

20        96.     The Municipal Derivatives Seller Defendants, in concert with the

21    Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal

22    Derivatives bought by Government Entities as part of their bid-rigging and customer allocation

23    conspiracy.

24        97.     Bid-rigging of GIC transactions, which are illustrative of anticompetitive

25    conduct in the overall market for Municipal Derivatives, typically occurs when only one firm

26    submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids

27    offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

28

98.    Other times, bids are late or incomplete, leaving only one viable bid for the Government Entity to choose from.

99.    Although at least one market participant has recently attempted to add transparency to the market by developing a web-based bid auction service, GIC Bids are traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type alleged herein.

100.    At least one investment bank has provided the government with transcripts of telephone conversations that indicated that the investment bank and other market participants were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

101.    While the winning bid may be financially viable in light of the Treasury Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and does not necessarily provide the Government Entity with the best possible Rate of Return on the investment it is seeking by buying the GIC.

102.    The unrealistically low bids – dubbed "courtesy bids" because they are provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is below fair market value – are often more than 100 basis points below the winning bid. As Mark Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumption you can draw is that there are courtesy bids being provided."

103.    Often the winning bid is the only one high enough to make the GIC work and be a worthwhile reinvestment vehicle for the Government Entity.

104.    According to a speaker at a recent teleconference organized by the National Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of courtesy bids in GICs transactions is quite prevalent. IRS officials have stated that bid-rigging is a wide and pervasive practice in GIC transactions and have uncovered numerous transactions involving rigged bids and customer allocation. A number of these transactions involve both the Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

105.   Municipal Derivatives Brokers also routinely offer favored Municipal Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even exclude potential bidders without the Government Entity's knowledge.

106.   Evidence seized by the federal government as part of its wide-ranging investigation, including taped telephone conversations, revealed instances in which the winning bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for preferential treatment in later deals.

107.   As part of its ongoing investigation into these practices, the IRS also uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for the GIC – that is, provide a less than fair market value interest rate – and then overpay the Municipal Derivatives Broker for other investment agreements or remarketing fees associated with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying bond or result in excess "arbitrage" paid to the federal government.

### Governmental Investigations of Defendants' Conspiracies

108.   On Wednesday, November 15, 2006, the FBI began a series of nationwide raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker Defendants.  The FBI raids coincided with the service of nearly two dozen subpoenas on other participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers named as Defendants herein.

109.   The DOJ's Antitrust Division served subpoenas from a grand jury sitting in the Southern District of New York, and a number of the targeted companies revealed that they had also received subpoenas from the Securities and Exchange Commission in connection with a parallel civil probe.

110.   The Antitrust Division is conducting a criminal probe into anticompetitive conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging market participants with continuing acts of conspiracy, and (as detailed above) have targeted a number of individuals for indictment.

1    111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused

2    on securities fraud in municipal bond deals undertaken since 2000.  Upon information and belief,

3    the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme

4    involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary

5    corollary to the conspiracy alleged herein.  Such non-disclosure of kickbacks to Municipal

6    Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may

7    subject them to potentially excessive arbitrage payments to the federal government.

8    112.    The DOJ and SEC investigations follow a lengthy and continuing probe by

9    the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

10    113.    The Justice Department subpoenas asked for documents, e-mails, tapes or

11    notes of phone conversations and other information regarding "contracts involving the investment

12    or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as

13    well as] related transactions involving the management or transferal of the interest rate risk

14    associated with those bonds, including but not limited to [GICs], forward supply, purchase or

15    delivery agreements; repurchase agreements; swaps; options; and swaptions."

16    114.    The subpoenas also demanded organizational charts, phone directories, and

17    lists of all employees involved with Municipal Derivatives, in addition to all documents

18    associated with what the subpoenas apparently described as "relevant municipal contracts

19    awarded or intended to be awarded pursuant to competitive bidding," which would include

20    invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients;

21    actual or proposed responses to those RFPs; and amounts and prices bid for the various

22    investment vehicles.

23    115.    On February 9, 2007, Defendant Bank of America announced that it

24    entered into a leniency agreement with the Justice Department in connection with what it

25    described as "the Department's investigation into anticompetitive practices in the municipal

26    derivatives industry."

27

28

756814.3                                    - 30 -                        CLASS ACTION COMPLAINT

1         116.   Defendant Bank of America noted that the amnesty grant "was the result of

2    the company voluntarily providing information to the Department before the Department began

3    its investigation, as well as the company's continuing cooperation."

4         117.   Entry into the DOJ's amnesty program follows presentation of evidence of

5    a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America.

6    Evidence of Defendant Bank of America's dealings, including recorded telephone conversations

7    of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation.  Key

8    derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the

9    head of BOA's derivatives department.

10         118.   Defendant Bank of America also disclosed that it had reached a $14.7

11    million settlement with the IRS relating to the company's role in providing GICs and other

12    agreements to municipal bond issuers.

13         119.   As detailed in Paragraphs 16 to 53 above, a number of individuals have

14    been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives

15    Seller Defendants are facing civil and administrative actions from the SEC in relation to that

16    agency's investigation into anticompetitive practices in the Municipal Derivatives market.

17                            **FRAUDULENT CONCEALMENT**

18         120.   Oakland and members of the Class had no knowledge of the agreement,

19    contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have

20    led to the discovery thereof, until shortly before the filing of this action.  Oakland could not have

21    discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise

22    of reasonable diligence because of the deceptive practices and methods of secrecy employed by

23    Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their

24    agreement, contract, combination, and conspiracy.  These methods of secrecy included, but were

25    not limited to, secret meetings, misrepresentations concerning the reasons for price increases,

26    encouraging witnesses to give false testimony to the grand jury and government officials, and

27    destroying or concealing evidence of their illegal conduct.

28

1    121.    The affirmative acts of the Defendants alleged herein, including acts in

2    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

3    precluded detection.

4    122.    By their very nature, Defendants' bid-rigging and customer-allocation

5    conspiracy was inherently self-concealing.  The Municipal Derivatives industry is not exempt

6    from antitrust regulation, and thus Oakland reasonably considered it to be a well-regulated

7    competitive industry.

8    123.    In the context of the circumstances surrounding Defendants' pricing

9    practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a

10    reasonable person that defendants' bidding and pricing were conspiratorial.  Accordingly, a

11    reasonable person under the circumstances would not have been alerted to investigate the

12    legitimacy of Defendants' proffered Municipal Derivatives prices.

13    124.    Oakland and members of the Class could not have discovered the alleged

14    contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence

15    because of the deceptive practices and techniques of secrecy employed by Defendants and their

16    co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or

17    conspiracy.  Such practices are especially prevalent in bid-rigging and customer-allocation

18    conspiracies such as the one alleged herein.

19    125.    Because the alleged conspiracy was both self-concealing and affirmatively

20    concealed by Defendants and their co-conspirators, Oakland and members of the Class had no

21    knowledge of the alleged conspiracy, or of any facts or information that would have caused a

22    reasonably diligent person to investigate whether a conspiracy existed.

23    126.    As a result of Defendants' fraudulent concealment of their conspiracy, the

24    running of any statute of limitations has been tolled with respect to any claims that Oakland and

25    members of the Class have alleged in this Complaint.

26    127.    Throughout the Class Period, Defendants and their co-conspirators

27    affirmatively and fraudulently concealed their unlawful conduct.

28

1        128.    Oakland and the Class members did not discover, nor could have

2    discovered through reasonable diligence, that Defendants and their co-conspirators were violating

3    the antitrust laws until before this litigation was commenced because Defendants and their co-

4    conspirators used and continue to use deceptive and secret methods to avoid detection and to

5    affirmatively conceal their violations. Nor could Oakland or the Class members have discovered

6    the violations earlier than that time because Defendants and their co-conspirators conducted their

7    conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance

8    thereof, and fraudulently concealed their activities through various other means and methods

9    designed to avoid detection.

10        129.    Defendants and their co-conspirators engaged in a successful

11    anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively

12    concealed, at least in the following respects:

13            a.    By meeting secretly to discuss effective prices, bids, and customers

14    and markets of Municipal Derivatives in the U.S.;

15            b.    By agreeing among themselves not to discuss publicly, or otherwise

16    reveal, the nature and substance of the acts and communications in furtherance of their illegal

17    scheme;

18            c.    By intentionally creating the false appearance of competition by

19    staging sham auctions in which the results were pre-determined; and

20            d.    By furnishing each other participant in all given bidding sessions

21    with illegal "last looks" at their ostensible competitors' bids.

22        130.    Oakland and Class members did not know, and could not have discovered

23    through reasonable diligence, that the auctions arranged by the Derivatives Broker Defendants

24    were sham, and that rather than being competitive, the results of the auctions were rigged.

25        131.    As a result of Defendants' fraudulent concealment, all applicable statutes

26    of limitations affecting the Oakland's and the Class' claims have been tolled.

27

28

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 1 of the Sherman Act)**

132.    From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Oakland and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

b.    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

c.    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

d.    rigging bids for Municipal Derivatives sold in the United States; and

e.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

1    135.    Defendants and their co-conspirators engaged in the actions described

2    above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or

3    stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

4    136.    The Defendants' unlawful contract, combination or conspiracy has had at

5    least the following effects:

6        a.    Effective prices paid by Oakland and the members of the Class with

7    respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-

8    competitive levels in the United States;

9        b.    Bids for Municipal Derivatives sold in the United States were

10   rigged;

11       c.    Customers and markets for Municipal Derivatives were allocated

12   among Defendants and their co-conspirators;

13       d.    Oakland and the other members of the Class paid more or received

14   lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in

15   a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and

16   unlawful activities;

17       e.    Price competition with respect to the sale of Municipal Derivatives

18   was restrained, suppressed and eliminated in the United States; and

19       f.    As a direct and proximate result of the illegal combination, contract

20   or conspiracy, Oakland and the members of the Class have been injured and financially damaged

21   in their businesses and property, in amounts to be determined, by being deprived of the highest-

22   allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes also

23   called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the

24   Government Entities by creating the appearance of competition to conceal the secretly deflated

25   interest rate offers.

26

27

28

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code section 16720, *et seq.*)**

137.    Oakland, on behalf of itself and all others similarly situated, realleges and incorporates, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

138.    The unlawful conduct of Defendants, including the Defendants headquartered or based in California, was centered in and carried out within California, and Defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

139.    Beginning at least as early as January 1, 1992 through the present, the exact dates being unknown to Oakland, Defendants and various co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, Municipal Derivatives.

140.    For the purpose of forming and implementing the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did those things they conspired to do, including but not limited to the acts alleged above, including actions:

a.    to fix, raise, maintain and stabilize the price of Municipal Derivatives;

b.    to allocate markets for Municipal Derivatives amongst themselves; and

c.    to submit rigged bids for Municipal Derivatives.

141.    In formulating and carrying out the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

1   maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2   Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3   contract, combination, and conspiracy.

4        142.   The combination and conspiracy alleged herein has had the following

5   effects, among others:

6        a.   Price competition in the sale of Municipal Derivatives has been

7   restrained, suppressed and/or eliminated in the State of California and throughout the United

8   States;

9        b.   Prices for Municipal Derivatives sold by Defendants and their

10   co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11   competitive levels in the State of California and throughout the United States; and

12        c.   Those who purchased Municipal Derivatives from Defendants and

13   their co-conspirators have been deprived of the benefit of free and open competition.

14        143.   As a direct and proximate result of the illegal combination, trust,

15   agreement, understanding and concert of action, Oakland and the members of the Class have been

16   injured in their business and property in that they paid more for Municipal Derivatives than they

17   otherwise would have paid in the absence of Defendants' unlawful conduct.

18        144.   As a result of Defendants' violation of Section 16720 of the California

19   Business and Professions Code, Oakland seeks treble damages and the costs of suit, including

20   reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21   Professions Code.

22                **THIRD CLAIM FOR RELIEF**
      **(Violation of the California Unfair Competition Law,**

23        **Cal. Bus. & Prof. Code section 17200, *et seq.*)**

24        145.   Oakland, on behalf of itself and all others similarly situated, realleges and

25   incorporates, as if fully alleged herein, each of the allegations contained in the preceding

26   paragraphs of this Complaint, and further alleges against Defendants as follows.

27        146.   Defendants' unlawful conduct was centered in, carried out and perfected

28   mainly within the State of California, and Defendants' conduct within California injured all

1    members of the Class throughout the United States.  Therefore, this claim for relief under

2    California law is brought on behalf of all members of the Class, whether or not they are

3    California residents.

4        147.    Beginning at least as early as January 1, 1992 and continuing to the

5    present, the exact dates being unknown to Oakland, Defendants committed acts of unfair

6    competition, as defined by Sections 17200, *et seq*. of the California Business and Professions

7    Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices

8    specified above.

9        148.    Oakland and the members of the Class bring this claim pursuant to

10   Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution

11   and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair

12   Competition Law.

13       149.    Defendants' acts, omissions, misrepresentations, practices and non-

14   disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15   means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16   California Business and Professions Code, Section 17200, *et seq*., in that, for example:

17           a.    the violations of Section 16720, *et seq*., of the California Business

18   and Professions Code, set forth above;

19           b.    the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20           c.    Defendants' acts, omissions, misrepresentations, practices and

21   nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the

22   California Business and Professions Code, and whether or not concerted or independent acts, are

23   otherwise unfair, unconscionable, unlawful or fraudulent;

24           d.    Defendants' act and practices are unfair to consumers of Municipal

25   Derivatives in the State of California and throughout the United States, within the meaning of

26   Section 17200, California Business and Professions Code; and

27           e.    Defendants' acts and practices are fraudulent or deceptive within

28   the meaning of Section 17200 of the California Business and Professions Code.

1    150.    Oakland and each of the Class members are entitled to full restitution

2 and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may

3 have been obtained by Defendants as a result of such business acts or practices.

4    151.    The unlawful and unfair business practices of Defendants, and each of

5 them, as described above, have caused Oakland and the members of the Class to pay supra-

6 competitive and artificially-inflated prices for Municipal Derivatives. Oakland and the members

7 of the class suffered injury in fact and lost money or property as a result of such unfair

8 competition.

9    152.    The conduct of Defendants as alleged in this Complaint violates

10 Section 17200 of the California Business and Professions Code.

11    153.    As alleged in this Complaint, Defendants and their co-conspirators have

12 been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

13 competition. Oakland and the members of the Class are accordingly entitled to equitable relief

14 including restitution and/or disgorgement of all revenues, earnings, profits, compensation and

15 benefits which may have been obtained by Defendants as a result of such business practices,

16 pursuant to the California Business and Professions Code, Sections 17203 and 17204.

17    **PRAYER FOR RELIEF**

18    WHEREFORE, the Plaintiff prays for relief as follows:

19    1.    That the Court determine that this action may be maintained as a class

20 action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Oakland be

21 certified as a class representative and Oakland's counsel be appointed as counsel for the Class;

22    2.    That the unlawful contract, combination or conspiracy alleged be adjudged

23 and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the

24 Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the

25 Cartwright Act);

26    3.    That the unlawful contract, combination or conspiracy alleged be adjudged

27 and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the

28 California Business & Professions Code (the Unfair Competition Law);

1        4.     That Oakland and the Class recover damages and restitution, as provided

2  by law, determined to have been sustained as to each of them, in an amount to be trebled in

3  accordance with the antitrust laws, and that judgment be entered against defendants on behalf of

4  Oakland and of the Class;

5        5.     That Oakland and the Class recover their costs of the suit, including

6  attorneys' fees, as provided by law; and

7        6.     For such other and further relief as is just under the circumstances.

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

756814.3

CLASS ACTION COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

3    a jury trial as to all issues triable by a jury.

4

5    Dated: April __, 2008              By:_____

6                                            John A. Russo

7                                      John A. Russo, City Attorney (SBN 063203)
                                       *jrusso@oaklandcityattorney.org*
8                                      Barbara Parker, Chief Asst. City Attorney (SBN 069722)
                                       *bparker@oaklandcityattorney.org*
9                                      Mark Morodomi, Supervising Deputy City Attorney
                                       (SBN 120914)
10                                     *mmorodomi@oaklandcityattorney.org*
                                       Kathleen Salem-Boyd, Deputy City Attorney (SBN
11                                     100179)
                                       *ksalemboyd@oaklandcityattorney.org*
12                                     CITY OF OAKLAND
                                       One Frank H. Ogawa Plaza, 6th Floor
13                                     Oakland, California 94612
                                       Telephone:  (510) 238-3034
14                                     Facsimile:  (510) 238-6500

15                                     Richard M. Heimann (SBN 63607)
                                       *rheimann@lchb.com*
16                                     Joseph R. Saveri (SBN 130064)
                                       *jsaveri@lchb.com*
17                                     Eric B. Fastiff (SBN 182260)
                                       *efastiff@lchb.com*
18                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 30th Floor
19                                     San Francisco, CA  94111
                                       Telephone:    (415) 956-1000
20                                     Facsimile:    (415) 956-1008

21                                     James A. Quadra (SBN 131084)
                                       *quadra@meqlaw.com*
22                                     Sylvia Sokol (SBN 200126)
                                       *sokol@meqlaw.com*
23                                     MOSCONE, EMBLIDGE & QUADRA, LLP
                                       220 Montgomery Street
24                                     Mills Tower, Suite 2100
                                       San Francisco, CA 94104
25                                     Telephone:    (415) 362-3599
                                       Facsimile:    (415) 362-2006

26

27

28

756814.3                    - 41 -                    CLASS ACTION COMPLAINT

1

2
Steven E. Fineman (SBN 140335)
*sfineman@lchb.com*
Daniel E. Seltz
*dseltz@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

3

4

5

6
*Attorneys for Individual and Representative Plaintiff*
*City of Oakland, California*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit B





# Firm Resume

March 21, 2008



COHEN MILSTEIN
HAUSFELD & TOLL<sup>rue</sup>

For decades, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, environmental, consumer protection, civil rights/discrimination, ERISA and human rights laws. Cohen Milstein is at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international.

The firm was established in March 1986 and is based in Washington, D.C. with offices in New York, Philadelphia, Chicago, San Francisco and London. From 1969 until 1986, the Firm was the Washington, D.C. office of the Philadelphia law firm currently known as Kohn, Swift & Graf, P.C.

Cohen Milstein is an innovator in new areas of the law. Cohen Milstein was in the forefront of filing antitrust claims on behalf of indirect purchasers in 1993 and 1994, when it filed state-court actions in 18 states on behalf of indirect purchasers of infant formula. This was the first effort to systematically and simultaneously pursue treble damages claims on behalf of indirect-purchasing consumers in all states where antitrust laws permitted such claims. This approach, and variations of it, has since become the accepted model for pursuing antitrust damages on behalf of indirect-purchasing consumers.

The firm also has been in the forefront of the development of international antitrust theory and litigation of claims. As the global economy has produced worldwide conglomerates, so, too, has the nature of antitrust violations changed. For example, in *Kruman v. Christie's International PLC, et al.* Docket No. 01-7309 and *In re Bulk Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.), both the parties and the anticompetitive actions were played out on a world, rather than domestic, stage. Cohen Milstein also represents and won Lead Plaintiff status for domestic and foreign investors in a foreign company's bonds, in a PSLRA litigation being pursued in the United States, *In re Parmalat Securities Litigation*, Master Docket 04 Civ 0030 (LAK) (S.D.N.Y.).

Cohen Milstein has also served as lead or co-lead counsel, or on Plaintiffs' Executive Committee(s), in many dozens of antitrust, securities, consumer protection or product liability, civil rights, and human rights class action cases.

Cohen Milstein has contributed over 37,000 hours of time to human rights and *pro bono* cases since 1996. As an example, the Firm represented eight survivors and/or families of the victims of the September 11, 2001 attack on the Pentagon before the Federal compensation fund. Cohen Milstein has obtained a substantial recovery for each, including the highest recovery to date, $6.8 million, for an injured individual.



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past cases include:

### *In re Vitamins Antitrust Litigation, MDL No. 1285 (D.D.C.).*

Cohen Milstein served as co-lead counsel for two certified classes of businesses that directly purchased bulk vitamins and were overcharged as a result of a ten year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a later trial before Chief Judge Hogan concerning four Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly-owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the conspiracy and ordered them to pay $49,539,234, which is trebled to $148,617,702 under the federal antitrust laws. The case was subsequently settled against those defendants.

### *Dukes v. Wal-Mart Stores, Inc., No. C-01-2252 (N.D. Cal.)*

Cohen Milstein is one of the co-lead counsel in this discrimination case. In June 2004, U.S. District Court Judge Martin Jenkins ruled that six current and former Wal-Mart employees from California may represent all female employees of Wal-Mart who worked at its U.S. stores anytime after December 26, 1998 in a nationwide sex discrimination class action lawsuit (appeal pending). As the largest civil rights class action ever certified against a private employer, the Judge described the case as "historic in nature, dwarfing other employment discrimination cases that came before it." The action charges that Wal-Mart discriminates against its female retail employees in pay and promotions. The class in this case includes more than 1.5 million current and former female employees of Wal-Mart retail stores in America, including Wal-Mart discount stores, super centers, neighborhood stores, and Sam's Clubs.

### *In re Lucent Technologies Securities Litigation, Civ. Action No. 00-621 (JAP) (D.N.J.)*

A settlement in this massive securities fraud class action was reached in late March 2003. The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed. Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

### *Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al., Civil Action No. 00-015 (Knox County Superior Court, Me.)*

In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately



800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. The Firm served as co-lead counsel.

*In re StarLink Corn Products, Liability Litigation, MDL No. 1403. (N.D. Ill..*
Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003. This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

*In re Diet Drug Litigation (Fen-Phen), MDL No. 1203 (E.D. Pa.)*
As a member of the Plaintiffs' Management Committee and Sub-Class Counsel, Cohen Milstein played a major part in the success of the Fen-Phen diet drug litigation and settlement *(In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* MDL 1203). CMHT and other plaintiffs' counsel achieved the largest settlement ever obtained in a mass tort case - $3.75 billion – on behalf of millions of U.S. consumers who used Pondimin (fenfluramine) or Redux (dexfenfluramine), either alone or in combination with phentermine, diet drugs that are associated with heart valve damage.

*Snyder v. Nationwide Mutual Insurance Company, No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.)*
Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force. The action alleged consumer fraud and misrepresentations. Plaintiffs obtained a settlement valued at more than $85 million. The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people." He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

*Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al., No. 1:01CV02313 (D.D.C.)*
Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol.



COHEN MILSTEIN
HAUSFELD & TOLL PLLC

Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen, Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

### *Kruman v. Christie's International PLC, et al., Docket No. 01-7309*
A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action. Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs. The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation. The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

### *In re Infant Formula Consumer Antitrust Litigation (multiple state courts)*
Cohen Milstein instituted price-fixing cases on behalf of indirect-purchasers in 17 states under state antitrust laws against three companies who conspired to drive up the price of infant formula. The cases resulted in settlements of $64 million for purchasers of infant formula.

### *Domestic Air Transportation Antitrust Litigation (N.D. Ga.)*
Plaintiffs alleged a conspiracy among major airlines to set prices. In one of the largest consumer class actions ever brought to a successful conclusion, Cohen Milstein was one of the lead counsel and obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses.

### *In re The Exxon Valdez Litigation, No. A89-095 Civ. (D. Ak.)*
The firm was selected from dozens of law firms around the country by federal and state judges in Alaska to serve as co-lead counsel for plaintiffs in the largest environmental case in United States history that resulted in a jury verdict of more than $5 billion (reversed and remanded for revised punitive damages award; further proceedings pending).

### *Holocaust Litigation*
In the historic Swiss Banks litigation, CMHT served, *pro bono,* as co-lead counsel for Holocaust survivors against the Swiss banks that collaborated with the Nazi regime during World War II by laundering stolen funds, jewelry and art treasures. Cohen Milstein obtained a $1.25 billion settlement, leading the presiding judge to call the firm's work "indispensable." *See In re Holocaust Victim Assets Litig.,* Case No. CV 96-4849 (ERK) (MDG) (Memorandum of Chief Judge Korman dated July 26, 2002). The Firm was also a lead counsel in litigation by survivors of World War II-era forced and slave labor in litigation against the German companies that profited from using the labor of concentration camp inmates. This



litigation, which resulted in an unprecedented settlement of $5.2 billion, was resolved by multinational negotiations involving the defendants, plaintiffs' counsel, and the governments of several countries for approximately two million claimants.

### *Roberts v. Texaco, Inc., 94-Civ. 2015 (S.D.N.Y.)*
Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief). The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole ...".

### *Conanan v. Tanoue, No. 00-CV-3091 (ESH)*
Cohen Milstein represented African-American employees at the Federal Deposit Insurance Corporation (FDIC) in this race discrimination suit, which settled for $14 million. The settlement provides the largest payment made in an employment discrimination class action based on race against a federal agency.

### *Trotter v. Perdue Farms, Inc., Case No. 99-893 (RRM) (JJF) (MPT), D. Del.*
This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply. The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law. In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices. In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. CMHT was co-lead counsel.

### *In re North Atlantic Air Travel Antitrust Litigation, Civ. Action No. 84-1103 (D.D.C.)*
The firm, as co-lead counsel, obtained a class settlement of $30 million in coupons for air travelers between the United States and England.

### *In re Screws Antitrust Litigation, MDL No. 443 (D. Mass.)*
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

### *Ocean Shipping Antitrust Litigation, MDL No. 395 (S.D.N.Y)*
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

### *In re Corrugated Container Antitrust Litigation, MDL No. 310 (S.D. Tex.)*
The firm was one of a handful of firms involved in the successful trial of this



massive antitrust case which was eventually settled for approximately $366 million.

***Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Incorporated v. Perelman, Case No. 659511 (Cal. Sup. San Diego Cty.)***
As one of co-lead counsel in the derivative action, the firm and others obtained a global settlement of class and derivative litigation for $65 million.

***In re Flat Glass Antitrust Litigation, MDL No.1200, (W.D. Pa.)***
The firm as co-lead counsel obtained a total of $ 61.7 million in settlement funds on behalf of glass shops, window manufacturers, and others who directly purchased the affected products from the defendants.

***Buspirone Antitrust Litigation, MDL No. 1413 (S.D.N.Y.)***
As one of four co-lead counsel, the firm and others obtained a $90 million settlement for the class.

***Masonite Hardboard Siding Litigation, Civ. Action No. 996787 (Cal. Super. Ct.)***
The firm, as one of the lead counsel, obtained a settlement valued at hundreds of millions of dollars.

***Polybutylene Pipe Litigation, Civ. Action No. W 2004-017770COA-R3-CV (W.D. Tenn.)***
The firm helped obtain a settlement valued at $900 million.

***Biben v. Card, No. 84-0844-CV-W-6 (W.D. Mo.)***
The firm, as one of two co-lead counsel, negotiated settlements for $11.9 million, which was 93% of class members' damages.

***In re Newbridge Networks Securities Litigation, Civ. Action No. 90-1061 (D.D.C.)***
The firm, as co-counsel, obtained a cash and stock class settlement valued at approximately $20 million.

***Jiffy Lube Securities Litigation, Civ. Action No. Y-89-1939 (D. Md.)***
The firm, as co-lead counsel, obtained class settlements for a total of $12 million.

***In re Saxon Securities Litigation, Civ. Action No. 82 Civ. 3103 (S.D.N.Y.)***
The firm, as co-lead counsel, obtained a class settlement of approximately $20 million.

***Grossman v. Waste Management, Civ. Action No. 83 Civ. 2167 (N.D. Ill.)***
The firm, as co-lead counsel, obtained a class settlement of approximately $13 million.

***In re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1986)***
The firm was one of plaintiffs' counsel in this case where a class settlement of



$18.4 million was obtained.

***In re Tandon Securities Litigation, No. CV86-4566 (C.D. Cal.)***
The firm played a major role in this class action where settlement was valued at approximately $16 million.

***Immunex Securities Litigation, No. C92-548WD (W.D. Wash.)***
The firm was one of lead counsel where the largest securities class action settlement in Seattle -- $14 million – was recovered.

***In re Caremark Securities Litigation, Case No. 94 C 4751 (N.D. Ill.)***
The firm, as co-lead counsel, obtained a class settlement of $25 million.

***In re Commercial Explosives Antitrust Litigation, Consolidated Case No. 2:96md 1093S (D. Utah)***
The firm, as co-lead counsel, obtained a settlement of $77 million.



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

## Awards & Recognition

**50 Most Powerful People in DC**
GQ Magazine
September, 2007
Michael Hausfeld named #40.

**Beacon of Justice Award**
From the National Legal Aid and Defender Association
Summer 2007
For Cohen Milstein's work on the Guatanamo cases.

**Fierce Sister Award**
Summer 2007
For Cohen Milstein's work on the comfort woman case.

**500 Leading Plaintiffs' Lawyers in America**
Lawdragon
January-February, 2007

**Top Antitrust Plaintiffs' Firm**
Competition Law 360
February 14, 2007
Cohen Milstein named #1

**International World-shakers**
The Lawyer (UK)
February 8, 2007
Michael Hausfeld named as one of top 40 international lawyers "making waves" in the UK

Joseph Sellers has been selected by his peers to be included in the upcoming 2007 edition of **The Best Lawyers in America**® in the specialty of Civil Rights Law.

**500 Leading Litigators in America**
LawDragon
Spring 2006
Michael Hausfeld, Steven Toll and Joseph Sellers are named to the list.

**The Plaintiffs' Hotlist**
The National Law Journal
October 9, 2006

**100 Most Influential Lawyers**
The National Law Journal
June 19, 2006
Michael Hausfeld is named as one of "the most influential lawyers in America."

**Runner up for Matter of the Year**
Global Competition Review
February, 2005
On Empagran matter, praised for ingenuity in how the case was prosecuted.

# Exhibit C

# BOIES, SCHILLER & FLEXNER LLP

5301 WISCONSIN AVENUE, N.W. • WASHINGTON, D.C. 20015-2015 • PH. 202.237.2727 • FAX 202.237.6131

Boies, Schiller & Flexner LLP, founded in 1997, has become one of the nation's premier law firms. Today, with over 200 lawyers practicing in offices across the country, we regularly serve as lead counsel in the most significant and highest profile disputes in the world. While best known for landmark cases such as *United States v. Microsoft*, *Bush v. Gore*, and *In re Vitamins*, we represent some of the largest and most sophisticated organizations in the world when the results matter most. In less than a decade, we have won and saved our clients billions of dollars in trials, arbitrations, and settlements. We have been described by *The Wall Street Journal* as a "national litigation powerhouse" and by the *National Law Journal* as "unafraid to venture into controversial" and "high risk" matters.

In 1997, David Boies and Jonathan Schiller combined their talents and set out to build the most interesting and dynamic litigation practice anywhere. Two years later Don Flexner joined them. Since then, they have recruited and litigated side-by-side with a group of the most accomplished and effective lawyers in the country. Our lawyers have tried more than 400 cases, and include two former United States Attorneys, numerous former Justice Department officials and Assistant United States Attorneys, several former Supreme Court clerks, and many former partners of prestigious law firms. The talent of our partnership is matched by the skill and diversity of our associates, who come mainly from judicial clerkships and top law schools. Likewise, our corporate practice brings our standard of excellence to bear in negotiating complex and sophisticated transactions. For that reason, the *American Lawyer* noted that the firm has assembled "a team of seasoned attorneys to form one of America's most successful and sought-after law firms for cases that matter."

Our clients know and rely on our talent, standard of excellence, relentlessness, creativity, and track record of success in a wide variety of practice areas and industries, for both plaintiffs and defendants. We have successfully defended and brought actions on behalf of our clients in some of their most high-stakes litigation.

- We recently obtained, on behalf of our client, American Express, the largest antitrust recovery for a single plaintiff in the history of United States private antitrust litigation—more than twice the previous record. The settlement came in American Express' litigation against Visa, MasterCard and several banks, in which American Express alleges exclusionary conduct that prevented the banks from issuing American Express cards. The settlement was with Visa and the banks; the case continues against MasterCard.

- We won a verdict ordering the extraordinary relief of specific performance in a December 2007 trial on behalf of our client, Genesco Inc., in its suit against The Finish Line Inc. and UBS arising out of Finish Line's refusal to close on a $1.5 billion merger agreement. *The Wall Street Journal* noted "[t]he trial [was] closely watched on Wall Street, as investors and corporate

BOIES, SCHILLER & FLEXNER LLP

boards look for guidance in how to handle a spate of litigation over scuttled merger agreements." Dennis Berman, *Judge Rules Finish Line Must Acquire Genesco*, THE WALL STREET JOURNAL, Dec. 28, 2007, at A3.

- We uncovered a worldwide vitamin price fixing cartel, *In re Vitamins*, which, in the words of a federal judge, "enabl[ed] the criminal investigation to begin." The firm secured a $1.1 billion settlement for a class of vitamin purchasers, and later won a $148 million jury verdict against some of the non-settling defendants.

- We won a $512 million settlement of antitrust claims against the world's major auction houses, Christie's and Sotheby's, which was 1.8 times the out-of-pocket damages—in the settlement approval process, no one could point to an antitrust case that had previously settled for more than out-of-pocket damages.

- We are recognized internationally in arbitration where, among other matters, we successfully defended Siemens-Westinghouse against a $1.4 billion default judgment obtained in Pakistan; won a $261 million award in Paris for Florida Power & Light against its joint venture partner after Indonesia cancelled a geothermal power project; and won an arbitral award on behalf of YES Network in the form of a long-term carriage agreement with Cablevision that substantially increased the enterprise value of YES.

- We have defended our clients—such as Qwest Communications, Tyco International, and Maurice R. "Hank" Greenberg, Chairman and CEO of C.V. Starr & Company, and former Chairman and CEO of American International Group—against government investigations and in some of the highest profile corporate governance and related securities matters, including parallel proceedings in the United States and Europe.

- We recently won a New York jury verdict worth some $700 million for Lloyd's of London involving property insurance for the 9/11 destruction of the World Trade Center.

This record of success is the foundation on which the firm was built. It has distinguished Boies, Schiller & Flexner LLP as the law firm of choice for "the cases that matter."


## ANTITRUST

Boies, Schiller & Flexner has a highly successful and sophisticated antitrust practice counseling clients that face large challenges. We excel in the defense and prosecution of complex, high-stakes antitrust cases, and the defense of antitrust and competition-related government investigations. Our practice is both national and international in scope as it

2

BOIES,  SCHILLER & FLEXNER  LLP

spans a broad range of industries. Among our partners are the former lead trial attorney for the United States in *United States v. Microsoft*; a former Deputy Assistant Attorney General in charge of the Antitrust Division and the former lead attorney for the United States in *United States v. AT&T*.

Our partners have been lead trial counsel, or co-lead trial counsel, in some of the most important antitrust cases in history, including: *United States v. Microsoft*; *United States v. AT&T*; *United States v. IBM*; *United States v. Northwest Airlines and Continental Airlines*; *United States v. ADM and RJR Nabisco*; *In re Vitamins Antitrust Litigation*; *In re Auction Houses Antitrust Litigation*; *California Computer Products v. IBM*; *Square D Co. v. Niagara Frontier Tariff Bureau*; and *In re Scrap Metal Litigation*.

This experience translates into cutting-edge antitrust actions. We became pioneers in plaintiffs' side international price fixing cases when we brought the first antitrust lawsuits against certain Chinese manufacturers for conspiring to fix the prices of Vitamin C and Magnesite sold in the United States. The firm recently won several summary judgment motions, each affirmed on appeal, for a company alleged to have violated federal antitrust laws through its retail merchandising and wholesale distribution policies. Damages sought ranged from $85 million to more than $1 billion.

### CLASS ACTIONS

Boies, Schiller & Flexner enjoys one of the most selective and sophisticated class action practices in the country. We have been trial counsel in two successful class action jury trials against non-settling defendants in *In re Vitamins Antitrust Litigation* (D.D.C.) (a $49.5 million verdict in 2004 before trebling) and *In re Scrap Metal Antitrust Litigation* (an $11.5 million verdict in 2006 before trebling). The firm acted as lead counsel in *In re Auction Houses Antitrust Litigation* (S.D.N.Y.) (a $512 million settlement that another plaintiffs' counsel described as "the most outstanding result I have ever heard of in the history of the antitrust laws.").

Boies, Schiller & Flexner also served as co-lead counsel in *In re Vitamins Antitrust Litigation* (D.D.C.) (a $1.1 billion initial settlement followed by additional settlements of over $200 million); *In re Cardizem CD Antitrust Litigation* (E.D. Mich.) (a $110 million settlement); *In re Alcatel Alsthom Securities Litigation* (E.D. Texas) (a $75 million settlement); *In re Buspirone Antitrust Litigation* (S.D.N.Y.) (a $220 million settlement); *In re Terazosin Hydrochloride Antitrust Litigation* (S.D.Fla.) (a $72.5 million settlement); *In re First Databank Antitrust Litigation* (D.D.C.) (a $24 million settlement); *In re Scrap Metal Antitrust Litigation* (N.D. Ohio) (an $11 million in settlements on top of jury verdict); and *Van Roden v. Termeer* (S.D.N.Y.) ($64 million settlement).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum of Law in

Support of Unopposed Motion for the Appointment of Interim Co-Lead Class Counsel was

served via the Court's ECF system upon all counsel registered for ECF and via first-class mail on

the following counsel and parties:

Joel Davidow
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS PLLC
1200 New Hampshire Avenue, N.W., Suite 570
Washington, DC 20036

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103

Samuel D. Heins
Vincent J. Esades
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403

Allan Steyer
STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111

Steven Greenfogel
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102

Brian K. Herrington
BRENT COON & ASSOCIATES
6360 I-55 North
Suite 340
Jackson, MS 39211

Arnold Levin
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401

Steven A. Kanner
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS 39211

Precious Martin Senior
PRECIOUS MARTIN SENIOR & ASSOCIATES PLLC
821 North Congress St.
P.O. Box 373
Jackson, MS 39205-0373

Paul Bennett
Steven Sidener
Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market St., Suite 2300
San Francisco, CA 94105

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market St.
Philadelphia, PA 19103

Date:  May 9, 2008

/s/ Linda Aono
Linda Aono

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum of Law in

Support of Unopposed Motion for the Appointment of Interim Co-Lead Class Counsel was

served via the Court's ECF system upon all counsel registered for ECF and via first-class mail on

the following counsel and parties:

Joel Davidow
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS PLLC
1200 New Hampshire Avenue, N.W., Suite 570
Washington, DC 20036

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103

Samuel D. Heins
Vincent J. Esades
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403

Allan Steyer
STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111

Steven Greenfogel
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102

Brian K. Herrington
BRENT COON & ASSOCIATES
6360 I-55 North
Suite 340
Jackson, MS 39211

Arnold Levin
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401

Steven A. Kanner
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS 39211

Precious Martin Senior
PRECIOUS MARTIN SENIOR & ASSOCIATES PLLC
821 North Congress St.
P.O. Box 373
Jackson, MS 39205-0373

Paul Bennett                          Gerald J. Rodos
Steven Sidener                        Jeffrey B. Gittleman
Andrew Dirksen                        BARRACK, RODOS & BACINE
GOLD BENNETT CERA & SIDENER LLP       3300 Two Commerce Square
595 Market St., Suite 2300            2001 Market St.
San Francisco, CA 94105               Philadelphia, PA 19103

Date: May 9, 2008

                        /s/ Linda Aono
                        Linda Aono