## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAIRFAX COUNTY, VIRGINIA, *et al.*,

        Plaintiffs,

        v.

BANK OF AMERICA N.A.,

        Defendant.

Civil Case No. 08-0433 (JR)

### MOTION OF CITY OF OAKLAND FOR INTERVENTION FOR THE LIMITED PURPOSE OF RESPONDING TO PLAINTIFFS' PENDING MOTION FOR THE APPOINTMENT OF INTERIM CO-LEAD COUNSEL

Pursuant to Federal Rule of Civil Procedure 24(b), the City of Oakland

("Oakland"), plaintiff in an action pending in the Northern District of California, *City of Oakland*

*v. AIG Financial Products Corp., et al.*, Case No. 08-cv-2116 (MMC), hereby moves to

intervene for the limited purpose of responding to the motion of Plaintiff Fairfax County and its

co-Plaintiffs for the appointment of interim co-lead counsel.  Oakland's motion is based on this

Motion, the accompanying Memorandum, the Declaration of Eric B. Fastiff, and any other such

written or oral argument or materials as may be permitted or requested by the Court.


Dated: May 16, 2008        Respectfully submitted,

        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


        By:      /s/ *Eric B. Fastiff*
            Eric B. Fastiff (D.C. Bar No. 453854)

Richard M. Heimann
*rheimann@lchb.com*
Joseph R. Saveri
*jsaveri@lchb.com*
Eric B. Fastiff (D.C. Bar No. 453854)
*efastiff@lchb.com*
275 Battery Street, 30th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

John A. Russo, City Attorney
*jrusso@oaklandcityattorney.org*
Barbara Parker, Chief Asst. City Attorney
*bparker@oaklandcityattorney.org*
Mark Morodomi, Supervising Deputy City Attorney
*mmorodomi@oaklandcityattorney.org*
Kathleen Salem-Boyd, Deputy City Attorney
*ksalemboyd@oaklandcityattorney.org*
CITY OF OAKLAND
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:  (510) 238-3034
Facsimile:  (510) 238-6500

James A. Quadra
*quadra@meqlaw.com*
Sylvia Sokol
*sokol@meqlaw.com*
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, California 94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Steven E. Fineman
*sfineman@lchb.com*
Daniel E. Seltz
*dseltz@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, New York  10017
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

*Attorneys for Individual and Representative Plaintiff*
*City of Oakland, California*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

FAIRFAX COUNTY, VIRGINIA, *et al.*,

        Plaintiffs,

        v.

BANK OF AMERICA N.A.,

        Defendant.

Civil Case No. 08-0433 (JR)

---

**CITY OF OAKLAND'S MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE
FOR THE LIMITED PURPOSE OF RESPONDING TO PLAINTIFFS' PENDING
MOTION FOR THE APPOINTMENT OF INTERIM CO-LEAD COUNSEL**

**I.     Introduction and Background**

        The City of Oakland, California ("Oakland"), plaintiff in an action pending in the

United States District Court for the Northern District of California, *City of Oakland,*

*California v. AIG Financial Products Corp., et al.*, Case No. 08-cv-2116 (MMC), moves to

intervene for the limited purpose of responding to the Motion for the Appointment of Interim

Co-Lead Class Counsel of Plaintiff Fairfax County ("Fairfax County") and its Co-Plaintiffs.[1]

Should the Court grant Oakland's motion to intervene, Oakland requests that Fairfax County's

motion be held in abeyance until after the Judicial Panel on Multidistrict Litigation ("Panel") has

---

[1] Fairfax County filed its Motion for Appointment of Interim Co-Lead Counsel on March 12,
2008 (Dkt. No. 5).  It filed its Memorandum In Support of the Motion (Dkt. No. 45) on May 9,
2008.  Although Oakland filed its case in the Northern District of California on April 23, 2008,
and served and filed a response to Fairfax County's motion before the Judicial Panel on
Multidistrict Litigation for consolidation and transfer on May 6, 2008, Fairfax County did not
serve Oakland's counsel of record with the interim co-lead counsel motion papers.

ruled on Fairfax County's motion for consolidation and transfer of the five pending cases. These

cases all allege illegal antitrust conduct in the sale, marketing, and distribution of municipal

derivative products. Fairfax County, along with the plaintiff in one other case and defendant

Bank of America N.A. ("BofA"), support transfer to the District of Columbia, while other

defendants and one plaintiff support transfer to the Southern District of New York. Oakland has

filed a response supporting transfer to the Northern District of California. Fairfax County's

motion is scheduled for oral argument before the Panel on May 29, 2008, and a ruling is

expected in June. Thus, the period for holding the Motion For Appointment of Interim Co-Lead

Counsel in abeyance will be limited.

## II.     Oakland Should Be Permitted To Intervene For the Limited Purpose of Responding to Fairfax County's Rule 23(g) Motion

Under Federal Rule of Civil Procedure 24(b), "the court may permit anyone to

intervene who . . . has a claim or defense that shares with the main action a common question of

law or fact." Fed. R. Civ. P. 24(b)(1)(B). Federal courts have taken a "flexible" approach to

Rule 24's requirements. *Equal Employment Opportunity Comm. v. Nat'l Children's Center, Inc.*,

146 F.3d 1042 (D.C. Cir. 1998) (reversing denial of motion for permissive intervention); *In re

Vitamins Antitrust Litig.*, 2001 WL 34088808, at *2 (D.D.C. Mar. 19, 2001). "[W]hen

intervention is sought in an action alleging anticompetitive conduct, no stringent showing of a

strong nexus of common fact or law is required." *Id.* at *4 (internal quotation and citations

omitted).

There can be no question that Oakland meets this standard. Its case and Fairfax

County's case arise out of the same course of alleged illegal antitrust conduct involving the sale

of financial derivative products to municipalities and other debt-instrument issuers. Although

Oakland's claims are more broad than those on the above-captioned action, Oakland alleges

violations of the same federal antitrust statute arising from the same type of business practices as does Fairfax County.[2]  Oakland alleges claims against the same defendant, BofA, as does Fairfax County, as well as claims against several additional defendants.[3]  Oakland's complaint is attached as Exhibit A to the accompanying Declaration of Eric B. Fastiff ("Fastiff Decl.") and demonstrates the similarity of claims of the *City of Oakland* action and the underlying action.

Rule 24 also requires the Court to consider whether the proposed intervention "will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  No delay or prejudice will result from the limited intervention requested by Oakland, which only requests to be heard on a motion already filed.  *See Independent Petrochemical Corp., et al. v. Aetna Casualty & Surety Co.*, 1988 WL 23257, at *3 (D.D.C. Mar. 2, 1988) (granting limited intervention for the purpose of modifying protective order).  Moreover, this case is at its inception.  Fairfax County filed its complaint on March 12, 2008.  No Defendant has responded.  No initial disclosures have occurred, and no formal discovery has been propounded.  Granting Oakland's motion would not encourage a rush of similar motions for intervention, as there are only two other cases on file alleging similar municipal derivatives antitrust claims before the Panel.

---

[2] Oakland also raises claims under California's Cartwright Act, California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition Law, Business and Professions Code § 17200, *et seq. See* Fastiff Decl., Ex. A.

[3] Fairfax County has divided its claims between the two cases it has filed.  Simultaneously with this case, Fairfax County filed a separate case in this Court alleging the same illegal antitrust conduct against numerous defendants other than BofA.  *See Fairfax County, Virginia, et al. v. Wachovia Bank N.A., et al.*, Civ. No. 08-432 (JR).  Fairfax County's interim co-lead counsel motion appears to have only been filed in the action against BofA and not in the action against the other defendants.

III.    **Fairfax County's Motion Should Be Held In Abeyance**

Should the Court grant Oakland's motion to intervene, Oakland requests that the

Court hold Fairfax County's motion in abeyance until the cases before the Panel are transferred

and are consolidated in one court.  In order to proceed in an orderly and efficient fashion, and to

avoid any unnecessary pleadings or motions, the plaintiffs in the five pending actions before the

Panel have agreed, pursuant to a stipulation or in principle (pending finalizing written

stipulations), to extend the time for defendants to respond to the complaints until, at the earliest,

45 days after the Panel rules.  The Court has approved and entered such a stipulation submitted

by Fairfax County and BofA here continuing BofA's deadline to respond to the complaint.  *See*

Dkt. No. 26 and Minute Order of April 15, 2008.

It is Oakland's understanding, and presumably also the defendants'

understanding, that continuing defendants' time to respond to all pending complaints is

consistent with continuing all pre-trial motion practice, including Rule 23(g) motions, until the

cases are coordinated and transferred.  Indeed, counsel for JPMorgan Chase & Co., a defendant

in the other cases before the Panel, including Fairfax County's other case before this Court, took

this position in a letter to the Court in *Haywood County, Tennessee v. Bank of America N.A.*,

No. 08-CV-3002 (S.D.N.Y.) (Swain, J.), arguing that the *Haywood County* case should not

proceed until the JPML rules on the pending motion to consolidate and transfer.  Indeed,

JPMorgan stated that "[d]iscovery issues should therefore be left to the transferee court."  *See*

Fastiff Decl. Ex. B.  Judge Swain adjourned a previously scheduled conference pending further

order of the court.  *Id.*  Thus, Oakland seeks consistency with what the parties have already

agreed and other potential transferee courts have ordered: to wait the brief period for the Panel to

rule before proceeding further.  A limited delay to resolve the motion before the Panel will not

delay the progress of this case.  Indeed, a short delay is entirely consistent with principles of

-4-

judicial economy and efficiency by avoiding unnecessary filings and motion proceedings.

Fairfax County's motion should also be held in abeyance because it is inconsistent with the *Manual for Complex Litigation*'s teachings and with Rule 23's mandate governing the orderly progress of class actions.  The *MCL* counsels that interim class counsel should be selected from all attorneys seeking the role.  *See MCL* § 21.11 (4th ed. 2004) ("Absent a stipulation [among plaintiffs' counsel], the court may need to select interim class counsel from lawyers competing for the role and formally designate the lawyer selected.").  Here, there are multiple overlapping class actions on file and there may be additional class actions yet to be filed.  Resolving competing motions for lead counsel should be delayed, at least until the Panel rules and all parties appear and have had an opportunity to be heard.  *See* 2003 Advisory Committee Note to Rule 23 ("In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel.  The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel.  Examples might include instances in which more than one class action has been filed . . . .").  The transferee court should select interim lead counsel, and address all other case management issues, when all parties are before it.

As noted above, no defendant has yet answered any complaint.  Since no defendant will be required to respond to any complaint until the Panel rules, there is no need for an interim lead counsel at this early juncture.  Once the Panel rules, the structure of Plaintiffs' counsel and other initial case management issues can be addressed with the participation of all interested parties.

**IV.**    **Conclusion**

For the foregoing reasons, Oakland respectfully requests that the Court grant its

motion to intervene for the limited purpose of responding to Fairfax County's Motion, and hold

that motion in abeyance pending the decision of the Judicial Panel on Multidistrict Litigation on

Fairfax County's Motion for Consolidation and Transfer.  If the Panel transfers the actions to this

Court, Fairfax County may re-notice its interim co-lead counsel motion at that time.


Dated: May 16, 2008                    Respectfully submitted,

                                       LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


                                       By:___/s/ *Eric B. Fastiff*_____
                                           Eric B. Fastiff (D.C. Bar No. 453854)

                                       Richard M. Heimann
                                       *rheimann@lchb.com*
                                       Joseph R. Saveri
                                       *jsaveri@lchb.com*
                                       Eric B. Fastiff (D.C. Bar No. 453854)
                                       *efastiff@lchb.com*
                                       275 Battery Street, 30th Floor
                                       San Francisco, CA  94111-3339
                                       Telephone:    (415) 956-1000
                                       Facsimile:    (415) 956-1008

                                       John A. Russo, City Attorney
                                       *jrusso@oaklandcityattorney.org*
                                       Barbara Parker, Chief Asst. City Attorney
                                       *bparker@oaklandcityattorney.org*
                                       Mark Morodomi, Supervising Deputy City Attorney
                                       *mmorodomi@oaklandcityattorney.org*
                                       Kathleen Salem-Boyd, Deputy City Attorney
                                       *ksalemboyd@oaklandcityattorney.org*
                                       CITY OF OAKLAND
                                       One Frank H. Ogawa Plaza, 6th Floor
                                       Oakland, CA  94612
                                       Telephone:    (510) 238-3034
                                       Facsimile:    (510) 238-6500

762869.3

James A. Quadra
*quadra@meqlaw.com*
Sylvia Sokol
*sokol@meqlaw.com*
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, CA  94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Steven E. Fineman
*sfineman@lchb.com*
Daniel E. Seltz
*dseltz@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

*Attorneys for Individual and Representative Plaintiff*
*City of Oakland, California*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FAIRFAX COUNTY, VIRGINIA, *et al.*,

        Plaintiffs,

        v.

BANK OF AMERICA N.A.,

        Defendant.

Civil Case No. 08-0433 (JR)

**[PROPOSED] ORDER GRANTING PLAINTIFF CITY OF OAKLAND'S
MOTION FOR INTERVENTION FOR THE LIMITED PURPOSE OF
RESPONDING TO PLAINTIFFS' PENDING MOTION FOR THE
APPOINTMENT OF INTERIM CO-LEAD COUNSEL AND
STAYING MOTION TO APPOINT INTERIM CO-LEAD COUNSEL**

        Before the Court is the City of Oakland's Motion to Intervene for the Limited

Purpose of Responding to Plaintiffs' Pending Motion for the Appointment of Interim Co-Lead

Counsel and Staying Motion to Appoint Interim Co-Lead Counsel.  The Court, having

considered the submissions of the parties and for good cause shown, finds that the City of

Oakland has a claim that shares with the main action common questions of law and fact, and that

the City of Oakland's limited intervention will neither unduly delay nor prejudice the

adjudication of the original parties' rights, and hereby GRANTS the City of Oakland's motion

for limited intervention.  *See* Federal Rule of Civil Procedure 24(b)(1)(B), (b)(3).

Furthermore, the Court grants the City of Oakland's request to hold the pending

motion for appointment of interim co-lead counsel in abeyance.  If the Judicial Panel on

Multidistrict Litigation transfers *In Re Municipal Derivatives Antitrust Litigation*, MDL

No. 1950, to this Court, the motion may be re-noticed.

SO ORDERED this ___ day of May, 2008.


_____
THE HONORABLE JAMES ROBERTSON
United States District Judge

To:

Julia Jordan
**SULLIVAN & CROMWELL LLP**
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5805

Robert Hotz
**AKIN GUMP STRAUSS  HAUER & FELD LLP**
590 Madison Avenue
New York, NY  10022-2524

**Financial Guaranty Insurance Co.**
125 Park Avenue
New York, NY  10017

David Eggert
**ARNOLD & PORTER LLP**
555 Twelfth Street, NW
Washington, DC  20004-1206

**GE Funding Capital Market Services, Inc.**
335 Madison Avenue, 11th Floor
New York, NY  10017

Neil K. Gilman
**HUNTON & WILLIAMS LLP**
1900 K Street, NW
Washington, DC  20006

Peggy Chen
**DAVIS & GILBERT LLP**
1740 Broadway
New York, NY  10019

**Piper Jaffray & Co.**
  800 Nicollet Mall
Suite 800
Minneapolis, MN  55402-7020

Matthew Ingber
**MAYER BROWN LLP**
1675 Broadway
New York, NY  10019

Jon Fetterolf
**WILLIAMS & CONNOLLY**
752 12th Street, NW
Washington, DC  20005

**Security Capital Assurance, Inc.**
A.S. Cooper Building
26 Reid Street
4th Floor
Hamiton, HM 11, Bermuda

Robert A Alessi
**CAHILL GORDON & REINDEL LLP**
Eighty Pine Street
New York, NY  10005-1702

Moses Silverman
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON**
1285 Avenue of the Americas
New York, NY 10019-6064

**Merrill Lynch & Co.**
4 World Financial Center
250 Vesey Street
New York, NY  10080

Paul Eckles
**SKADDEN ARPS SLATE MEAGHER &
FLOM LLP**
Four Times Square
New York, NY  10036

**National Westminster Bank PLC**
135 Bishopsgate
London
EC2M3 UR, England

**Investment Management
Advisory Group, Inc.**
886 Vaughn Road
Pottstown, PA  19465

**Cain Brothers & Co., LLC**
360 Madison Avenue
5th Floor
New York, NY  10017

Richard W. Beckler
**HOWREY LLP**
1299 Pennsylvania Ave. NW
Washington, DC  20004

**Feld Winters Financial LLC**
15260 Ventura Blvd.
Suit 2220
Sherman Oaks, CA  91403

Gary Licenberg
**BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS & LICENBERG, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067-2561

Alden Lewis Atkins
**VINSON & ELKINS, LLP**
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004

**George K. Baum & Co.**
4801 Main Street
Suite 500
Kansas City, MO  64112

**Kinsell Newcomb & De Dios Inc.**
2776 Gateway Road
Carlsbad, CA  92009

**Packerkiss Securities, Inc.**
Fifteen North East Fourth Street
Suite A
Delray Beach, FL  33444

Daniel Kaplan
**PERRY, GUTHERY, HAASE &
GESSFORD P.C., LLO**
233 South 13th Street, Suite 1400
Lincoln, Nebraska  68508

John Lundquist
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402

Joseph D. Edmondson
**FOLEY & LARDNER LLP**
3000 K Street, N.W.
Suite 500
Washington, DC  20007

Robert D. Wick
**COVINGTON & BURLING LLP**
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Joseph Bial
**CADWALADER WICKERSHAM &
TAFT LLP**
1201 F. Street, N.W.
Washington, D.C. 20004

Peter C. Thomas
**SIMPSON THATCHER & BARTLETT
LLP**
601 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Michael M. Buchman
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017

Roland G. Riopelle
**SERCARZ & RIOPELLE LLP**
152 West 57th Street
Suite 24C
New York, NY 10019

William A. Isaacson
Tanya Chutkan
Jonathan Shaw
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave. NW
Washington, DC 20015

Jonathan W. Cuneo
Daniel M. Cohen
**CUNEO GILBERT & LADUCA, LLP**
507 C Street NE
Washington, D.C. 20002

Joel Davidow
Clifford K. Williams
**KILE GOEKJIAN REED & McMANUS
PLLC**
1200 New Hampshire Avenue, NW Suite 570
Washington, DC 20036

Allen Black
Roberta Liebenberg
Donald Perelman
**FINE KAPLAN & BLACK, RPC**
1835 Market Street
28th Floor
Philadelphia, PA 19103

Samuel D. Heins
Vincent J. Esades
**HEINS MILLS & OLSON**
310 Clifton Avenue
Minneapolis, MN 55403

Michael D. Hausfeld
Richard A. Koffman
Megan E. Jones
Christopher J. Cormier
**COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
**COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.**
One Embarcadero Plaza
San Francisco, CA 94111

Robert G. Eisler
**COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.**
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Carol V. Gilden
**COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603

Arthur N. Bailey
**ARTHUR N. BAILEY & ASSOCIATES**
111 West Second Street, Suite 4500
Jamestown, NY 14701

Allan Steyer
**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP**
One California Street, Third Floor
San. Francisco, CA 94111

Steven Greenfogel
**MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.**
1521 Locust St., 8th Floor
Philadelphia, PA 19102

Precious Martin Senior
**PRECIOUS MARTIN SENIOR &
ASSOCIATES PLLC**
821 North Congress St. P.O. Box 373
Jackson, MI 39205-0373

Arnold Levin
**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697

Armand Derfner
**DERFNER ALTMAN & WILBORN**
40 Calhoun Street, Suite 410 P.O. Box 600
Charleston, SC 29401

Steven A. Kanner
**FREED KANNER LONDON & MILLEN
LLC**
2201 Waukegan Rd.,
Suite 130
Bannockburn, IL 60015

Brent Hazzard
**HAZZARD LAW, LLC**
6360 155 N
Suite 340
Jackson, MS 39211

Joe R. Whatley Jr.
**WHATLEY DRAKE & KALLAS LLC**
2001 Park Place North
Suite 1000
Birmingham, Alabama 35203

Stephen Neuwirth
**QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**
51 Madison Avenue, 22° Floor
New York, New York 10010

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing Motion for

Intervention for the Limited Purpose of Responding to Plaintiffs' Pending Motion for the

Appointment of Interim Co-Lead Counsel, Memorandum in Support of Motion for Intervention

for the Limited Purpose of Responding to Plaintiffs' Pending Motion for the Appointment of

Interim Co-Lead Counsel, Declaration of Eric B. Fastiff and exhibits, Proposed Order, and this

Certificate of Service, were served via email to the Court and upon all counsel registered for

ECF and via first-class mail on the following counsel and parties:

Joel Davidow
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS PLLC
1200 New Hampshire Avenue, N.W., Suite 570
Washington, DC 20036

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103

Samuel D. Heins
Vincent J. Esades
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403

Allan Steyer
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102

763209.1

Brian K. Herrington
BRENT COON & ASSOCIATES
6360 I-55 North
Suite 340
Jackson, MS 39211

Arnold Levin
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3697

Armand Derfaer
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
P.O. Box 600
Charleston, SC 29401

Steven A. Kanner
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015

Brent Hazzard
HAZZARD LAW, LLC
6360 I 55 N
Suite 340
Jackson, MS 39211

Precious Martin Senior
PRECIOUS MARTIN SENIOR &
ASSOCIATES PLLC
821 North Congress St.
P.O. Box 373
Jackson, MS 39205-0373

Paul Bennett
Steven Sidener
Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market St., Suite 2300
San Francisco, CA 94105

763209.1

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market St.
Philadelphia, PA 19103

Michael M. Buchman
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY 10017

Roland G. Riopelle
SERCARZ & RIOPELLE LLP
152 West 57th Street
Suite 24C
New York, NY 10019


Date:  May 16, 2008

Sharon Chelton

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FAIRFAX COUNTY, VIRGINIA, *et al.*,

              Plaintiffs,

       v.

BANK OF AMERICA N.A.,

              Defendant.

Civil Case No. 08-0433 (JR)

**DECLARATION OF ERIC B. FASTIFF IN SUPPORT OF
CITY OF OAKLAND'S MOTION FOR INTERVENTION FOR THE LIMITED
PURPOSE OF RESPONDING TO PLAINTIFFS' PENDING MOTION FOR THE
APPOINTMENT OF INTERIM CO-LEAD COUNSEL**

I, Eric B. Fastiff, declare as follows:

1.      I am a partner of the law firm Lieff, Cabraser, Heimann & Bernstein, LLP in San Francisco, California and am admitted to practice before this Court.  I am counsel for Plaintiff City of Oakland in *City of Oakland v. AIG Financial Products Corp., et al.*, Case No. 08-cv-2116 (MMC), pending in the United States District Court for the Northern District of California.  I submit this Declaration in support of Oakland's Motion for Intervention for the Limited Purpose of Responding to Plaintiffs' Pending Motion for the Appointment of Interim Co-Lead Counsel.

2.      Attached hereto as Exhibit A is a true and correct copy of the complaint filed by Oakland in the Northern District of California on April 23, 2008.

3.      Attached hereto as Exhibit B is a true and correct copy of a letter dated

May 14, 2008 from Joseph F. Wayland to the Honorable Laura J. (*sic*) Swain, entered as Docket

Number 4 in Case No. 08-CV-3002 (S.D.N.Y.).

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct. Executed this 16th day of May, at San Francisco, California.

_/s/ *Eric B. Fastiff*_
Eric B. Fastiff

# Exhibit A

COPY

1   John A. Russo, City Attorney (SBN 063203)
    *jrusso@oaklandcityattorney.org*
2   Barbara Parker, Chief Asst. City Attorney (SBN 069722)
    *bparker@oaklandcityattorney.org*
3   Mark Morodomi, Supervising Deputy City Attorney (SBN 120914)
    *mmorodomi@oaklandcityattorney.org*
4   Kathleen Salem-Boyd, Deputy City Attorney (SBN 100179)
    *ksalemboyd@oaklandcityattorney.org*
5   CITY OF OAKLAND, CALIFORNIA
    One Frank H. Ogawa Plaza, 6th Floor
6   Oakland, California 94612
    Telephone:    (510) 238-3034
7   Facsimile:    (510) 238-6500

8   Richard M. Heimann (SBN 63607)
    *rheimann@lchb.com*
9   Joseph R. Saveri (SBN 130064)
    *jsaveri@lchb.com*
10  Eric B. Fastiff (SBN 182260)
    *efastiff@lchb.com*
11  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
12  San Francisco, California 94111
    Telephone:    (415) 956-1000
13  Facsimile:    (415) 956-1008

14  James A. Quadra (SBN 131084)
    *quadra@meqlaw.com*
15  Sylvia Sokol (SBN 200126)
    *sokol@meqlaw.com*
16  MOSCONE, EMBLIDGE & QUADRA, LLP
    220 Montgomery Street
17  Mills Tower, Suite 2100
    San Francisco, California 94104
18  Telephone:    (415) 362-3599
    Facsimile:    (415) 362-2006
19
    *Attorneys for Individual and Representative Plaintiff*
20  *City of Oakland, California*

E-filing

ORIGINAL FILED
APR 2 8 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CV 08 2116 MEJ

21              UNITED STATES DISTRICT COURT

22            NORTHERN DISTRICT OF CALIFORNIA

23  CITY OF OAKLAND, CALIFORNIA, a Municipal      Case No.
    Corporation, on behalf of itself and all others
24  similarly situated,                           **COMPLAINT FOR VIOLATIONS
                                                  OF THE SHERMAN ACT, THE
25              Plaintiff,                         CARTWRIGHT ACT, AND THE
                                                  UNFAIR COMPETITION LAW**
26      v.
                                                  **CLASS ACTION**
27  AIG FINANCIAL PRODUCTS CORP.; AIG
    SUNAMERICA LIFE ASSURANCE CO.; BANK           **JURY TRIAL DEMANDED**
28  *(caption continued on next page)*

756814.3                                          CLASS ACTION COMPLAINT

1 | OF AMERICA CORPORATION; BANK OF
AMERICA, N.A.; BEAR STEARNS
2 | COMPANIES, INC.; CAIN BROTHERS &
COMPANY, LLC; CDR FINANCIAL
3 | PRODUCTS, INC.; FELD WINTERS
FINANCIAL, LLC; FINANCIAL GUARANTY
4 | INSURANCE CO.; FINANCIAL SECURITY
ASSURANCE HOLDINGS, LTD.; FIRST
5 | SOUTHWEST COMPANY; GE FUNDING
CAPITAL MARKET SERVICES, INC.;
6 | GENWORTH FINANCIAL, INC.; GEORGE K.
BAUM & COMPANY; INVESTMENT
7 | MANAGEMENT ADVISORY GROUP, INC.;
JPMORGAN CHASE & CO.; JPMORGAN
8 | CHASE BANK, N.A.; KINSELL NEWCOMB &
DE DIOS, INC.; LEHMAN BROTHERS INC.;
9 | MERRILL LYNCH & CO. INC.; MORGAN
KEEGAN & CO., INC.; MORGAN STANLEY;
10 | NATIONAL WESTMINSTER BANK plc;
NATIXIS, S.A.; PACKERKISS SECURITIES,
11 | INC.; PIPER JAFFRAY & CO.; SECURITY
CAPITAL ASSURANCE, INC.; SHOCKLEY
12 | FINANCIAL CORP.; SOCIÉTÉ GÉNÉRALE;
SOUND CAPITAL MANAGEMENT, INC.;
13 | TRINITY FUNDING COMPANY, LLC; UBS AG;
UBS SECURITIES LLC; UBS FINANCIAL
14 | SERVICES INC.; WACHOVIA BANK, N.A.;
WACHOVIA CORPORATION; WINTERS & CO.
15 | ADVISORS, LLC; XL ASSET FUNDING
COMPANY 1 LLC; XL CAPITAL, LTD.; and XL
16 | LIFE INSURANCE & ANNUITY COMPANY,

17 |                              Defendants.

18 |

19 |          Plaintiff City of Oakland, California (hereafter "Oakland" or "Plaintiff"),

20 | individually and on behalf of a class of all those similarly situated, brings this action for treble

21 | damages under the antitrust laws of the United States against Defendants, demands a trial by jury,

22 | and alleges the following on information and belief except as to the contents of paragraphs 1 and

23 | 16 which are based on personal knowledge:

24 |                          **NATURE OF THE CASE**

25 |          1.      The City of Oakland, California has issued hundreds of millions of dollars

26 | of tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs") to

27 | allow Oakland to have funds available while earning a higher rate of return than they would if

28 | Oakland simply invested the proceeds in a savings account. For example, Oakland issued tax-

1    free municipal bonds to, *inter alia*, rebuild the Oakland Coliseum, modernize its sewer system,

2    and provide for general obligations.

3            2.      Oakland alleges a nationwide conspiracy among Defendants to rig bids, to

4    allocate customers and markets, and to fix, raise, maintain, or stabilize the returns received by

5    Oakland and the members of the Class for Municipal Derivatives (as defined below), including

6    but not limited to GICs, sold in the United States.

7            3.      Oakland brings this action on behalf of itself and all entities that contracted

8    for Municipal Derivatives in the United States and its territories directly from Municipal

9    Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as defined in this

10   Complaint during the period from January 1, 1992 through December 31, 2007.  As a result of

11   Defendants' unlawful conduct, Oakland and the Class, as defined in this Complaint, have paid

12   higher supracompetitive prices for these products, and therefore suffered injury to their business

13   and property.

14                              **JURISDICTION AND VENUE**

15           4.      Oakland brings this action pursuant to Section 4 of the Clayton Act,

16   15 U.S.C. §§ 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for

17   Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act,

18   California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition

19   Law, Business and Professions Code § 17200, *et seq.*

20           5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and

21   1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

22           6.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and

23   22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the

24   Defendants resided, transacted business, was found, or had agents in this district, and because a

25   substantial part of the events giving rise to Oakland's claims occurred, and a substantial portion

26   of the affected interstate trade and commerce described below was carried out in this district.

27

28

1

**INTRA-DISTRICT ASSIGNMENT**

2      7.     Pursuant to Local Rules 3-5(b) and 3-2(c), this action should be assigned to

3  the San Francisco/Oakland Division based on Oakland's location in the County of Alameda.

4

**DEFINITIONS**

5      8.    <u>Bid</u>:  As used herein, the term "Bid" means the Rate of Return offered by

6  prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or

7  the competitive processes by which other Municipal Derivatives are purchased by Government

8  Entities.

9      9.    <u>Competitive Bidding Process</u>:  As used herein, the term "Competitive

10  Bidding Process" means the process mandated by Treasury Regulation §148.5, *et seq.*, and

11  detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers

12  submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to

13  purchase a Guaranteed Investment Contract, as that term is defined herein.

14      10.   <u>Government Entity</u>:  As used herein, the term "Government Entity" means

15  any state, local or municipal body or any subdivision thereof.  Excluded from the definition of

16  Government Entity is any federal government body.

17      11.   <u>Municipal Derivative</u>:  As used herein, the term "Municipal Derivative"

18  means a variety of financial instruments that Government Entities use to invest the proceeds of

19  bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the

20  interest-rate risk associated with the issuance of tax-exempt debt.  As used herein, the term

21  Municipal Derivative encompasses all of the following types of transactions:

22      a.    <u>Guaranteed Investment Contract ("GIC")</u>:  "Guaranteed Investment

23  Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal

24  Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit

25  rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange

26  for a series of payments at a guaranteed Rate of Return over the life of the contract.  A GIC is a

27  Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery"

28  or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs

1  (typically used for capital projects and subject to provisions allowing investment principal to be

2  drawn down pursuant to a set schedule). A GIC is similar to a bond, in that "principal" – the

3  proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate

4  of Return determined by the terms of the contract.

5         b.    Advance Refunding Escrow: An "advance refunding escrow" is an

6  arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding

7  bond) are deposited into an escrow account for investment in an amount sufficient to pay the

8  principal of, and interest on, the underlying issue to be refunded on the original interest payment

9  and maturity dates.

10        c.    Swap: A "swap" is a type of agreement frequently used to

11  minimize the interest rate risk Government Entities face when issuing large amounts of tax-

12  exempt debt obligations. A swap involves two Counterparties – the Government Entity and a

13  Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous

14  purchase of another instrument for purposes of enhancing the Counterparties' respective holdings.

15  Government Entities use swaps to achieve desired tax results, or to alter or protect various

16  features of an existing municipal bond portfolio. There are several types of swaps: (a) floating-

17  for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

18  rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

19  Government Entities, even those with sophisticated and experienced municipal finance

20  departments, retain a Municipal Derivatives Broker (including many of those named as

21  Defendants herein) as "swap advisors" to aid in the swap transaction.

22        d.    Option: An "option" is one of two types of agreements used to

23  shift a Government Entity's tax-exempt securities holdings typically acquired in association with

24  issuance of municipal bonds.

25             i.    A Put Option is a provision in a bond contract where the

26  investor has the right, on specified dates after required notification, to surrender the securities to

27  the issuer or the issuer's agent at the predetermined price (usually par value).

28

1                ii.     A <u>Call Option</u> is a transaction where the issuer repays to the

2  holder of an outstanding security the principal amount thereof (plus, in certain cases, an

3  additional amount representing a redemption premium) as a result of the issuer exercising a right

4  under the bond contract to repay the security prior to its scheduled maturity date (often referred to

5  as the "call").

6              e.     <u>Swaption:</u>  A "Swaption" is the combination of a Swap and an

7  Option.

8              f.     <u>Interest Rate Floors and Collars:</u>  Interest rate "floors" and "collars"

9  are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the

10  Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing

11  to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less

12  than a particular interest rate within range of interest rates (a "collar").

13        12.    <u>Municipal Derivatives Broker:</u> As used herein, the term "Derivatives

14  Broker" means an entity retained by a Government Entity to oversee the processes, including the

15  Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased.

16  Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal

17  Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding

18  undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly

19  competitive means.  Derivatives Brokers enjoy mutually symbiotic and incestuous relationships

20  with large investment banks and insurance companies, and act as "finders" of municipal securities

21  business for the securities dealers or investment banks that often pay kickbacks to the Municipal

22  Derivatives Brokers in the form of finders' fees and monthly retainers.

23        13.    <u>Municipal Derivatives Counterparty:</u> As used herein, the term "Municipal

24  Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a

25  Government Entity contracts for a transaction involving the purchase of one or more of the

26  Municipal Derivatives described herein.

27

28

1    14.    Municipal Derivatives Seller: As used herein, the term "Derivatives Seller"

2    means an entity offering to enter into a Municipal Derivative transaction with a Government

3    Entity pursuant to the Competitive Bidding Process or other competitive process.

4    15.    Rate of Return: As used herein, the term "Rate of Return" means the fixed

5    amount, typically expressed as a percentage of the underlying bond proceeds amount or as a

6    specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received

7    by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction

8    with a Municipal Derivatives Counterparty.  The Rate of Return is an element of the Competitive

9    Bidding Process where competition is intended to occur for the benefit of bond issues.  It was a

10   focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

11                                   **PARTIES**

12                                   **Plaintiff**

13   16.    Plaintiff, the City of Oakland, California, is a municipal corporation and a

14   Government Entity.  Oakland purchased Municipal Derivatives, including from one or more

15   Derivatives Seller Defendants pursuant to a Competitive Bidding Process overseen by one or

16   more of the Derivative Broker Defendants during the Class Period.  Oakland purchased millions

17   of dollars' worth of Municipal Derivatives from one or more of the Derivatives Seller Defendants

18   and retained one or more of the Derivatives Broker Defendants to oversee, supervise and manage

19   the processes, including the Competitive Bidding Process, undertaken to purchase the Municipal

20   Derivatives.  As a result of the unlawful conspiracy alleged herein, Oakland was injured in its

21   business or property.  Oakland has contracted for its GICs with a variety of brokers and

22   underwriters, including Bank of America, FSA Management (a subsidiary of Financial Security

23   Assurance Holdings, Ltd.) and IXIS Corporate & Investment Banking, on which the Department

24   of Justice has served subpoenas as part of its investigation into Municipal Derivative bid-rigging.

25                          **Municipal Derivatives Seller Defendants**

26   17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware

27   corporation maintaining its principal place of business in Wilton, Connecticut.  It is a wholly

28

1    owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and

2    sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

3                    a.    AIG Financial is part of the Capital Markets arm of its parent

4    company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

5                    b.    In November, 2006, AIG Financial received a subpoena from the

6    Antitrust Division of the United States Department of Justice in connection with its grand jury

7    investigation into anticompetitive conduct in the Municipal Derivatives business.

8            18.    Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is

9    an Arizona corporation maintaining its principal place of business in Los Angeles, California.

10    During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to Oakland

11    and/or members of the Class in the United States.

12                    a.    In November, 2006, AIG SunAmerica received a subpoena from

13    the Securities and Exchange Commission in connection with the SEC's investigation into

14    anticompetitive practices in the Municipal Derivatives industry.

15            19.    Defendant Bank of America Corporation ("BOA") is a Delaware

16    corporation with its principal place of business in Charlotte, North Carolina.  During the time

17    period covered by this complaint, Bank of America was headquartered in San Francisco,

18    California and conducted substantial business operations in this judicial district.  During the Class

19    Period, BOA issued and sold Municipal Derivatives to Oakland and/or members of the Class in

20    the United States, either directly or through its wholly-owned subsidiary Defendant Bank of

21    America, N.A ("BANA").

22            20.    Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary

23    of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte,

24    North Carolina.  During the Class Period, BANA issued and sold Municipal Derivatives to

25    Oakland and/or members of the Class in the United States.

26                    a.    In November, 2006, BOA received subpoenas from the Antitrust

27    Division of the United States Department of Justice and the Securities and Exchange Commission

28

1    in connection with those agencies' investigations into anticompetitive conduct in the Municipal

2    Derivatives business.

3              b.      In February, 2007, BOA entered into a Corporate Conditional

4    Leniency agreement with the DOJ in connection with the antitrust investigation into

5    anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged

6    in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives industry.

7    Such leniency agreements, which insulate the corporate applicant from criminal antitrust

8    prosecution as long as it cooperates, are only entered into after the cooperating company has

9    proactively offered the DOJ evidence of *per se* violations of the antitrust laws. Such leniency

10   agreements only cover criminal antitrust violations, and do not insulate companies from criminal,

11   civil or administrative actions in other areas.

12             c.      On February 4, 2008, Defendant BOA's subsidiary BANA received

13   a so-called Wells notice from the SEC, advising the company that the SEC staff has

14   recommended that the SEC bring a civil or administrative action against BANA in connection

15   with its investigation of anticompetitive practices in the Municipal Derivatives industry.

16             d.      BOA and BANA are also targets of investigation by the Internal

17   Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal

18   Derivatives industry. In February, 2007, concurrently with its entrance into the DOJ's Corporate

19   Leniency agreement covering criminal antitrust violations, BOA entered into an agreement with

20   the IRS related to BOA's role in providing GICs and other agreements in connection with certain

21   "blind pool" municipal bond transactions.

22             e.      BOA has also been implicated in a bid-rigging and kickback

23   scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved

24   Derivative Broker Defendants CDR and Feld Winters as well as Derivative Seller Defendants

25   UBS and Piper Jaffray.

26             21.     Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware

27   corporation with its principal place of business in New York, New York. During the Class

28

1   Period, Bear Stearns issued and sold Municipal Derivatives to Oakland and/or members of the

2   Class in the United States.

3                    a.    The SEC has previously investigated Beam Stearns' municipal

4   bond department and its municipal bond underwriting practices.

5                    b.    Stephen Salvadore, currently the Senior Managing Director and

6   Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has

7   disclosed that he is a target of the grand jury convened in the Southern District of New York by

8   the Antitrust Division of the Department of Justice investigating antitrust and other violations

9   related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

10  kind received by Salvadore are an indication that the DOJ has substantial evidence of the

11  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

12  plea agreement or cooperation deal.

13                   c.    In addition, at least one former Bear Stearns employee is a target of

14  both the SEC and the grand jury convened in the Southern District of New York by the Antitrust

15  Division of the Department of Justice investigating antitrust and other violations related to

16  anticompetitive conduct in the Municipal Derivatives business.

17                   d.    Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and

18  whose last position at the company was Managing Director and Chief of Municipal Structuring,

19  has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or

20  administrative action against him in connection with securities violations related to bidding

21  procedures in the Municipal Derivatives industry during his tenure at Bear Stearns. Marsh also

22  disclosed that he is a target of the grand jury convened in the Southern District of New York by

23  the Antitrust Division of the Department of Justice investigating antitrust and other violations

24  related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

25  kind received by Marsh are an indication that the DOJ has substantial evidence of the commission

26  of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

27  agreement or cooperation deal. Marsh was also subpoenaed by the SEC in connection with its

28

1   investigation into wrongdoing associated with municipal bond derivatives transactions in

2   Jefferson County, Alabama.

3        22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

4   corporation maintaining its principal place of business in New York, New York.  During the

5   Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

6   to Oakland and/or members of the Class in the United States.

7        a.    FGIC has received a subpoena from the Securities and Exchange

8   Commission in connection with the SEC's investigation into anticompetitive practices in the

9   Municipal Derivatives industry.

10       23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

11  is a New York corporation maintaining its principal place of business in New York, New York.

12  During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Oakland and/or

13  members of the Class in the United States, either directly or through its wholly-owned subsidiary

14  FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited liability company

15  headquartered in New York City.

16       a.    In November, 2006 FSA Holdings received subpoenas from the

17  Antitrust Division of the United States Department of Justice and the Securities and Exchange

18  Commission in connection with those agencies' investigations into anticompetitive conduct in the

19  Municipal Derivatives business.

20       b.    On February 4, 2008, FSA Holdings received a so-called Wells

21  notice from the Philadelphia regional office of the SEC, informing the company that the SEC

22  staff had recommended civil or administrative action against FSA Holdings in connection with its

23  investigation into anticompetitive practices in the Municipal Derivatives industry.  The Wells

24  notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

25  Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

26       24.    Defendant First Southwest Company ("First Southwest") is a Delaware

27  corporation with its principal place of business in Dallas, Texas.  During the Class Period, First

28

1    Southwest issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

2    United States.

3              a.      First Southwest has received a subpoena from the Securities and

4    Exchange Commission in connection with the SEC's investigation into anticompetitive practices

5    in the Municipal Derivatives industry.

6              25,     Defendant Genworth Financial, Inc. ("Genworth") is a New York

7    corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

8    and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

9              a.      Genworth has received subpoenas from the Antitrust Division of

10    the United States Department of Justice and the Securities and Exchange Commission in

11    connection with those agencies' investigations into anticompetitive conduct in the Municipal

12    Derivatives business.

13              26.     Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

14    Delaware corporation maintaining its principal place of business in New York, New York.  GE

15    Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

16    During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

17    Class.

18              27.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware

19    corporation maintaining its principal place of business in New York, New York.  During the

20    Class Period, JPMorgan issued and sold Municipal Derivatives to Oakland and/or members of the

21    Class in the United States.

22              a.      In November, 2006, JPMorgan received subpoenas from the

23    Antitrust Division of the United States Department of Justice and the Securities and Exchange

24    Commission in connection with those agencies' investigations into anticompetitive conduct in the

25    Municipal Derivatives business.

26              b.      At least three former JPMorgan employees are targets of the Justice

27    Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives

28    industry.

1            c.     Samuel Gruer, who worked at JPMorgan from 1994 through 2006

2   and whose last position was Vice-President in the Derivatives Marketing unit of the company's

3   Tax-Exempt Capital Markets Group, has recently disclosed that he is a target of the grand jury

4   convened in the Southern District of New York by the Antitrust Division of the Department of

5   Justice investigating antitrust and other violations related to anticompetitive conduct in the

6   Municipal Derivatives business.  Target letters of the kind received by Gruer are an indication

7   that the DOJ has substantial evidence of the commission of a federal crime and typically a sign

8   that the recipient will soon be indicted absent a plea agreement or cooperation deal.

9            d.     Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also

10   recently disclosed that he is a target of the grand jury convened in the Southern District of New

11   York by the Antitrust Division of the Department of Justice investigating antitrust and other

12   violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters

13   of the kind received by Raz are an indication that the DOJ has substantial evidence of the

14   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

15   plea agreement or cooperation deal.

16            e.     James Hertz, who worked at JPMorgan from 1994 until he was

17   fired from the firm in January, 2008, has also recently disclosed that JPMorgan informed him that

18   he was under investigation by the DOJ for what Hertz described as "conduct on the municipal

19   derivatives marketing desk," an indication that the investigation involves JPMorgan's entire

20   municipal derivatives business, which necessarily includes Municipal Derivatives.  Target letters

21   of the kind received by Hertz are an indication that the DOJ has substantial evidence of the

22   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

23   plea agreement or cooperation deal.

24         28.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

25   banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase.  During

26   the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Oakland and/or

27   members of the Class in the United States.

28

1          29.     Defendant Kinsell Newcomb & DeDios Inc. ("KND") is a California

2  corporation with its principal place of business in Solano Beach, California. During the Class

3  Period, KND issued and sold Municipal Derivatives to Oakland and/or members of the Class in

4  the United States.

5          a.     KND has received subpoenas from the Antitrust Division of the

6  United States Department of Justice and the Securities and Exchange Commission in connection

7  with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

8  business.

9          30.     Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware

10  corporation maintaining its principal place of business in New York, New York. During the

11  Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class.

12  Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

13          31.     Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware

14  corporation maintaining its principal place of business in New York, New York. During the

15  Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

16          32.     Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation

17  maintaining its principal place of business in New York, New York. During the Class Period,

18  Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

19          33.     Defendant National Westminster Bank plc ("NatWest") is a public limited

20  corporation maintaining its principal place of business in London, England. During the Class

21  Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a

22  subsidiary of Royal Bank of Scotland.

23          34.     Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate &

24  Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place

25  of business in Paris, France. During the Class Period, Natixis issued and sold Municipal

26  Derivatives to Oakland and/or members of the Class in the United States.

27          a.     In November, 2006, Natixis' predecessor IXIS Corporate &

28  Investment Bank received a subpoena from the Antitrust Division of the United States

1    Department of Justice in connection with its grand jury investigation into anticompetitive conduct

2    in the Municipal Derivatives business.

3                 35.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation

4    with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper

5    Jaffray issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

6    United States.

7                 a.    Piper Jaffray has received subpoenas from the Antitrust Division of

8    the United States Department of Justice and the Securities and Exchange Commission in

9    connection with those agencies' investigations into anticompetitive conduct in the Municipal

10   Derivatives business.

11                b.    James Towne, employed as Managing Director of Piper Jaffray's

12   municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed

13   him that he is under investigation by the Antitrust Division of the Department of Justice for

14   potential antitrust and other violations relating to the Municipal Derivatives industry.

15                36.    Defendant Security Capital Assurance, Inc. ("Security Capital") is a

16   foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the

17   Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

18   and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Oakland

19   and/or members of the Class in the United States.

20                37.    Defendant Société Générale ("SocGen") is a French corporation

21   headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives

22   to Oakland and/or members of the Class in the United States, either directly or through its wholly-

23   owned subsidiaries Société Générale Americas, Inc., a Delaware corporation headquartered in

24   New York, New York and/or SG Americas Securities, LLC, a Delaware limited liability

25   corporation also headquartered in New York, New York.

26                a.    SocGen has received a subpoena from the Securities and Exchange

27   Commission in connection with the SEC's investigation into anticompetitive practices in the

28   Municipal Derivatives industry.

1      b.      SocGen's Municipal Derivatives business is being scrutinized by

2   the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

3   by CDR.

4      38.      Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

5   limited liability corporation maintaining its principal place of business in New York, New York.

6   GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

7   During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

8   Class.

9      39.      Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

10  in Basel, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to

11  Oakland and/or members of the Class in the United States, either directly or through its wholly-

12  owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

13      a.      In November, 2006, UBS received subpoenas from the Antitrust

14  Division of the United States Department of Justice and the Securities and Exchange Commission

15  in connection with those agencies' investigations into anticompetitive conduct in the Municipal

16  Derivatives business.

17      b.      On February 4, 2008, UBS received a so-called Wells notice from

18  the Philadelphia regional office of the SEC advising the company that the SEC staff had

19  recommended that the SEC bring a civil action against UBS in connection with the

20  anticompetitive practices associated with municipal bond derivatives.

21      c.      Peter Ghavami, until December 2007 the Managing Director and

22  Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently

23  disclosed that he is a target of the grand jury convened in the Southern District of New York by

24  the Antitrust Division of the Department of Justice investigating antitrust and other violations

25  related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

26  kind received by Ghavami are an indication that the DOJ has substantial evidence of the

27  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

28  plea agreement or cooperation deal.

40.     Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. During the Class Period, UBS Securities issued and sold Municipal Derivatives to members of the Class.

41.     Defendant UBS Financial Services Inc. ("UBS Financial"), formerly known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. In 2000, UBS Financial was purchased by Defendant UBS AG. During the Class Period, UBS Financial issued and sold Municipal Derivatives to members of the Class.

42.     Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia N.A. issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

43.     Defendant Wachovia Corporation ("Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States either directly or through its wholly-owned subsidiary Defendant Wachovia Bank, N.A. ("Wachovia N.A.").

a.     In November, 2006, Wachovia received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

b.     Both the DOJ and the SEC have advised Wachovia that they believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid municipal derivatives transactions.

c.     Two Wachovia N.A. employees working in the company's Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

1   grand jury convened in the Southern District of New York by the Antitrust Division of the

2   Department of Justice investigating antitrust and other violations related to anticompetitive

3   conduct in the Municipal Derivatives business. Target letters of the kind received by McConnell

4   and Saunders are an indication that the DOJ has substantial evidence of the commission of a

5   federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6   or cooperation deal. Wachovia recently placed both Saunders – who worked for Defendant Bank

7   of America from 1998 through 2003 – and McConnell on administrative leave following their

8   disclosure that they were targets of the government's grand jury investigation.

9          44.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

10  liability corporation maintaining its principal place of business in Schaumberg, Illinois. During

11  the Class Period, XLAF issued and sold Municipal Derivatives to Oakland and/or members of the

12  Class in the United States.

13                a.    XLAF received subpoenas from the Antitrust Division of the

14  United States Department of Justice and the Securities and Exchange Commission in connection

15  with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

16  business.

17         45.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance")

18  is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois.

19  During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Oakland

20  and/or members of the Class.

21         46.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation

22  maintaining its principal place of business in Hamilton, Bermuda. During the Class Period, XL

23  Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding

24  1, LLC issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

25  United States.

26                        **Municipal Derivatives Broker Defendants**

27         47.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited

28  liability corporation with its principal place of business in New York, New York. During the

1    Class Period, Cain acted as a broker for Oakland and/or members of the Class in purchasing

2    Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3              a.    Cain was subpoenaed by the SEC in connection with its

4    investigation of anticompetitive practices in the Municipal Derivatives industry.

5              48.    Defendant CDR Financial Products, Inc. ("CDR") is a Delaware

6    corporation maintaining its principal place of business at Beverly Hills, California. During the

7    Class Period, CDR acted as a broker for Oakland and/or members of the Class in purchasing

8    Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

9              a.    CDR's California offices were raided by the FBI in November,

10   2006, at the start of the government's investigation into anticompetitive conduct in the Municipal

11   Derivatives market.

12             b.    CDR has been the subject of a series of long-standing federal

13   governmental investigations involving its dealings with other participants in the municipal

14   derivatives market, including Defendant Bank of America.

15             49.    Defendant Feld Winters Financial, LLC ("Feld Winters"), is a California

16   limited liability corporation with its principal place of business in Sherman Oaks, California.

17   During the Class Period, Feld Winters acted as a broker for Oakland and/or members of the Class

18   in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

19   Defendants.

20             a.    Feld Winters was subpoenaed by the Justice Department in

21   connection with its investigation of anticompetitive conduct in the Municipal Derivatives

22   business.

23             50.    Defendant George K. Baum & Company ("Baum") is a Missouri

24   corporation with its principal place of business in Kansas City, Missouri. During the Class

25   Period, Baum acted as a broker for Oakland and/or members of the Class in purchasing Municipal

26   Derivatives from one or more of the Municipal Derivatives Seller Defendants.

27             a.    Baum was subpoenaed by the SEC in connection with its

28   investigation of anticompetitive practices in the Municipal Derivatives industry.

1          b.      Baum has been the target of previous governmental investigations

2 related to its Municipal Derivatives business.

3          c.      On November 10, 2006, Baum settled allegations with the IRS that

4 it diverted profits from municipal bond deals.  In one instance the IRS alleged that bidding was

5 rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

6 1999 and issued by the Illinois Development Finance Authority.

7          51.     Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

8 Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

9 During the Class Period, IMAGE acted as a broker for Oakland and/or members of the Class in

10 purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

11 Defendants.

12          a.      IMAGE's Pennsylvania offices were raided by the FBI in

13 November, 2006, at the start of the government's investigation into anticompetitive conduct in the

14 Municipal Derivatives market.

15          52.     Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

16 Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

17 Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for Plaintiff

18 and/or members of the Class in purchasing Municipal Derivatives from one or more of the

19 Municipal Derivatives Seller Defendants.

20          a.      Morgan Keegan has received a subpoena from the Securities and

21 Exchange Commission in connection with the SEC's investigation into anticompetitive practices

22 in the Municipal Derivatives industry.

23          53.     Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

24 corporation maintaining its principal place of business in Delray Beach, Florida.  During the

25 Class Period, PackerKiss acted as a broker for Plaintiff and/or members of the Class in

26 purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

27 Defendants.

28

1    54. Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet

2 Inc., is a corporation maintaining its principal place of business in Aurora, Colorado. During the

3 Class Period, Shockley acted as a broker for Plaintiff and/or members of the Class in purchasing

4 Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

5    55. Defendant Sound Capital Management, Inc. ("Sound Capital") is a

6 Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota.

7 During the Class Period, Sound Capital acted as a broker for Oakland and/or members of the

8 Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

9 Defendants.

10    a. Sound Capital's Minnesota offices were raided by the FBI in

11 November, 2006, at the start of the government's investigation into anticompetitive conduct in the

12 Municipal Derivatives market.

13    56. Defendant Winters & Co. Advisors, LLC ("Winters") is a California

14 limited liability company maintaining its principal place of business in Los Angeles, California.

15 During the Class Period, Winters acted as a broker for Plaintiff and/or members of the Class in

16 purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

17 Defendants.

18           **CO-CONSPIRATORS**

19    57. Various other persons, firms and corporations, not named as Defendants

20 herein, have participated as co-conspirators with Defendants and have performed acts and made

21 statements in furtherance of the conspiracy.

22    58. Whenever in this Complaint reference is made to any act, deed or

23 transaction of any corporation, the allegation means that the corporation engaged in the act, deed

24 or transaction by or through its officers, directors, agents, employees or representatives while they

25 were actively engaged in the management, direction, control or transaction of the corporation's

26 business or affairs.

27

28

**CLASS ACTION ALLEGATIONS**

59.    Oakland brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local or municipal Government Entities and private entities in the United States and its territories that purchased Municipal Derivatives directly from one or more of the Municipal Derivatives Seller Defendants and/or through one or more of the Derivatives Broker Defendants at any time from January 1, 1992 through December 31, 2007. Excluded from the Class are all federal governmental entities and instrumentalities of the federal government.

60.    Oakland does not know the exact number of Class members because such information is in the exclusive control of Defendants. But due to the nature of the trade and commerce involved, Oakland believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

61.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62.    There are questions of law and fact common to the Class, including:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective prices of Municipal Derivatives sold in the United States;

b.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the United States;

c.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for Municipal Derivatives sold in the United States;

d.    The identity of the participants of the alleged conspiracy;

e.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

1          f.       Whether the alleged conspiracy violated Section 1 of the Sherman

2 Act, 15 U.S.C. § 1;

3          g.       Whether the conduct of Defendants and their co-conspirators, as

4 alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code §

5 16720, *et seq.*;

6          h.       Whether the conduct of Defendants and their co-conspirators, as

7 alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof.

8 Code § 17200, *et seq.*;

9          i.       Whether the conduct of Defendants and their co-conspirators, as

10 alleged in this Complaint, caused injury to the business or property of the Oakland and the other

11 members of the Class;

12          j.       The effect of the alleged conspiracy on the effective prices of

13 Municipal Derivatives sold in the United States during the Class Period;

14          k.       Whether the Defendants and their co-conspirators fraudulently

15 concealed the conspiracy's existence from the Oakland and the other members of the Class; and

16          l.       The appropriate class-wide measure of damages.

17      63.      Oakland is a member of the Class, Oakland's claims are typical of the

18 claims of the Class members, and Oakland will fairly and adequately protect the interests of the

19 Class. Oakland is a direct purchaser of Municipal Derivatives, and its interests are coincident

20 with, and not antagonistic to, those of the other members of the Class.

21      64.      Oakland is represented by counsel who are competent and experienced in

22 the prosecution of antitrust and class action litigation.

23      65.      The prosecution of separate actions by individual members of the Class

24 would create a risk of inconsistent or varying adjudications, establishing incompatible standards

25 of conduct for Defendants.

26      66.      The questions of law and fact common to the members of the Class

27 predominate over any questions affecting only individual members, including legal and factual

28 issues relating to liability and damages.

1    67.    A class action is superior to other available methods for the fair and

2    efficient adjudication of this controversy.  The Class is readily definable and is one for which

3    records should exist.  Prosecution as a class action will eliminate the possibility of repetitious

4    litigation.  Treatment as a class action will permit a large number of similarly situated persons to

5    adjudicate their common claims in a single forum simultaneously, efficiently, and without the

6    duplication of effort and expense that numerous individual actions would engender.  This class

7    action presents no difficulties in management that would preclude maintenance as a class action.

8    **TRADE AND INTERSTATE COMMERCE**

9    68.    The activities of Defendants and their co-conspirators, as described in this

10    Complaint, were within the flow of and substantially affected interstate commerce.

11    69.    During the Class Period, Defendants and their co-conspirators issued and

12    sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of

13    interstate commerce to Government Entities located in states other than the states in which the

14    Municipal Derivatives Seller Defendants issued and/or brokered these products.

15    70.    The conspiracy in which the Defendants and their co-conspirators

16    participated had a direct, substantial, and reasonably foreseeable effect on United States

17    commerce.

18    **FACTS**

19    **The Market for Municipal Derivatives**

20    71.    Municipalities and state and local government agencies issue over $2

21    trillion worth of municipal bonds annually.

22    72.    While the tax-free bonds are sold in contemplation of construction, public

23    housing or other public-works projects, municipalities have in the last decade opted to invest the

24    proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk

25    associated with the issuance of large amounts of tax-exempt debt.

26    73.    Municipal Derivatives have become an attractive investment vehicle for

27    municipalities looking to park bond proceeds until the money raised from the sale is actually

28    needed for capital projects, or to protect themselves from interest-rate risk associated with issuing

1   their tax-exempt bonds. There are roughly $40 - $60 billion in Municipal Derivatives created in

2   the United States annually.

3      74. The market for Municipal Derivatives has become more concentrated since

4   the late 1990's, with an increasingly smaller number of investment banks and bond insurers

5   occupying the market.

6      75. The Municipal Derivatives industry has been variously described by

7   market participants as opaque, intertwined and interconnected, all characteristics which facilitate

8   the type of illegal collusion alleged herein. The Municipal Derivatives market lacks transparency,

9   and regulatory and private efforts to impose transparency have not been successful. On July 26,

10  2007, the Chairman of the Securities and Exchange Commission delivered a white paper to

11  Congress calling for improved oversight of the municipal securities market.

12        **The Competitive Bidding Process**

13     76. A wide variety of Municipal Derivatives are sold through competitive

14  bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers

15  acting as their fiduciaries.

16     77. The Competitive Bidding Process involving GICs is illustrative of the way

17  many Government Entities purchase Municipal Derivatives, and indicative of the methods by

18  which the Defendants have succeeded in manipulating these financial instruments pursuant to

19  their bid-rigging and customer allocation conspiracy.

20     78. Flush with proceeds from a muni bond sale, a Government Entity looks to

21  invest in a GIC. The Government Entity will retain a GIC Broker to facilitate the acquisition of

22  the contract. The Government Entities typically pay a fee to the GIC Broker for shopping for

23  GIC Bids.

24     79. In the wake of the so-called "yield-burning" scandal of the 1980's and

25  1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged

26  fees that acted to artificially reduce the yields on their underlying bond issues – the IRS

27  promulgated regulations meant to ensure that Government Entities were purchasing Municipal

28  Derivatives at a fair market value price.

80.     IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-exempt bond investments is required to be rebated to the IRS, absent an exception.

81.     To satisfy these so-called arbitrage rules, any given GIC is structured to limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond whose issuance financed the investment in the GIC in the first place.  The Rate of Return any particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively capped.

82.     Treasury Regulations related to Municipal Derivatives are aimed at ensuring that Government Entities get competitive bids on the interest rate a Municipal Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain procedures.  Essentially, there should be at least three reasonably competitive bids solicited from Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid – that is, no bidder can have a "last look" to review other bids before bidding on the contract.  Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an entity with "an established industry reputation" as a competitive Municipal Derivatives Seller.  The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging has occurred.

83.     The Municipal Derivatives Broker, acting as the fiduciary to the Government Entity, oversees the solicitation and placement of the bids from Municipal Derivatives Sellers.

84.     After hiring a Municipal Derivatives Broker to oversee the solicitation of GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the Competitive Bidding Process.

85.     The parties to a GIC are the Municipal Derivatives Seller, acting as the Counterparty and the Government Entity. The Municipal Derivatives Seller now acting as the Counterparty supplies the most salient term, namely the Rate of Return on the investment.

86.     The GIC entitles the Government Entity to receive the return of the Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to withdraw principal from the GIC as permitted.

87.     Generally, a Government Entity will acquire a GIC in order to invest funds on deposit in a debt service reserve fund or construction fund until it needs to use such funds to service debt or fund the payment of project expenses in accordance with the underlying bond documents.

88.     In exchange for the payment of a guaranteed Rate of Return to the Government Entity, and the full repayment of all principal on a date certain, the Municipal Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity. The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to whatever investment the Municipal Derivatives Counterparty chooses.

89.     The Competitive Bidding Process outlined in the Treasury Regulations mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids from Municipal Derivatives Sellers. Each bidder typically faxes its Bid into the Municipal Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and the time each Bid was received.

90.     Each GIC Bid includes a statement that the Bid was determined without regard to any other formal or informal agreement with another Municipal Derivatives Seller, and that the Bid was not submitted solely as a so-called "courtesy" Bid.

1     91. The Municipal Derivatives Seller that offers the highest-yielding Rate of

2 Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding

3 Process.

4     92. The vast majority of GICs purchased in the United States are purchased

5 pursuant to the competitive bidding process established by Treasury Regulation §1.148-5 *et seq.*,

6 which has been in effect since approximately 1993, and which are only some of the Treasury

7 Regulations governing the reinvestment of municipal bond proceeds.

8     93. The entire GIC bidding and purchasing process, as well as those processes

9 relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even

10 when dealings involve sophisticated and experienced Government Entities.

11     94. Even sophisticated Government Entities (who rely in large part on the

12 Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are

13 the target of the bid-rigging and customer allocation conspiracy alleged herein.

14          **The Bid-Rigging Conspiracy**

15     95. The potential for bid-rigging in any given GIC transaction exists in the

16 exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government

17 Entity looking to invest its bond proceeds.  The Municipal Derivatives Seller Defendants, aided

18 by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a

19 travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

20     96. The Municipal Derivatives Seller Defendants, in concert with the

21 Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal

22 Derivatives bought by Government Entities as part of their bid-rigging and customer allocation

23 conspiracy.

24     97. Bid-rigging of GIC transactions, which are illustrative of anticompetitive

25 conduct in the overall market for Municipal Derivatives, typically occurs when only one firm

26 submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids

27 offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

28

98. Other times, bids are late or incomplete, leaving only one viable bid for the Government Entity to choose from.

99. Although at least one market participant has recently attempted to add transparency to the market by developing a web-based bid auction service, GIC Bids are traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type alleged herein.

100. At least one investment bank has provided the government with transcripts of telephone conversations that indicated that the investment bank and other market participants were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

101. While the winning bid may be financially viable in light of the Treasury Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and does not necessarily provide the Government Entity with the best possible Rate of Return on the investment it is seeking by buying the GIC.

102. The unrealistically low bids – dubbed "courtesy bids" because they are provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is below fair market value – are often more than 100 basis points below the winning bid. As Mark Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumption you can draw is that there are courtesy bids being provided."

103. Often the winning bid is the only one high enough to make the GIC work and be a worthwhile reinvestment vehicle for the Government Entity.

104. According to a speaker at a recent teleconference organized by the National Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of courtesy bids in GICs transactions is quite prevalent. IRS officials have stated that bid-rigging is a wide and pervasive practice in GIC transactions and have uncovered numerous transactions involving rigged bids and customer allocation. A number of these transactions involve both the Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

1          105.   Municipal Derivatives Brokers also routinely offer favored Municipal

2   Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even

3   exclude potential bidders without the Government Entity's knowledge.

4          106.   Evidence seized by the federal government as part of its wide-ranging

5   investigation, including taped telephone conversations, revealed instances in which the winning

6   bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for

7   preferential treatment in later deals.

8          107.   As part of its ongoing investigation into these practices, the IRS also

9   uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for

10   the GIC – that is, provide a less than fair market value interest rate – and then overpay the

11   Municipal Derivatives Broker for other investment agreements or remarketing fees associated

12   with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying

13   bond or result in excess "arbitrage" paid to the federal government.

14          **Governmental Investigations of Defendants' Conspiracies**

15          108.   On Wednesday, November 15, 2006, the FBI began a series of nationwide

16   raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker

17   Defendants. The FBI raids coincided with the service of nearly two dozen subpoenas on other

18   participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers

19   named as Defendants herein.

20          109.   The DOJ's Antitrust Division served subpoenas from a grand jury sitting in

21   the Southern District of New York, and a number of the targeted companies revealed that they

22   had also received subpoenas from the Securities and Exchange Commission in connection with a

23   parallel civil probe.

24          110.   The Antitrust Division is conducting a criminal probe into anticompetitive

25   conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging

26   market participants with continuing acts of conspiracy, and (as detailed above) have targeted a

27   number of individuals for indictment.

28

756814.3                       - 29 -                 CLASS ACTION COMPLAINT

111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused on securities fraud in municipal bond deals undertaken since 2000.  Upon information and belief, the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary corollary to the conspiracy alleged herein.  Such non-disclosure of kickbacks to Municipal Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may subject them to potentially excessive arbitrage payments to the federal government.

112.    The DOJ and SEC investigations follow a lengthy and continuing probe by the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

113.    The Justice Department subpoenas asked for documents, e-mails, tapes or notes of phone conversations and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to [GICs], forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions."

114.    The subpoenas also demanded organizational charts, phone directories, and lists of all employees involved with Municipal Derivatives, in addition to all documents associated with what the subpoenas apparently described as "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding," which would include invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients; actual or proposed responses to those RFPs; and amounts and prices bid for the various investment vehicles.

115.    On February 9, 2007, Defendant Bank of America announced that it entered into a leniency agreement with the Justice Department in connection with what it described as "the Department's investigation into anticompetitive practices in the municipal derivatives industry."

116. Defendant Bank of America noted that the amnesty grant "was the result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."

117. Entry into the DOJ's amnesty program follows presentation of evidence of a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America. Evidence of Defendant Bank of America's dealings, including recorded telephone conversations of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation. Key derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the head of BOA's derivatives department.

118. Defendant Bank of America also disclosed that it had reached a $14.7 million settlement with the IRS relating to the company's role in providing GICs and other agreements to municipal bond issuers.

119. As detailed in Paragraphs 16 to 53 above, a number of individuals have been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives Seller Defendants are facing civil and administrative actions from the SEC in relation to that agency's investigation into anticompetitive practices in the Municipal Derivatives market.

## FRAUDULENT CONCEALMENT

120. Oakland and members of the Class had no knowledge of the agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof, until shortly before the filing of this action. Oakland could not have discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their agreement, contract, combination, and conspiracy. These methods of secrecy included, but were not limited to, secret meetings, misrepresentations concerning the reasons for price increases, encouraging witnesses to give false testimony to the grand jury and government officials, and destroying or concealing evidence of their illegal conduct.

121.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

122.    By their very nature, Defendants' bid-rigging and customer-allocation conspiracy was inherently self-concealing.  The Municipal Derivatives industry is not exempt from antitrust regulation, and thus Oakland reasonably considered it to be a well-regulated competitive industry.

123.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that defendants' bidding and pricing were conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered Municipal Derivatives prices.

124.    Oakland and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.  Such practices are especially prevalent in bid-rigging and customer-allocation conspiracies such as the one alleged herein.

125.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Oakland and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

126.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Oakland and members of the Class have alleged in this Complaint.

127.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

128.    Oakland and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Nor could Oakland or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

129.    Defendants and their co-conspirators engaged in a successful anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

a.    By meeting secretly to discuss effective prices, bids, and customers and markets of Municipal Derivatives in the U.S.;

b.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    By intentionally creating the false appearance of competition by staging sham auctions in which the results were pre-determined; and

d.    By furnishing each other participant in all given bidding sessions with illegal "last looks" at their ostensible competitors' bids.

130.    Oakland and Class members did not know, and could not have discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker Defendants were sham, and that rather than being competitive, the results of the auctions were rigged.

131.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Oakland's and the Class' claims have been tolled.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Violation of Section 1 of the Sherman Act)

132.    From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Oakland and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

b.    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

c.    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

d.    rigging bids for Municipal Derivatives sold in the United States; and

e.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

135. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

136. The Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a. Effective prices paid by Oakland and the members of the Class with respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-competitive levels in the United States;

b. Bids for Municipal Derivatives sold in the United States were rigged;

c. Customers and markets for Municipal Derivatives were allocated among Defendants and their co-conspirators;

d. Oakland and the other members of the Class paid more or received lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

e. Price competition with respect to the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f. As a direct and proximate result of the illegal combination, contract or conspiracy, Oakland and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined, by being deprived of the highest-allowable interest rate on its Municipal Derivatives investment. The courtesy (sometimes also called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the Government Entities by creating the appearance of competition to conceal the secretly deflated interest rate offers.

## SECOND CLAIM FOR RELIEF
### (Violation of the California Cartwright Act, Cal. Bus. & Prof. Code section 16720, *et seq.*)

137.    Oakland, on behalf of itself and all others similarly situated, realleges and incorporates, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

138.    The unlawful conduct of Defendants, including the Defendants headquartered or based in California, was centered in and carried out within California, and Defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

139.    Beginning at least as early as January 1, 1992 through the present, the exact dates being unknown to Oakland, Defendants and various co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, Municipal Derivatives.

140.    For the purpose of forming and implementing the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did those things they conspired to do, including but not limited to the acts alleged above, including actions:

a.    to fix, raise, maintain and stabilize the price of Municipal Derivatives;

b.    to allocate markets for Municipal Derivatives amongst themselves; and

c.    to submit rigged bids for Municipal Derivatives.

141.    In formulating and carrying out the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

1   maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2   Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3   contract, combination, and conspiracy.

4           142.    The combination and conspiracy alleged herein has had the following

5   effects, among others:

6                a.    Price competition in the sale of Municipal Derivatives has been

7   restrained, suppressed and/or eliminated in the State of California and throughout the United

8   States;

9                b.    Prices for Municipal Derivatives sold by Defendants and their

10   co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11   competitive levels in the State of California and throughout the United States; and

12                c.    Those who purchased Municipal Derivatives from Defendants and

13   their co-conspirators have been deprived of the benefit of free and open competition.

14           143.    As a direct and proximate result of the illegal combination, trust,

15   agreement, understanding and concert of action, Oakland and the members of the Class have been

16   injured in their business and property in that they paid more for Municipal Derivatives than they

17   otherwise would have paid in the absence of Defendants' unlawful conduct.

18           144.    As a result of Defendants' violation of Section 16720 of the California

19   Business and Professions Code, Oakland seeks treble damages and the costs of suit, including

20   reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21   Professions Code.

22                     **THIRD CLAIM FOR RELIEF**
**(Violation of the California Unfair Competition Law,**

23                     **Cal. Bus. & Prof. Code section 17200, *et seq.*)**

24           145.    Oakland, on behalf of itself and all others similarly situated, realleges and

25   incorporates, as if fully alleged herein, each of the allegations contained in the preceding

26   paragraphs of this Complaint, and further alleges against Defendants as follows.

27           146.    Defendants' unlawful conduct was centered in, carried out and perfected

28   mainly within the State of California, and Defendants' conduct within California injured all

1    members of the Class throughout the United States.  Therefore, this claim for relief under

2    California law is brought on behalf of all members of the Class, whether or not they are

3    California residents.

4           147.    Beginning at least as early as January 1, 1992 and continuing to the

5    present, the exact dates being unknown to Oakland, Defendants committed acts of unfair

6    competition, as defined by Sections 17200, *et seq*. of the California Business and Professions

7    Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices

8    specified above.

9           148.    Oakland and the members of the Class bring this claim pursuant to

10    Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution

11    and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair

12    Competition Law.

13           149.    Defendants' acts, omissions, misrepresentations, practices and non-

14    disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15    means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16    California Business and Professions Code, Section 17200, *et seq*., in that, for example:

17           a.    the violations of Section 16720, *et seq*., of the California Business

18    and Professions Code, set forth above;

19           b.    the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20           c.    Defendants' acts, omissions, misrepresentations, practices and

21    nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the

22    California Business and Professions Code, and whether or not concerted or independent acts, are

23    otherwise unfair, unconscionable, unlawful or fraudulent;

24           d.    Defendants' act and practices are unfair to consumers of Municipal

25    Derivatives in the State of California and throughout the United States, within the meaning of

26    Section 17200, California Business and Professions Code; and

27           e.    Defendants' acts and practices are fraudulent or deceptive within

28    the meaning of Section 17200 of the California Business and Professions Code.

1        150.    Oakland and each of the Class members are entitled to full restitution

2  and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may

3  have been obtained by Defendants as a result of such business acts or practices.

4        151.    The unlawful and unfair business practices of Defendants, and each of

5  them, as described above, have caused Oakland and the members of the Class to pay supra-

6  competitive and artificially-inflated prices for Municipal Derivatives. Oakland and the members

7  of the class suffered injury in fact and lost money or property as a result of such unfair

8  competition.

9        152.    The conduct of Defendants as alleged in this Complaint violates

10  Section 17200 of the California Business and Professions Code.

11        153.    As alleged in this Complaint, Defendants and their co-conspirators have

12  been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

13  competition. Oakland and the members of the Class are accordingly entitled to equitable relief

14  including restitution and/or disgorgement of all revenues, earnings, profits, compensation and

15  benefits which may have been obtained by Defendants as a result of such business practices,

16  pursuant to the California Business and Professions Code, Sections 17203 and 17204.

17                                **PRAYER FOR RELIEF**

18        WHEREFORE, the Plaintiff prays for relief as follows:

19        1.    That the Court determine that this action may be maintained as a class

20  action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Oakland be

21  certified as a class representative and Oakland's counsel be appointed as counsel for the Class;

22        2.    That the unlawful contract, combination or conspiracy alleged be adjudged

23  and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the

24  Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the

25  Cartwright Act);

26        3.    That the unlawful contract, combination or conspiracy alleged be adjudged

27  and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the

28  California Business & Professions Code (the Unfair Competition Law);

1        4.    That Oakland and the Class recover damages and restitution, as provided

2    by law, determined to have been sustained as to each of them, in an amount to be trebled in

3    accordance with the antitrust laws, and that judgment be entered against defendants on behalf of

4    Oakland and of the Class;

5        5.    That Oakland and the Class recover their costs of the suit, including

6    attorneys' fees, as provided by law; and

7        6.    For such other and further relief as is just under the circumstances.

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1                           **DEMAND FOR JURY TRIAL**

2             Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

3 a jury trial as to all issues triable by a jury.

4

5 Dated: April 23, 2008             By: _John A. Russo ( by sb)_

6                                John A. Russo

7                        John A. Russo, City Attorney (SBN 063203)
                       *jrusso@oaklandcityattorney.org*

8                        Barbara Parker, Chief Asst. City Attorney (SBN 069722)
                       *bparker@oaklandcityattorney.org*

9                        Mark Morodomi, Supervising Deputy City Attorney
                       (SBN 120914)

10                       *mmorodomi@oaklandcityattorney.org*
                       Kathleen Salem-Boyd, Deputy City Attorney (SBN
                       100179)

11                       *ksalemboyd@oaklandcityattorney.org*
                       CITY OF OAKLAND

12                        One Frank H. Ogawa Plaza, 6th Floor
                       Oakland, California 94612

13                        Telephone: (510) 238-3034
                       Facsimile: (510) 238-6500

14

15                        Richard M. Heimann (SBN 63607)
                       *rheimann@lchb.com*

16                        Joseph R. Saveri (SBN 130064)
                       *jsaveri@lchb.com*

17                        Eric B. Fastiff (SBN 182260)
                       *efastiff@lchb.com*

18                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                       275 Battery Street, 30th Floor

19                        San Francisco, CA 94111
                       Telephone:   (415) 956-1000

20                        Facsimile:   (415) 956-1008

21                        James A. Quadra (SBN 131084)
                       *quadra@meqlaw.com*

22                        Sylvia Sokol (SBN 200126)
                       *sokol@meqlaw.com*

23                        MOSCONE, EMBLIDGE & QUADRA, LLP
                       220 Montgomery Street

24                        Mills Tower, Suite 2100
                       San Francisco, CA 94104

25                        Telephone:   (415) 362-3599
                       Facsimile:   (415) 362-2006

26

27

28

1    Steven E. Fineman (SBN 140335)
     *sfineman@lchb.com*
2    Daniel E. Seltz
     *dseltz@lchb.com*
3    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     780 Third Avenue, 48th Floor
4    New York, NY  10017
     Telephone:    (212) 355-9500
5    Facsimile:    (212) 355-9592

6    *Attorneys for Individual and Representative Plaintiff*
     *City of Oakland, California*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit B

### SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

———

FACSIMILE (212) 455-2502



DIRECT DIAL NUMBER

212-455-3203

E-MAIL ADDRESS
jwayland@stblaw.com

### BY HAND DELIVERY



April 17, 2008

Re:     *Haywood County, Tennessee v. Bank of America, N.A. et al.,* (08 Civ. 3002) (LTS) (JCF)

The Honorable Laura T. Swain
Federal District Judge
United States District Court
Southern District of New York
United States Courthouse
500 Pearl St., Room 755
New York, N.Y. 10007

Dear Judge Swain:

    We represent JPMorgan Chase & Co. in connection with the above referenced case.[1] We write to request that the Court amend the Initial Conference Order dated April 14, 2008 (the "Initial Conference Order") to adjourn the date of the initial conference. Specifically, we request that the Court postpone the initial conference pending a determination by the Judicial Panel on Multidistrict Litigation (the "MDL Panel") concerning the proper venue for this suit. It is our understanding that eight of the nine

---

[1]     JPMorgan Chase & Co. has yet to be served with a complaint in this suit. In submitting this application, JPMorgan Chase & Co. reserves all defenses in this suit, including defenses and objections based on personal jurisdiction and lack of proper service of process.

defendants named in this action join in this application.[2]  In addition, we have conferred
with counsel for plaintiff who takes no position on this request.

        The above-referenced case is an alleged antitrust action against numerous
corporate defendants.  Another similar suit is pending before your Honor in the Southern
District of New York,[3] and two other related cases are pending in the District Court for the
District of Columbia.[4]  There is currently pending before the MDL Panel a motion to
transfer and consolidate these cases to the District Court for the District of Columbia.[5]  To
our knowledge all of the parties in the several suits agree that transfer and consolidation of
these actions in one district is appropriate.  The sole disagreement is the relevant forum – the
District of Columbia or New York.

        In an order dated April 2, 2008, the Court scheduled an initial conference in
the related action, *Hinds County, Mississippi v. Wachovia Bank, N.A., et al.*, S.D.N.Y. No.
08-CV-2516 (LTS).  By letter dated April 8, 2008, the parties to the *Hinds County* action
requested adjournment of the initial scheduling conference due to the pendency of the MDL
proceeding.  On April 10, 2008, this Court granted that request for an adjournment.  For the

---

[2]     We do not presently know who represents the one remaining defendant, Feld Winters
        Financial, LLC, and therefore have been unable to contact them regarding this request.

[3]     *See Hinds County, Mississippi v. Wachovia Bank, N.A., et al.*, S.D.N.Y. No. 08-CV-2516
        (LTS).

[4]     *See Fairfax County, Virginia et al. v. Wachovia Bank, N.A. et al.*, D.D.C. Case No. 1:08-cv-
        00432 (JR); *Fairfax County, Virginia et al. v. Bank of America N.A.*, D.D.C. Case No. 1:08-
        cv-00433 (JR).

[5]     *See* Plaintiff Fairfax County, Virginia's Revised Notice of Motion and Motion for Transfer
        of Related Actions to the District of Columbia Pursuant to 28 U.S.C. § 1407 for
        Consolidated Pretrial Proceedings.

The Honorable Laura Swain                -3-                April 17, 2008

same reasons, we respectfully request that the initial scheduling conference in the above-
reference action be adjourned.

As we noted previously, the purpose of a Multidistrict Litigation transfer is to
conserve judicial resources, in part by preventing premature and potentially wasteful judicial
action. *See, e.g., In re Computervision Corp. Secs. Litig.,* 814 F. Supp. 85, 86 (J.P.M.L.
1993) (centralization and transfer is necessary to "prevent inconsistent pretrial rulings . . .
and conserve the resources of the parties, their counsel and the judiciary."). Until the MDL
Panel makes its determination concerning the appropriate venue of this case, an initial
conference would be premature and wasteful of this Court's valuable resources. For
example, if the MDL Panel transfers all cases to the District Court for the District of
Columbia, there would be no need for any conference. Alternatively, if the MDL Panel
determines that the Southern District of New York is the proper venue, this Court would
then need to revisit any orders or deadlines that might otherwise be set at the currently
scheduled conference.

Thus, defendants request that the Court amend its Initial Conference Order to
adjourn the currently scheduled June 20, 2008 conference date pending the MDL Panel's
determination of the proper venue for this suit.

The June 20, 2008 conference date is
adjourned pending further order of the
Court.

SO ORDERED.

4/18/08

**LAURA TAYLOR SWAIN, U.S.D.J.**

Respectfully submitted,

Joseph F. Wayland

J.L.F.

cc:    All counsel on attached service list